*No. 25-____*

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

KAELI GARNER, et al.,

*Plaintiffs-Respondents,*

v.

AMAZON.COM, INC., a Delaware Corporation, and AMAZON.COM
SERVICES, LLC, a Delaware Limited Liability Company;

*Defendants-Petitioners,*

**The United States District Court**
**Western District of Washington**
**Hon. Robert S. Lasnik**
**Case No. 2:21-cv-00750-RSL**

**PETITION OF AMAZON.COM, INC. AND**
**AMAZON.COM SERVICES, LLC FOR PERMISSION TO APPEAL**
**PURSUANT TO FED. R. CIV. P. 23(F)**

Brian D. Buckley (WSBA No. 26423)  Jedediah Wakefield (CSB No. 178058)
Y. Monica Chan (WSBA No. 58900)  Tyler G. Newby (CSB No. 205790)
FENWICK & WEST LLP  Armen Nercessian (CSB No. 284906)
401 Union Street, 5th Floor  FENWICK & WEST LLP
Seattle, WA 98101  555 California Street, 12th Floor
Telephone:  206.389.4510  San Francisco, CA 94104
Facsimile:   206.389.4511  Telephone:  415.875.2300
 Facsimile:   415.281.1350

Counsel for Defendants-Petitioners
*Amazon.com, Inc. and Amazon.com Services, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel of record for Defendants-Petitioners Amazon.com, Inc. and Amazon.com Services, LLC (collectively "Amazon"), certifies that Amazon has no parent corporation and there is no publicly held corporation that owns 10% or more of Amazon's stock.

Dated: July 21, 2025       FENWICK & WEST LLP


By: */s/ Brian D. Buckley*
     Brian D. Buckley

Counsel for Defendants-Petitioners
AMAZON.COM, INC. and
AMAZON.COM SERVICES, LLC

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ...................................................................................1

QUESTIONS PRESENTED..................................................................2

JURISDICTIONAL STATEMENT .......................................................3

BACKGROUND .................................................................................3

LEGAL STANDARD...........................................................................7

ANALYSIS .........................................................................................8

    A.    STANDING OF UNINJURED CLASS MEMBERS
           PRESENTS AN UNSETTLED AND FUNDAMENTAL
           ISSUE OF LAW..............................................................8

    B.    PLAINTIFFS FAILED TO PROVIDE A MODEL TO
           CALCULATE CLASS DAMAGES..................................17

           1.    Whether Amazon Derived Value From Recordings Is
                Irrelevant To Plaintiffs' Damages Theory. ...............18

           2.    Plaintiffs Offered No Method To Measure The
                "Value" Of Recordings—Even As To Amazon. ......................20

           3.    The District Court Failed To Assess The Reliability Of
                Plaintiffs' Damages Evidence..................................22

CONCLUSION....................................................................................24

CERTIFICATE OF COMPLIANCE.......................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Cashatt v. Ford Motor Co.*,
2020 WL 1987077 (W.D. Wash. Apr. 27, 2020) ................................9

*Castillo v. Bank of Am., NA*,
980 F.3d 723 (9th Cir. 2020) ...........................................................16

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) .............................................................7

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..........................................................17, 18, 19, 21

*Davis v. Lab. Corp. of Am. Holdings*,
604 F. Supp. 3d 913 (C.D. Cal. 2022) .............................................11

*Del Vecchio v. Amazon.com, Inc.*,
2012 WL 1997697 (W.D. Wash. June 1, 2012) .........................18, 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)..........................................................................17

*Harvey v. Centene Mgmt. Co. LLC*,
2020 WL 2411510 (E.D. Wash. May 12, 2020).................................9

*In re Bank of Am. Cal. Unemployment Bens. Litig.*,
2025 WL 943089 (S.D. Cal. Mar. 28, 2025) ....................................12

*Lab. Corp. of Am. Holdings v. Davis*,
145 S. Ct. 1608 (2025)..........................................................7, 8, 11

*Lytle v. Nutramax Labs., Inc.*,
114 F.4th 1011 (9th Cir. 2024) ..................................................*passim*

*Mazza v. American Honda Motor Co., Inc.*,
666 F.3d 581 (9th Cir. 2012) .....................................................*passim*

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (2022) (en banc) ...................................................*passim*

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ...........................................................22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..............................................................................8

*Van v. LLR, Inc.*,
61 F.4th 1053 (9th Cir. 2023) .........................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)............................................................................17

*Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*,
858 P.2d 1054 (Wash. 1993) ...........................................................18

## STATUTES AND RULES

28 U.S.C. § 1292(e) ...............................................................................3

Fed. R. App. P. 5 ....................................................................................3

Fed. R. Civ. P. 23 ........................................................................*passim*

Fed. R. Evid. 702 ............................................................................6, 22

Wash. Rev. Code § 19.86.090................................................................18

Washington Consumer Protection Act .........................................*passim*

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 23(f), Amazon submits this Petition for permission to take an immediate appeal from the district court's order certifying a damages class of registered users of Amazon's Alexa service. App. Ex. A (Dkt. 492) ("Order"). The Order is manifestly erroneous and the Court should clarify an unsettled and fundamental issue of law regarding class-action standing.

The district court certified a Rule 23(b)(3) damages class of every registered Alexa user—unlimited by time and unqualified in any way—to assert a single claim under the Washington Consumer Protection Act ("WCPA"). By definition, that class will include potentially millions of people who suffered no possible or conceivable harm caused by the Alexa service, and therefore lack standing. That overbroad class violates Article III of the Constitution and cannot be certified under well-established Ninth Circuit law. Yet the district court entirely ignored standing issues and instead misapplied a Rule 23(b) predominance analysis, perpetuating widespread confusion about the meaning of this Court's decision in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc). That was manifest error, and the Court should accept review to dispel the confusion and clarify Ninth Circuit law regarding the requirements of class-action standing.

The district court's predominance analysis under Rule 23(b) was also manifestly erroneous. To certify any damages class, Plaintiffs bear the burden of providing a viable model or methodology for measuring damages on a classwide basis, even if that model will be applied—i.e., Plaintiffs will "do the math"—after certification. Plaintiffs failed to carry that burden in two respects. <u>First</u>, Plaintiffs proposed that damages be measured by the value *to Amazon* of Alexa recordings, but it is black-letter law that benefit to the defendant is not cognizable harm under the WCPA—*plaintiffs* must have suffered a loss. <u>Second</u>, even if the value to Amazon were relevant, Plaintiffs proffered literally no model or methodology to determine or measure that value. That alone precludes class certification.

The Court should grant this Petition and allow Amazon to immediately appeal these critical issues.

## QUESTIONS PRESENTED

1.     Did the district court manifestly err by certifying a Rule 23(b)(3) class that, as defined, necessarily contains many class members who lack Article III standing? And should the Court grant review to offer guidance on that fundamental, and ostensibly unsettled, issue of law?

2.     Did the district court manifestly err by certifying the registrant class under Rule 23(b)(3) when Plaintiffs have failed to offer any workable method capable of measuring classwide damages attributable to their theory of liability?

2

3.     Did the district court manifestly err by failing to evaluate the reliability of Plaintiffs' damages evidence, failing to resolve expert disputes raised by Amazon's rebuttal expert, and ignoring Amazon's challenge to Plaintiffs' expert under Federal Rule of Evidence ("FRE") 702?

## JURISDICTIONAL STATEMENT

Pursuant to Federal Rule of Civil Procedure 23(f), Federal Rule of Appellate Procedure 5, and 28 U.S.C. § 1292(e), Amazon timely seeks leave to appeal from the district court's Order.

## BACKGROUND

Amazon offers the popular Alexa service, a voice-activated personal assistant. Through Alexa, users can access a wide array of news, music, weather, trivia, entertainment, movies, books, and much more. Users can access the Alexa service through many different Alexa-enabled devices, including hands-free devices like the Echo line of smart speakers or "push-to-talk" devices like the Fire TV stick, a physical remote that requires the user to push a button and speak. *See* Dkt. 301 (Class Cert. Opp.) at 3. To activate Alexa, users press a physical button or say a "wake word" (typically "Alexa"), followed by a command or request. *Id.* When a user first signs up for Alexa, Amazon discloses that it retains audio recordings of Alexa interactions, and uses those recordings to provide and improve the Alexa service. *Id.* at 4-5; Dkt. 59 (Complaint) ¶¶ 95-100. Registrants also agree to Alexa

3

terms that expressly permit use of recordings to improve Alexa. Dkt. 59 ¶¶ 95-100 And it is undisputed that Amazon discloses to Alexa users in myriad other ways that the Alexa service records audio and stores it, unless the user chooses otherwise. Dkt. 301 at 5, 14-15.

Amazon also widely discloses that, like every technology, the Alexa service is not perfect. Sometimes the service experiences what are called "false wakes," where the service believes it detected the wake word when it was not in fact spoken. *Id.* at 4. In theory a false wake could record audio that was not intended for Alexa, but the only way to determine whether a wake was in fact "false" is to review each individual recording and listen for the wake word. *Id.* at 19-20.

Plaintiffs are longtime Alexa users who claim that, through the Alexa service, Amazon "surreptitiously" intercepted, recorded, and used Plaintiffs' private communications without their knowledge or consent. The district court categorized Plaintiffs as either "registrants" who personally signed up for Alexa or registered an Alexa-enabled device, or "non-registrants" who did not personally sign up for the Alexa service. Dkt. 91 (Order Granting in Part Amazon's MTD) at 1-2. Those categorizations are in dispute because discovery revealed that several Plaintiffs who claimed to be non-registrants in fact registered Alexa accounts or devices. Dkt. 301 at 9-10. Plaintiffs asserted claims for violation of the Washington Consumer Protection Act ("WCPA") and various state wiretapping laws. Dkt. 59, ¶¶ 143-357.

4

On May 6, 2022, the district court granted in part Amazon's motion to dismiss, substantially narrowing the case. Dkt. 91. The district court ruled that, through the Alexa registration process, registrants receive notice of, *and expressly consent to*, Alexa recordings, including false wake recordings. *Id.* at 12-17. As a result, the district court dismissed the registrants' state wiretapping claims, leaving only their WCPA claim. *Id.* at 27-28. The district court allowed non-registrants to proceed with both the WCPA and wiretapping claims. *Id.*

On June 18, 2024, pursuant to Rule 23(b)(2) and (b)(3), Plaintiffs moved to certify (1) a nationwide registrant class, defined as "[a]ll persons in the United States who registered one or more Alexa devices," and (2) several state-specific non-registrant classes, defined as all persons in a particular state "who never registered an Alexa device and resided with a Registrant while an Alexa device was active and operational." Dkt. 255 (Class Cert. Mot.) at 2. According to Plaintiffs, members of the registrant class "bring a claim under the WCPA for the same wrongdoing (Amazon's undisclosed retention and use of recordings not intended for Alexa)," and "each Registrant suffered the same injury, having been deprived of the inherent value of their personal data that Amazon surreptitiously collected and used." *Id.* at 14, 22-23. As the only support for their WCPA damages theory, Plaintiffs submitted a declaration from purported expert Jonathan Hochman. App. Ex. B (redacted version of Dkt. 255-12) ("Hochman Decl."). Hochman opined that

5

"[e]ach user's data has discrete value" because some companies, in other contexts with other types of data, may offer "[o]pportunities to trade or sell your personal data." *Id.* ¶ 95.

On October 7, 2024, Amazon filed its class-certification opposition. Dkt. 301. Amazon submitted evidence that many putative class members were never recorded by the Alexa service and therefore undeniably lack Article III standing. *Id.* at 8-9. That included over 900,000 users who configured the Alexa service not to make or store recordings, meaning that those people were never recorded, or their recordings have since been deleted through their own actions. *Id.* at 4, 8. And even for people who were recorded by Alexa, resolving individual questions about the circumstances and number of recordings would require a review of every recording, on every account, for every one of the millions of putative class members. Not only is that process prohibitively time-consuming, but having gone through the recording review process themselves, Plaintiffs admitted that they had difficulty identifying voices in recordings and often misidentified their own recordings. *Id.* at 6.

On October 7, Amazon also moved to exclude Hochman under FRE 702. Dkt. 312 (Amazon's Mot. to Exclude Hochman). Amazon offered a rebuttal expert declaration from Professor Lorin Hitt, a leading academic in the economics of information, who opined that neither Hochman nor any of Plaintiffs' other experts

6

have offered any viable method to measure classwide damages in this case.  App. Ex. C (redacted version of Dkt. 300) ("Hitt Decl.").

On July 7, 2025, without holding a hearing, the district court partially granted Plaintiffs' motion and certified two Alexa registrant classes, one seeking injunctive relief under Rule 23(b)(2) and one seeking WCPA damages under Rule 23(b)(3). Order at 30-31.  According to the district court, "the registrant class seeks compensation for the value of the false wake recordings defendants have compiled." *Id*. at 3 (citation modified).  The district court correctly declined to certify the non-registrant classes, in part because individualized inquiries about putative class members' consent, reasonable expectations of privacy, and damages would predominate over any common issues. *Id.* at 19-22.  The district court still has not ruled on Amazon's motion to exclude Hochman, nor is there any indication in the Order that the district court even considered Professor Hitt's declaration.

## LEGAL STANDARD

As relevant to this Petition, a Rule 23(f) petition should be granted when (1) "the certification decision presents an unsettled and fundamental issue of law relating to class actions," or (2) "the district court's class certification decision is manifestly erroneous." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005).  Both grounds apply here.

## ANALYSIS

### A. STANDING OF UNINJURED CLASS MEMBERS PRESENTS AN UNSETTLED AND FUNDAMENTAL ISSUE OF LAW.

There currently is no more unsettled and fundamental issue relating to class actions than "whether federal courts may certify a Rule 23 damages class that includes both injured and uninjured members." *Lab. Corp. of Am. Holdings v. Davis*, 145 S. Ct. 1608, 1610 (2025) (Kavanaugh, J., dissenting) ("*LabCorp*"). There is a long-standing circuit split on that issue that many assumed would be resolved by the Supreme Court's decision in *LabCorp*. Unfortunately, in June, the Supreme Court dismissed the writ of certiorari in *LabCorp*, on purely procedural grounds, thereby leaving open and unresolved this "important class-action question." *Id.*

There is widespread confusion and disagreement among courts and lawyers with respect to Ninth Circuit law on Article III standing in the class-action context. That confusion stems from a misreading and misconstruction of this court's decision in *Olean*, which hinged on a *predominance* analysis under Rule 23, *not on standing*. Here, the district court erroneously applied *Olean*'s principles regarding predominance to a proposed damages class that is unconstitutionally overbroad under Article III. By accepting this appeal, the Court can clarify and confirm Ninth Circuit law.

To take a step back, in order to recover damages, every class member—like any other litigant—must have Article III standing. *TransUnion LLC v. Ramirez*,

8

594 U.S. 413, 430 (2021). Properly considered, this is not a class-action concept but a constitutional concept. Thus, Article III standing always requires "an injury in fact" that is "fairly traceable to the challenged conduct" of the defendant, regardless of whether the injured person seeks to remedy that injury as a named plaintiff or as a member of a certified class. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 594 (9th Cir. 2012) ("[N]o class may be certified that contains members lacking Article III standing.").

Courts sometimes describe the fatal lack of classwide standing in terms of the class being "overbroad" as defined. *See, e.g.*, *Cashatt v. Ford Motor Co.*, 2020 WL 1987077, at *4 (W.D. Wash. Apr. 27, 2020) ("For example, a class definition may be overbroad if it includes individuals who sustained no injury and therefore lack standing to sue."); *Harvey v. Centene Mgmt. Co. LLC*, 2020 WL 2411510, *6 (E.D. Wash. May 12, 2020) ("That the proposed class would inevitably contain many members who never suffered the alleged primary injury is itself fatal to Plaintiff's motion.") (citation omitted). In *Mazza*, a false advertising case, the district court "certified a class that included all persons who purchased or leased an Acura RL with the CMBS between August 2005 and class certification," regardless of whether they were exposed to the false advertising. 666 F.3d at 596. The court rejected that class and vacated certification, stating that "the relevant class must be defined in such a way as to include only members who were exposed to advertising

9

that is alleged to be materially misleading. The relevant class must also exclude those members who learned of the CMBS's allegedly omitted limitations before they purchased or leased the CMBS system." *Id.*[1]

In *Olean*, the court affirmed the key holding of *Mazza*. 31 F.4th at 682 n.32. The court overruled *Mazza only* as it applies to classes exclusively seeking injunctive or declaratory relief, where only one plaintiff needs Article III standing. *Id.* In all other respects, the *Olean* court "[did] not overrule *Mazza* as to any other holding which remain[s] good law." *Id.* Indeed, the *Olean* court expressly noted that courts "must consider *whether the possible presence of uninjured class members means that the class definition is fatally overbroad. When a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.*" *Id.* at 669 n.14 (emphasis added, citation modified). Consequently, it remains the unequivocal law in the Ninth Circuit that, for a class

---

[1] The *Mazza* court also noted that the standing issues undermined the predominance of common issues under Rule 23, 666 F.3d at 596, but that is neither the crux nor the importance of the holding. *Mazza* established, *without qualification*, that "*no class may be certified*" if it is defined to include members without standing, *id.* at 594 (emphasis added), and, as addressed below, *Olean* did not disturb that rule. Under a Rule 23 rubric, that means a constitutionally "overbroad" class automatically defeats predominance.

seeking *damages*, "no class may be certified that contains members lacking Article III standing." *Mazza*, 666 F.3d at 594.

Subsequent confusion about the meaning and scope of *Olean* stems from the balance of the decision, which involved *exclusively* predominance issues, *not* standing issues. In fact, the court itself made that fact clear, stating: "We need not consider the Tuna Suppliers' argument that the possible presence of a large number of uninjured class members raises *an Article III issue*, because the Tuna Purchasers have demonstrated that *all class members have standing here*." 31 F.4th at 682 (emphases added). In other words, as the *Olean* classes were defined, the court concluded that all of the putative class members were *potentially* harmed by the anticompetitive conduct at issue, and whether they were *in fact* harmed could be determined later (a much easier task in an antitrust case involving harm to the market segment as a whole). Similarly, in *LabCorp*, the defined class comprised "[a]ll legally blind individuals in California who visited a LabCorp patient service center in California during the applicable limitations period and were denied full and equal enjoyment … due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals," *Davis v. Lab. Corp. of Am. Holdings*, 604 F. Supp. 3d 913, 934 (C.D. Cal. 2022), which the court ostensibly believed described only people who were at least potentially harmed. Had the proposed class instead comprised "all

legally blind individuals in the United States, whether or not they visited a LabCorp site," it obviously would have failed under *Mazza*.

Stated differently, there are two distinct questions at play. <u>First</u>, can a court ever certify a class that, *by definition*, includes uninjured people? *Mazza* says no, categorically, and *Olean* affirms that holding as the law in the Ninth Circuit. That first question is one of unconstitutional "overbreadth" under Article III. <u>Second</u>, if a class is defined to include only people who were *potentially* injured, does resolving questions of injury *in fact* mean that individualized issues predominate? That is a Rule 23 predominance question addressed in cases like *Olean*. Courts, including several Circuits, are divided on those core questions. *See, e.g.*, *In re Bank of Am. Cal. Unemployment Bens. Litig.*, 2025 WL 943089, *3 (S.D. Cal. Mar. 28, 2025) (noting that courts are divided on two issues: "1) whether Article III bars certification of a proposed Rule 23(b)(3) class that contains uninjured members; and 2) whether Rule 23(b)(3) bars certification of a proposed class with an appreciable number of uninjured members").

To illustrate the point, imagine a 500-home housing development where the developer paints some of the houses with blue paint, which is later discovered to contain lead. One homeowner with a blue house files a putative class action on behalf of other owners and proposes a putative class comprising every homeowner in the development. Could that class be certified? Of course not, but not because of

predominance concerns. Someone could easily drive around the development and record the addresses of the blue houses—that straightforward factual inquiry would not preclude class treatment. The proposed class could not be certified because, as defined, it necessarily includes people who were not harmed. That class (as defined) necessarily includes—not *might* include (depending on the facts) but *must* include— people who lack standing under Article III. That is not a Rule 23 predominance problem but a constitutional problem based on an overbroad class definition. *Mazza* says that such a class can never be certified.

On the facts, this case is plainly *Mazza*, not *Olean*. Here, Plaintiffs sought, and the district court certified, "a nationwide class of everyone who registered one or more Alexa devices to pursue a [W]CPA claim for unfair or deceptive trade practices." Order at 3, 31. That class of all Alexa registrants is unbounded by time— including by the applicable statute of limitations, which is four years under the WCPA—and is unqualified in any way, including by whether the class members suffered harm. The district court acknowledged that "the registrant class seeks [] compensation for the value of the false wake recordings defendants have compiled," *id*. at 3, but the certified class is not so limited. By definition, it includes Alexa registrants who were never recorded by a false wake (or otherwise) or "deprived" of the "value" of their recordings (whatever that "value" conceivably could be).

Worse, the undisputed facts established that over 900,000 registered Alexa users enabled Alexa's "do-not-save-recordings" feature, which means that either they were never recorded or those recordings are now gone (by virtue of the users' own voluntary actions) and they could never prove injury. Many thousands or tens of thousands more Alexa users only registered "push-to-talk" devices and did not experience false wakes because their devices do not record unless a button is pressed. Many people registered Alexa devices and gave them away without using them, as one of the named Plaintiffs did. Many Alexa users are mute or non-verbal and could never have activated Alexa with their voices. And many Alexa users stopped using their Alexa devices outside the four-year WCPA statute-of-limitations period and have no legally viable claim. These are not hypothetical or speculative facts, they are certainties established in the record—and all of those categories of Alexa users are members of the certified class as the district court defined it. As such, those putative class members are no different than the Acura RL purchaser who never saw a misleading ad, the blind person who never entered a LabCorp facility, or the hypothetical homeowner without a blue house. Again, "when a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, *the class is defined too broadly to permit certification*." *Olean*, 31 F.4th at 669 (emphasis added, citation modified).

The district court did not address the overbreadth of Plaintiffs' proposed classes, or analyze the implications of *Mazza* or the requirements of Article III. Instead, the court misapplied the *Olean* principles regarding predominance (more on that below) and ignored standing. Under Rule 23(f), that has two implications. First, Amazon respectfully submits that the district court's conclusion is manifest error that cannot possibly square with *Mazza*. That error alone is a basis for the Court to accept review. Second, the continuing confusion regarding the meaning of *Olean* should be put to bed.

Finally, had the district court properly addressed the overbreadth of Plaintiffs' proposed classes, it would have been unnecessary to reach predominance questions. But in analyzing predominance, the district court also misapplied Ninth Circuit law. In *Olean*, the court simply declined to adopt a per se rule that a class "that potentially includes more than a de minimis number of uninjured class members" cannot be certified. *Id*. at 669. But it noted that a per se rule was unnecessary because the predominance rubric under Rule 23(b)(3) already requires a court to conduct a "rigorous analysis" of whether "the need to identify uninjured class members will predominate and render an adjudication unmanageable." *Id*. at 669 n.13 (citation modified). Beyond that, *Olean* is factually distinguishable, and not particularly helpful with respect to a predominance analysis, because it was an antitrust case

15

where the anticompetitive conduct allegedly harmed the market segment and, thereby, consumers in a common way.

This case is very different. The registrant class that the district court certified is seeking "compensation for the value of the false wake recordings defendants have compiled." Order at 3. That means, at a minimum, that an injured class member must have been recorded by at least one Alexa false wake, but the class necessarily contains hundreds of thousands, and conceivably millions, of people who never were. That includes the over 900,000 users who configured the Alexa service not to make or store recordings, countless users who registered only push-to-talk devices, countless more people who registered devices and gave them away, and countless more who stopped using Alexa outside the statute-of-limitations period. Moreover, the district court already ruled that registrants consent to being recorded, so an injured class member must be one who did not understand and consent to Alexa's recording practices for false wakes. *See Mazza*, 666 F.3d at 596 ("The relevant class must also exclude those members who learned of the CMBS's allegedly omitted limitations before they purchased or leased the CMBS system.").

The district court acknowledged that the class, as defined, would require an "account review" for each class member just to identify and exclude those who are uninjured. Order at 29. Yet the district court did not "rigorously analyze," and Plaintiffs did not produce any evidence regarding, how that individualized account

16

review conceivably could be "workable." *Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023). Just identifying people who were recorded by a false wake would require reviewing *billions* of Alexa recordings. And then the district court would be required to assess what each potential class member understood about Alexa, given the myriad disclosures and other sources of information about Alexa recordings. That is the essence of a scenario where individualized issues overwhelm common ones. *See, e.g.*, *Castillo v. Bank of Am., NA*, 980 F.3d 723, 732-33 (9th Cir. 2020).

### B. PLAINTIFFS FAILED TO PROVIDE A MODEL TO CALCULATE CLASS DAMAGES.

To certify a class, plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014). To certify a Rule 23(b)(3) class, Plaintiffs must prove that damages can be measured on a classwide basis using a common methodology. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). A damages model must measure only those damages attributable to plaintiffs' theory of liability; otherwise, it "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id*. A court must conduct a "rigorous analysis"—which frequently overlaps with the merits of the underlying claim—to determine whether plaintiffs' damages model is consistent with plaintiffs' liability case. *Id*. (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

17

Additionally, when plaintiffs rely on expert testimony to support their damages model, the court must determine whether the expert's methodology is reliable. *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1032 (9th Cir. 2024).

Here, Plaintiffs failed to offer *any* model that is capable of reliably measuring their claimed injury under the WCPA. <u>First</u>, Plaintiffs' expert, Hochman, merely argued that Alexa recordings have value *to Amazon*. But under the WCPA, "[i]t is not enough to allege only that the information has value to Defendant; the term 'loss' requires that Plaintiffs suffer a detriment." *Del Vecchio v. Amazon.com, Inc.*, 2012 WL 1997697, at *4 (W.D. Wash. June 1, 2012). Plaintiffs offered no methodology to measure any *loss* that *they* supposedly incurred. Nor could they, as they maintained access to their Alexa recordings at all times and could have monetized them as they saw fit. <u>Second</u>, even if the value *to Amazon* were a proper measure of damages, Plaintiffs failed to identify a methodology for actually measuring that value. <u>Third</u>, the district court erred by failing to assess the reliability of Plaintiffs' expert evidence. In the absence of any viable and reliable model for assessing damages on a classwide basis, the district court manifestly erred by certifying the registrant class.

### 1. Whether Amazon Derived Value From Recordings Is Irrelevant To Plaintiffs' Damages Theory.

Plaintiffs' WCPA theory of liability is that Amazon failed to fully disclose its practices for storing and using Alexa voice recordings. Dkt. 255 at 10. The WCPA

18

allows recovery of "actual damages" by a person injured in his or her "business or property."  Wash. Rev. Code § 19.86.090; *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 858 P.2d 1054, 1061 (Wash. 1993).  Plaintiffs offer only one theory of injury: that Alexa registrants lost the "value" of their voice recordings.  Dkt. 255 at 22-23 ("The loss of the value of that data constitutes a common injury for the Registrants").  Therefore, under *Comcast*, Plaintiffs' damages model must be capable of reliably measuring *that* specific claimed injury on a classwide basis.

Plaintiffs failed to meet their burden because they never identified a model to measure any "value" they supposedly "lost."  Instead, Plaintiffs relied on their expert, Hochman, who claimed without elaboration that "data has discrete value" and that "Amazon gets value" from recordings.  Ex. B, ¶¶ 87, 102.  But that measures the wrong thing.  "Value" in the abstract, or value to a defendant, does not equate to injury or loss to the plaintiff.  *See Del Vecchio*, 2012 WL 1997697, at *4.  None of Plaintiffs' experts even attempted to value anything lost by Alexa registrants, nor did they offer any model for doing so.  As Amazon's expert, Professor Hitt, observed, "Plaintiffs' experts … [all] testified in deposition that they did not opine on damages in this matter or propose a method to calculate the lost value of information to members of the Putative Classes."  Ex. C, ¶ 34.

On this threshold basis alone, the district court manifestly erred by certifying the registrant damages class.  *See Lytle*, 114 F.4th at 1027 (plaintiffs fail to satisfy

*Comcast* "where an expert's damages model is untethered" or "disconnect[ed]" from "plaintiff's theory of liability such that it has no possibility of demonstrating the amount of damages in a particular case").

### 2. Plaintiffs Offered No Method To Measure The "Value" Of Recordings—Even As To Amazon.

Even if the value of recordings to *Amazon* could properly be a proxy for *registrants'* injury under Plaintiffs' theory, they proposed no workable model to measure such damages on a classwide basis. In *Lytle*, the Court held that the district court must find, "by a preponderance of the evidence, that [plaintiffs'] model will be able to reliably calculate damages in a manner common to the class at trial." 114 F.4th at 1024. The Court warned that "[m]erely *gesturing at a model or describing a general method will not suffice* to meet this standard. Rather, plaintiffs—or their expert—must chart out a path to obtain all necessary data and demonstrate that the proposed method will be viable as applied to the facts of a given case." *Id.* at 1032 (emphasis added).

Plaintiffs and their expert did not even "gesture" at a model. Dkt. 301 at 21-22; Dkt. 312 at 6-8. Hochman opined that "[e]ach user's data, such as the utterances collected by Alexa, has discrete value by itself." Hochman Decl. ¶ 47. But merely suggesting that something has value is not a model for valuing it. As Hochman admitted, his opinion was "something less than" a method to calculate the value of voice recordings. Dkt. 315-2 at 99:8–22. Because he "wasn't asked to

20

opine about the methodology, … what that exact value is numerically would require further workup that [Hochman] was not asked to do." *Id.* at 89:12-90:3; *see also id.* at 115:20-116:10 ("[I]f someone were to sit down and try to actually determine a value of the utterances, beyond merely that they have value, to go further and say, Okay, what is that economic value? … I haven't weighed into that.").

Hochman also offered no opinion on whether recordings uniformly have the same value or whether the value varies depending on the characteristics of the recording (e.g., "false wake" or intentional command, human voice or incomprehensible sound, full sentences or snippets of words). He identified no "common proof" that would apply in measuring the value of Alexa recordings. Thus, this is not a case in which Plaintiffs provided a reliable model that has yet to be applied; it is a case with no model at all.

Against this backdrop, the district court manifestly erred when it accepted Plaintiffs' argument that they can calculate damages by reference to "(a) the fair market value of individual utterances or monthly subscriptions for the data and (b) the costs defendants currently incur to acquire non-Alexa voice recordings." Order at 28. Plaintiffs submitted no model for determining a "fair market value," no evidence to suggest that Amazon (or any voice-assistant provider) pays "monthly subscriptions for the data," and no explanation of what "data" even means in that context. At most, Hochman asserted that voice recordings have value to *Amazon*,

21

based only on the estimated cost to pay workers to create scripted recordings in a controlled environment. *See* Ex. B, ¶ 83. He offered no way to use such costs in other contexts as a model to measure classwide damages. The district court erred by crediting such vague and unsupported references as a "model or method" that Hochman merely "stop[ped] short of applying." *See* Order at 28 n.6. The district court's Order conflicts with the central tenets of *Comcast*, *Olean*, and *Lytle* by allowing a class action to proceed when there may never be a workable classwide damages model.

> ### 3. The District Court Failed To Assess The Reliability Of Plaintiffs' Damages Evidence.

"Whether expert evidence is capable of resolving a class-wide question in one stroke may include weighing conflicting expert testimony and resolving expert disputes, where necessary to ensure that Rule 23(b)(3)'s requirements are met and the common, aggregation-enabling issue predominates over individual issues." *Olean*, 31 F.4th at 666 (citation modified). In *Lytle*, the Court explained that courts can conduct a "full" or "limited" *Daubert* analysis at the class-certification stage. 114 F.4th at 1031. "Where an expert's model has yet to be fully developed, a district court is limited at class certification to making a predictive judgment about how likely it is the expert's analysis will eventually bear fruit," but "*this still requires determining whether the expert's methodology is reliable.*" *Id.* (emphasis added,

citation modified); *see also Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018).

The district court accepted at face value Hochman's opinions as putting forth a viable "model or method." Order at 28 n.6. But Amazon moved under FRE 702 to exclude Hochman and his opinions. Amazon demonstrated that, among other problems with Hochman's declaration, he is unqualified to opine on the value of voice recordings because he lacks any specialized knowledge. Dkt. 312 at 4-6. Moreover, Hochman's opinion that recordings have some nebulous value should be excluded as unhelpful because it "offers no methodology for determining class members' damages." *Id.* at 6-8. Hochman also conceded that he is not qualified as a damages expert; his role was simply to offer "some opinions" that "may be relied upon by a damages expert, who's going to do the full economic analysis." Dkt. 315-2 (Hochman Dep. Tr.) at 67:13–25. The district court failed to consider or address these valid objections to the admissibility of Hochman's opinions.

Amazon also provided a rebuttal expert declaration from Professor Hitt. Ex. C. Professor Hitt showed that Hochman proposed no workable classwide model, that the value of information is context-specific, and that the value to *Amazon* of recordings does not approximate the value of recordings to *putative class members*, who never lost access to their recordings or the ability to monetize them as they saw fit. *See id.*, § V; Dkt. 457. The district court ignored Amazon's *Daubert* motion,

23

did not even mention Professor Hitt's rebuttal expert declaration, and failed to resolve the dispute arising from the experts' competing opinions. Accordingly, the district court erred by failing to conduct the required "rigorous analysis of the expert evidence presented by the parties." *Olean*, 31 F.4th at 676.

## CONCLUSION

For the foregoing reasons, Amazon respectfully requests that the Court grant this Petition for review and allow Amazon to immediately appeal from the Order.

Respectfully submitted,

Dated: July 21, 2025          FENWICK & WEST LLP


By: *s/ Brian D. Buckley*
Brian D. Buckley (WSBA No. 26423)

Counsel for Defendants-Petitioners
AMAZON.COM, INC. and
AMAZON.COM SERVICES, LLC

## CERTIFICATE OF COMPLIANCE

I certify that this Petition contains 5,595 words, excluding the items exempted by Federal Rule of Appellate Procedure 5(b)(1)(E).  The Petition's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6), as it has been prepared in a proportional typeface in 14-point Times New Roman font.

I certify that this brief complies with the limit set forth in Circuit Rule 32-3 because the word count divided by 280 does not exceed the 20-page limit designated by Rule 5-2(b).

Dated:  July 21, 2025.      FENWICK & WEST LLP


By:  _s/ Brian D. Buckley_
     Brian D. Buckley (WSBA No. 26423)

     Counsel for Defendants-Petitioners
     AMAZON.COM, INC. and
     AMAZON.COM SERVICES, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and caused a copy of the foregoing **PETITION FOR PERMISSION TO APPEAL PURSUANT TO FED. R. CIV. P. 23(F)** to be electronically served via email on the following:

Bradley S. Keller
**Byrnes Keller Cromwell LLP**
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Email: bkeller@byrneskeller.com

Paul J. Geller
Stuart A. Davidson
Mark J. Dearman
Alexander C. Cohen
Nicolle B. Brito
Maxwell H. Sawyer
**Robbins Geller Rudman & Dowd LLP**
225 NE Mizner Blvd, Suite 720
Boca Raton, FL 33432
Email: pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
acohen@rgrdlaw.com
nbrito@rgrdlaw.com

Brian C. Gudmundson
Jason P. Johnston
Michael J. Laird
**Zimmerman Reed LLP**
1100 IDS Center
80 S. 8th Street

Michael P. Canty
Carol C. Villegas
Guillaume Buell
David Saldamando
Danielle Izzo
Gloria J. Medina
Michael Hotz
**Labaton Keller Sucharow LLP**
140 Broadway
New York, NY 10005
Email: mcanty@labaton.com
cvillegas@labaton.com
dsaldamando@labaton.com
gbuell@labaton.com
dizzo@labaton.com
gmedina@labaton.com
mhotz@labaton.com

Alec M. Leslie
Max S. Roberts
**Bursor & Fisher, P.A.**
1330 Avenue of the Americas
New York, NY 10019
Email: aleslie@bursor.com
mroberts@bursor.com

26

Minneapolis, MN 55402
Email: brian.gudmundson@zimmreed.com
        jason.johnston@zimmreed.com
        michael.laird@zimmreed.com

Rebecca A. Peterson
**Lockridge Grindal Nauen P.L.L.P.**
100 Washington Avenue, Suite 2200
Minneapolis, MN 55401
Email: rapeterson@locklaw.com

Caleb L. Marker
**Zimmerman Reed LLP**
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Email: caleb.marker@zimmreed.com

Robert K. Shelquist
**Cuneo Gilert & LaDuca, LLP**
5775 Wayzata Blvd., Suite 620
St. Louis Park, MN 55416
Email: rkshelquist@cuneolaw.com

Manish Borde
**Borfde Law PLLC**
1700 7th Avenue, Suite 2100
Seattle, WA 98101
Email: mborde@bordelaw.com

L. Timothy Fisher
**Bursor & Fisher, P.A.**
1990 N. California Blvd., Suite 940
Walnut Creek, CA 94506
Email: ltfisher@bursor.com

Brendan S. Thompson
Charles J. LaDuca
**Cuneo Gilbert & Laduca LLP**
4725 Wisconsin Avenue, Suite 200
Washington, DC 20016
Email: brendant@cuneolaw.com
        charlesl@cuneolaw.com

Michael J. Flannery
**Cuneo Gilbert & Laduca LLP**
Two Cityplace Drive, 2nd Floor
Saint Louis, MO 63141
Email: mflannery@cuneolaw.com

Thomas G. Hoffman, Jr.
**Labaton Keller Sucharow LLP**
140 Broadway
New York, NY 10005
Email: thoffman@labaton.com

Dated: July 21, 2025.          FENWICK & WEST LLP


By: _s/ Brian D. Buckley_
    Brian D. Buckley (WSBA No. 26423)

    Counsel for Defendants-Petitioners
    AMAZON.COM, INC. and
    AMAZON.COM SERVICES, LLC

# EXHIBIT A

1

2

3

4

5          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
6                     AT SEATTLE

7
    KAELI GARNER, *et al.*,                    Case No. 2:21-cv-00750-RSL
8
                  Plaintiffs,
9                                              ORDER GRANTING IN
           v.                                  PART PLAINTIFF'S
10                                             MOTION FOR CLASS
    AMAZON.COM, INC., *et al.*,                CERTIFICATION
11
                  Defendants.
12

13

14          This matter comes before the Court on "Plaintiffs' Motion for Class Certification." Dkt.

15  # 257. Having reviewed the memoranda, declarations, and exhibits submitted by the parties,[1] the

16  Court finds as follows:

17
                              I. BACKGROUND
18

19          Defendants developed Alexa, a voice-activated, cloud-based service that can access

20  online resources to respond to inquiries and execute commands. When Alexa's microphones

21  pick up a "wake" word, the device turns on a blue light and begins to stream audio to Amazon's

22
    cloud. The audio is transcribed, and the resulting text strings are processed by an algorithm to
23
    generate instructions to the Alexa system about how to respond to the user. After a request has
24

25

26  ─────────────────
         [1] This matter can be resolved on the papers submitted. The parties' requests for oral argument are
27  DENIED.

28
    ORDER GRANTING PLAINTIFF'S MOTION
    FOR CLASS CERTIFICATION - 1

been made, processed, and responded to, defendants store a copy of the audio file, the

transcription, the instructions, and associated metadata in an internal Amazon database. The

recordings are used to train defendants' speech-recognition and natural-language-understanding

systems, a process that involves human review of approximately 0.01% of Alexa interactions. At

this time, customers have the ability to delete recordings, to choose not to have their recordings

stored at all, and/or to opt out of human review.

Sometimes Alexa begins streaming when a wake word was not, in fact, used. These

events are called "false wakes." When the audio stream hits the cloud, a cloud-side wake word

verification process attempts to confirm the presence of a wake word. If it cannot, the audio

stream is terminated, the recording is labeled "not intended for Alexa," and the system saves "a

truncated snippet of audio, *i.e.*, only enough to determine what triggered the device to activate,

. . . both for use in improving the Alexa service and wake word models and to provide users with

visibility into what the Alexa device recorded when the streaming indicator was activated." Dkt.

# 310 at ¶ 27.

Plaintiffs assert that both the permanent storage of Alexa interactions and the false wakes

are intentional design elements of the service, used to amass huge numbers of voice recordings

that can be fed into algorithms and machine learning platforms for continuous improvement

training. By 2020, Alexa was processing 2.8 billion communications a week, and defendants

retained and continue to use the recorded data to train Alexa and the next generation assistants.

Plaintiffs further assert that Amazon failed to provide sufficient notice of the recording, saving,

1  human review, and/or use of the audio captured by the Alexa service in violation of six states'

2  wiretap laws or Washington's Consumer Protection Act ("CPA"). They seek certification of six

3  classes of non-registrants, defined as residents of California, Florida, Maryland, New

4

5  Hampshire, Pennsylvania, or Washington who never registered an Alexa device and resided

6  with a registrant while an Alexa device was active and operational, to pursue wiretap claims

7

8  under state law. The non-registrant classes seek to recover statutory damages. Plaintiffs also

9  seek certification of a nationwide class of everyone who registered one or more Alexa devices to

10  pursue a CPA claim for unfair or deceptive trade practices. The registrant class seeks

11

12  (a) compensation for the value of the false wake recordings defendants have compiled and

13  (b) injunctive relief.

14        Defendants argue that the named plaintiffs' claims are not viable because they consented

15

16  to the recordings at issue and were not harmed by the recording, storage, and/or use of

17  communications not intended for Alexa (*i.e.*, false wakes). They also argue that all of the

18  proposed classes are too broad in that they sweep in putative class members who were never

19

20  recorded at all and therefore lack Article III standing. Defendants challenge Kaeli Garner's and

21  Ronald Johnson's ability to represent a class of California or Pennsylvania non-registrants,

22  respectively, because both of them registered an Alexa-enabled device. Finally, defendants

23

24  maintain that the common questions of law and fact raised by plaintiffs' claims do not

25  predominate over questions affecting only individual members of the putative class and that

26

27

28

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 3

1  class treatment would be unmanageable and is therefore not superior to individual litigation.

## II. THRESHOLD ISSUES

### A. Viability of Named Plaintiffs' Claims

Defendants opted not to support their challenge to the viability of the named plaintiffs'

claims in response to the motion for class certification, instead filing a separate motion for

summary judgment that did not become ripe for consideration until months after the certification

issue was ready to be resolved. The Court declines the invitation to first rule on the summary

judgment motion.

### B. Article III Standing

Defendants argue that the putative classes are overbroad because they contain class

members who were never recorded and therefore lack Article III standing to pursue either a

wiretap or a CPA claim. Dkt. # 28 at 22. Article III, § 2 of the United States Constitution limits

the federal judicial power to "cases" and "controversies." Standing is a judicially-created

doctrine designed to protect the separation of powers concerns embodied in the text of Article

III. *Allen v. Wright*, 468 U.S. 737, 752 (1984) ("[T]he law of Art. III standing is built on a single

basic idea—the idea of separation of powers.") (abrogated on other grounds by *Lexmark Intern.,

Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)); *see also INS v. Chadha*, 462 U.S.

919, 946 (1983) ("[S]eparation of powers was not simply an abstract generalization in the minds

of the Framers: it was woven into the documents that they drafted in Philadelphia in the summer

of 1787.") (quoting *Buckley v. Valeo*, 424 U.S. 1, 124 (1976)). Standing protects separation of

powers by ensuring that plaintiffs have an adequate stake in the outcome of the litigation. *TransUnion v. Ramirez*, 594 U.S. 413, 423-24 (2021).

To satisfy Article III standing, plaintiffs must demonstrate that they have (1) suffered an injury in fact, which is (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact exists where the plaintiff suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560.

The Ninth Circuit has clarified that in class actions seeking injunctive or other equitable relief, only one plaintiff is required to demonstrate standing. *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n. 32 (9th Cir. 2022). If the class seeks damages, however, all members must have Article III standing. *TransUnion*, 594 U.S. at 431; *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 594 (9th Cir. 2012). While it is clear that federal courts lack the power to grant relief to a plaintiff who suffered no injury, the Supreme Court has not yet addressed "the distinct question whether every class member must demonstrate standing *before* a court certifies a class." *TransUnion*, 594 U.S. at 431 n.4 (emphasis in original) (citing *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019)). In *Cordoba*, the Eleventh Circuit held that, although a district court need not separate out uninjured class members before granting class certification (and may instead wait until a later stage of the proceeding to determine which class members have suffered a redressable injury), if it appears that a large

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 5

portion of the class might not have standing, the court must consider under Rule 23(b)(3) whether the individualized standing issues will predominate over the common issues in the case prior to certification. 942 F.3d at 1276–77. The Ninth Circuit agrees, rejecting the argument that a class cannot be certified if it includes more than a *de minimis* number of uninjured class members in favor of a "rigorous analysis whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages." *Olean*, 31 F.4th at 669.

The proposed classes each contain tens of millions of people. Defendants argue that some of those people use Alexa through a push-to-talk button (rather than through a wake word), may have gifted the device to someone else, or may be non-verbal so that they could not have had their voices recorded. They also argue that 900,000 Alexa users have taken advantage of a "do-not-save recordings" function. Putting aside the unknown efficacy of the "do-not-save recordings" function, the option did not exist until September 2020, and there is no reason to assume that the 900,000 were not recorded before that date. Nor is there any information from which the Court could hazard a guess regarding the number of Alexa users who use only push-to-talk, are disabled, or never used a device they were given or purchased. Plaintiffs estimate, based on defendants' alleged design preferences in favor of over-recording, the business need for voice recordings, and defendants' calculated "false wake rate," that Alexa-enabled devices record communications that were not intended for Alexa at least once a month. Even if there are some people who own or live with an Alexa device who were never recorded, there is no reason

to suspect, much less presume, that a significant or more than *de minimis* portion of the proposed classes escaped recording. The problem of individualized standing issues will be considered under the predominance analysis of Rule 23(b)(3).

## III. PREREQUISITES OF A CLASS

The party seeking certification must demonstrate that all four prerequisites of Rule 23(a) are met, as well as one of the requirements of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Rule 23(a) "requires that plaintiffs demonstrate numerosity, commonality, typicality, and adequacy of representation in order to maintain a class action." *Mazza*, 666 F.3d at 588 (9th Cir. 2012). Although the Court will not decide the underlying merits of a case at the class certification stage, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974), it will undertake a "rigorous analysis" to ensure the party seeking certification affirmatively complies with the Rule, which frequently requires peeking at the merits of plaintiff's claims, *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350-51 (2011) (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). In the Ninth Circuit, "plaintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean*, 31 F.4th at 665. "[A]ny admissible evidence" may be offered by members of the putative class in support of class certification. *Id.* (citing *Tyson Foods, Inc. v.*

*Bouaphakeo*, 577 U.S. 442, 454-55 (2016)).

**A. Numerosity**

Rule 23(a)(1) tests whether "the class is so numerous that joinder of all members is impracticable." Defendants do not contest numerosity.

**B. Commonality**

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Although the plain text of the Rule constrains itself to searching for common "questions," the key inquiry is actually whether the class proceeding will "generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)) (alteration in original). However, this does not mean that every question raised and answered must be shared in common: all that is required is "a single *significant* question of law or fact." *Mazza*, 666 F.3d at 589 (emphasis added); *see also Castillo v. Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020) ("Even a single common question of law or fact that resolves a central issue will be sufficient to satisfy this mandatory requirement.").

The Court finds that the following questions are shared in common by each non-registrant class and will likely generate a common answer for the entire class:

1. whether plaintiffs' common evidence establishes that defendants intended to and knew that Alexa intercepted communications of non-registrants that were not meant for Alexa;

and

2. whether Alexa devices are wiretapping "devices" as defined by the applicable state wiretapping statutes.

With regards to the registrant class, the following common questions are likely to generate common answers:

1. whether defendants adequately disclosed information regarding their interception, indefinite storage, and use of registrants' recordings (including conversations not intended for Alexa);

2. whether defendants' failure to adequately disclose information regarding the interception, indefinite storage, and use of registrants' recordings was an unfair or deceptive act or practice;

3. whether defendants' unfair and deceptive acts or practices impacted the public interest;

4. whether registrants' valuation of the utterances defendants compiled without compensation is reasonable and whether the loss of that value is an injury to each class members' business or property; and

5. whether registrants have demonstrated that defendants' actions in using intercepted recordings to train its algorithms and machine learning platforms should be enjoined.

The Court finds commonality satisfied in this case.

## C. Typicality

Typicality asks whether "the claims or defenses of the representative parties are typical of

the clams or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am.*, *LLC*, 617 F.3d 1168, 1175 (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). The analysis is guided by whether (1) "other members have the same or similar injury," (2) "the action is based on conduct which is not unique to the named plaintiffs," and (3) "other class members have been injured by the same course of conduct." *Gonzalez v. United States Immigration and Customs Enf't*, 975 F.3d 788, 809 (9th Cir. 2020) (quoting *Hanon*, 976 F.2d at 508). "Rule 23(a) is 'permissive' and requires nothing more than that a class plaintiff's claims be 'reasonably coextensive with those of absent class members.'" *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

Defendants argue that Kaeli Garner and Ronald Johnson are not part of the classes they seek to represent and therefore do not "possess the same interest and [did not] suffer the same injury as the [absent] class members." *Dukes*, 564 U.S. at 348-49. Ms. Garner seeks to represent a class of California non-registrants. At her deposition, Ms. Garner did not dispute evidence suggesting that she had purchased and registered an Alexa-enabled Fire TV stick in late 2017. Dkt. # 302-8 at 8 and 11. Defendants argue that she is therefore a registrant, that she is bound by a Washington choice-of-law provision contained in the terms and conditions to which she assented, and that she cannot assert claims under California law on behalf of herself or the non-registrant class. It appears that Ms. Garner is not typical of the California non-registrant class

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 10

because she is, in fact, a registrant and subject to the terms and conditions to which registrants agree. Because Ms. Garner is the only plaintiff offered as a representative for non-registrants located in California, that class cannot be certified.

With regards to Mr. Johnson, he seeks to represent a class of Pennsylvania non-registrants. Mr. Johnson acknowledged at his deposition that he had an Alexa app on his phone at some point in time. Dkt. # 302-10 at 4. Defendants provided evidence that use of the Alexa app requires consent to the same terms and conditions of use as the registrants whose wiretap claims have already been dismissed by the Court. Dkt. # 310 at ¶¶ 60-62; Dkt. # 91 at 16-17. Mr. Johnson is not, therefore typical of other non-registrants in Pennsylvania. In the absence of a representative, a Pennsylvania class of non-registrants cannot be certified.

**D. Adequate Representation**

The representative parties—meaning the named plaintiff as well as class counsel—must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see also* Fed. R. Civ. P. 23(g)(4). Except with regards to Ms. Garner and Mr. Johnson, discussed in the preceding section, defendants offer no reason to suspect that absent class members will not be adequately represented.

**IV. MAINTENANCE OF A CLASS**

In addition to meeting all four prerequisites of Rule 23(a), a plaintiff must also meet one of the three requirements of Rule 23(b). The Court considers this motion under Rule 23(b)(2) and (b)(3).

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 11

1   **A.  Rule 23(b)(2)**

2          Plaintiffs seek certification of a class of registrants to pursue injunctive relief under the

3   CPA. Certification under Rule 23(b)(2) is available when defendant "has acted or refused to act

4

5   on grounds that apply generally to the class, so that final injunctive relief or corresponding

6   declaratory relief is appropriate respecting the class as a whole." Plaintiffs argue that defendants

7
    acted uniformly in relation to the registrant class by recording them in the absence of a wake
8

9   word and, without disclosure, transcribing, storing, and using those recordings indefinitely for

10  their own benefit. They request that the Court enjoin defendants from using class recordings or
11
    data from those recordings to train algorithms and programs and to require defendants to destroy
12

13  existing recordings, transcripts, and related data.

14         Defendants argue that a Rule 23(b)(2) class cannot be certified because the primary relief
15
    sought through the CPA claim is monetary damages. While it is clear that Rule 23(b)(2) "does
16

17  not authorize class certification when each class member would be entitled to an individualized

18  award of monetary damages," *Dukes*, 564 U.S. at 360-61, that does not preclude the possibility
19
    of a Rule 23(b)(2) class seeking injunctive relief and a separate Rule 23(b)(3) class seeking
20

21  damages, *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013). The key to the

22  Rule 23(b)(2) analysis is whether an injunctive remedy (and, if applicable, any incidental
23

24  damage award) would apply to the class as a whole without having to make individual

25  determinations as to each class member's eligibility. *Ellis*, 657 F.3d at 987. That plaintiffs are

26

27

28

also seeking compensatory damages as a Rule 23(b)(3) class does not preclude a Rule 23(b)(2) class seeking remedies of an indivisible nature.

The Court finds that a Rule 23(b)(2) class of registrants may be certified for the purpose of seeking injunctive relief.

**B. Rule 23(b)(3)**

An "adventuresome innovation" created specifically with damages class actions in mind, Rule 23(b)(3) imposes two additional requirements on a putative class beyond the four prerequisites of Rule 24(a), namely predominance and superiority. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Kaplan, *A Prefatory Note*, 10 B.C. IND. & COM. L.REV. 497, 497 (1969)). These additional requirements reflect the concern that in actions for money damages, classwide adjudication may "not as clearly [be] called for as…in Rule 23(b)(1) and (b)(2) situations [yet] may nevertheless be convenient and desirable." *Id.* (internal quotations and citations omitted). Accordingly, the notification requirements of Rule 23(b)(3) are heightened and class members' right to opt-out is mandatory. *Compare* Fed. R. Civ. P. 23(c)(2)(B) ("For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable…including individual notice to all members who can be identified through reasonable effort."), *with* Fed. R. Civ. P. 23(c)(1)(A) ("For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class."); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974) (discussing the requirements of notice and opt out in a Rule 23(b)(3) action); *Ellis*, 657 F.3d at 987 (noting that Rule 23(b)(3) not only

"expand[ed] the breadth of possible class actions, it also expanded the procedural protections afforded the class.").

### 1. Predominance

Under the Rule 23(b)(3) predominance inquiry, the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods*, 577 U.S. at 453 (quoting 2 W. Rubenstein, NEWBERG ON CLASS ACTIONS § 4:50, 196-197 (5th ed. 2012 (internal quotations marks and alteration omitted))). Although somewhat similar to the commonality prerequisite of Rule 23(a)(2), commonality and the predominance requirement of Rule 23(b)(3) must be analyzed separately. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) ("Rule 23(b)(3)'s predominance criterion is even more demanding than 23(a)."); *Amchem*, 521 U.S. at 624 (finding that even if named and unnamed plaintiffs' shared asbestos exposure was sufficient to satisfy commonality, too many individual issues regarding the circumstances and subsequent effects of exposure predominated to uphold class certification). Where individual inquiries would overwhelm common issues, certification under Rule 23(b)(3) is inappropriate. *Amchem*, 521 U.S. at 623 (finding disparate circumstances of exposure to asbestos-containing products as well as differences in state law undermined predominance). The predominance

inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson*, 577 U.S. at 453.

Defendants argue that the issues that will require individual presentations of evidence and judicial determinations outnumber and outweigh the issues that can be resolved in one stroke for each of the proposed classes. In particular, they argue that the non-registrant plaintiffs will have to produce individual evidence that they are part of the class, that they are not bound by the terms and conditions that bind the registrants with whom they lived, that they did not consent to the interception of their communications, that those communications constitute "private conversation" under the relevant wiretap statutes, and that they had a reasonable expectation that their communications would not be recorded. Defendants further argue that every member of the non-registrant class will have to prove the number of wiretap violations in order to claim statutory damages. With regards to the registrant class, defendants maintain that proof of injury and causation will be individualized and that there is no viable method for ascertaining damages across the entire class. Each of these arguments and, if necessary, the standing issue will be considered, separately and collectively, below.

### a. Non-Registrant Class Members

#### i. Identification of Non-Registrant Class Members

With regards to the non-registrant class, defendants argue that there is no way to identify all persons within a given state who never registered an Alexa device but who resided with a

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 15

1    registrant while an Alexa device was active and operational. This issue is less about

2    predominance and more about manageability. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d

3    1121, 1126-28 (9th Cir. 2017); *Wetzel v. CertainTeed Corp.*, No. C16-1160JLR, 2019 WL

4

5    3976204, at *19 (W.D. Wash. Mar. 25, 2019). The class definition sets forth objective criteria

6    that allows the parties and the Court to recognize any given class member and to evaluate the

7    viability of the claims asserted on their behalf. Whether the absence of a database containing all

8

9    non-registrants' names or the related difficulties in providing class notice makes representative

10   litigation unmanageable is an issue to be considered when determining superiority.

11

12                              ii.     Agency and Estoppel

13            Defendants argue that non-registrants may be bound by Amazon's terms and conditions

14   through an agency or estoppel theory, a determination that can be made only after individualized

15

16   discovery and fact-finding. With regards to agency, defendants assert that non-registrant

17   spouses, children, and roommates (the purported principals) may have authorized the registrants

18

19   with whom they lived to register an Alexa device and enter into the terms and conditions on

20   their behalf.

21            A principal is generally bound by the acts of his or her agent which, based on the

22

23   objective manifestations of the principal, are within the express or apparent authority granted to

24   the agent. *See generally Steadman v. Green Tree Servicing, LLC*, No. 2:14-cv-00854-JLR, 2015

25   WL 2085565, at *6 (W.D. Wash. May 5, 2015) (citing *King v. Riveland*, 125 Wn.2d 500, 507

26

27   (1994)). There is evidence in the record that could support a finding that Michael McNealy, the

28

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 16

representative of the proposed class of non-registrants who are pursuing a wiretap claim under

New Hampshire law, authorized his wife to register an Alexa device in his name. Dkt. # 294-2 at

75-77. Mr. McNealy may, in fact, be a registrant (although there is some ambiguity in his

discovery responses). While that exact scenario may be rare, the possibility of a joint purchase

of an Alexa device with one spouse registering the device on behalf and with full knowledge of

both partners is not. "Authorization occurs when one spouse, prior to the initiation of a

transaction, indicates his willingness to allow the other to enter into a transaction." *Nichols Hills*

*Bank v. McCool*, 104 Wn.2d 78, 83 (1985). While defendants would have the burden of

establishing the existence of an agency relationship at trial, the issue will undoubtedly engender

discovery aimed at absent class members and, where appropriate, individualized fact-finding.

Defendants' estoppel argument is based on the fact that non-registrants used the Alexa

device in their home and are therefore equitably estopped from avoiding the terms and

conditions to which the registrant agreed, citing *Tice v. Amazon.com, Inc.*, No. 5:19-cv-1311-

SVW-KK, 2020 WL 1625782 (C.D. Cal. Mar. 25, 2020). *Tice* makes clear that state law

determines whether and under what theories nonsignatories may be bound by the terms of an

agreement. *Id.*, at *2. While California and Washington[2] recognize estoppel as one of the

ordinary contract principles that may bind nonsignatories to an agreement, defendants make no

effort to show that Florida, Maryland, New Hampshire, and/or Pennsylvania share that view.

More to the point, even if estoppel were a viable theory for binding non-registrants in all of the

---

[2] *See Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 811 n.22 (2009).

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 17

relevant states, simply using a tool, toy, device, or appliance that was purchased by another under the terms of a contract does not imply an awareness or exploitation of the contract, does not suggest that a claim for injuries caused by the tool, toy, vehicle, or appliance arises out of the contract, and is not evidence of an agency relationship. *See B.F. v. Amazon.com, Inc.*, 858 Fed. App'x 218 (9th Cir. 2021); *Townsend v. Quadrant Corp.*, 173 Wn.2d 451 (2012). The Court is not persuaded that equity must step in to hold a nonsignatory to unknown and undisclosed contractual terms simply because he or she was injured by a device that another purchased under a contract.

iii.    Consent

The wiretap statutes of California, Florida, Maryland, New Hampshire, Pennsylvania, and Washington require that plaintiffs prove that their private conversation was intercepted without their consent. Defendants argue that some purported non-registrants may have expressly consented to Amazon's terms and conditions of use (including that their conversations would be recorded) by buying an Alexa device on amazon.com and/or by signing into the Alexa app. As discussed above, Mr. Johnson, the proposed representative of a class of non-registrants who are pursuing a wiretap claim under Pennsylvania law, had the Alexa app on his cell phone for some unspecified period of time and therefore agreed to the same terms and conditions of use as the registrants whose wiretap claims have already been dismissed by the Court. Dkt. # 302-10 at 4; Dkt. # 310 at ¶¶ 60-62; Dkt. # 91 at 16-17. Plaintiffs argue that (1) the wiretap classes are defined to include only people who did not register an Alexa device and (2) Amazon already

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 18

possesses information sufficient to challenge the inclusion of a given non-registrant in the non-registrant class. The record shows, however, that registering an Alexa device is not the only way a consumer consents to the recordings, so merely looking at whether an individual has registered an Alexa device does not answer the consent question. That defendants will not have to undertake extensive discovery to identify putative non-registrants who have nevertheless consented does not change the fact that the inquiry is individualized and must be resolved before either liability or damages can be adjudicated.

Defendants also argue that publicly available disclosures, news reports, lawsuits, and other sources alerted non-registrants to the fact that if an Alexa device awoke – intentionally or unintentionally – the subsequent communications would be recorded, giving rise to the non-registrants' implied consent to the recordings. This issue might, as plaintiffs suggest, be susceptible to classwide resolution if, after a review of all of the relevant disclosures and sources, the fact-finder determines that the available information would not have put a reasonable consumer on notice that he or she was consenting to the recordings. *See Calhoun v. Google, LLC*, 113 F.4th 1141, 1148 (9th Cir. 2024). If that were the case, the issue of implied consent could be added to the list of other common questions in Section III.B. of this Order. But if plaintiffs are unable to achieve an unalloyed and universal victory on the issue, the fact-finder would be required to determine which sources of information each non-registrant read, saw, or heard and whether that specific constellation of sources established the non-registrant's implied

consent to the recordings, an intensely fact-based and individualized analysis.

iv.    Content of Recording

The wiretap statutes of Washington and Maryland prohibit the interception of "conversations." RCW 9.73.030; Md. Code Cts. & Jud. Proc. § 10-401(13). While the Court declines to undertake an exhaustive analysis of what is and what is not a "conversation" for purposes of these statutes at this stage of the litigation, unintelligible sounds, random noises, and words with little or no context likely fall outside the definition of "conversation." Defendants have provided at least two recordings that contain no words, convey no information, and would not likely be considered "conversations." Dkt. # 294-5 and # 294-7.

Plaintiffs assert that each member of the non-registrant classes was injured and damaged based on the facts that (a) they lived in proximity to an active Alexa device and (b) Amazon's internal data shows that false wakes were so frequent as to make it almost certain that each non-registrant was recorded at some point. Each of the proposed class representatives have identified at least one recorded communication that would be considered a private conversation. Dkt. # 257 at 13-14. Defendants' assertion that, amongst all the recordings it has transcribed, maintained, and used, a few of them are unintelligible does not invalidate any named plaintiff's claim. At most, individualized proof that certain recordings did not capture conversations might impact the calculation of the per violation damages for the Washington and Maryland classes, but the need for some individualized damage calculations does not outweigh the common issues

1    identified by plaintiffs.

2                          v.    Reasonable Expectation of Privacy

3

4              Most of the state wiretap laws at issue require a showing that plaintiff had a reasonable

5    expectation that the communication was private and/or that it would not be intercepted. The

6    analysis involves an objective inquiry which, plaintiffs argue, will be decided for the entire class

7
     based on common evidence. Plaintiffs point out that non-registrants were recorded in their
8

9    homes, a place where one normally expects privacy, and they rely on survey evidence showing

10   that consumers do not like the idea that their in-home communications are being intercepted by

11
     a constantly listening device. Defendants, for their part, offer a different survey suggesting that
12

13   the knowledge and expectations of Alexa users vary widely, with more than half understanding

14   that Alexa was recording and keeping communications. To the extent a given non-registrant

15
     understood how Alexa worked, including the possibility of false wakes and subsequent
16

17   recordings, it is difficult to see how that person could have a reasonable expectation that

18   communications taking place in the vicinity of the device were private and/or would not be

19
     intercepted. Individualized discovery and fact-finding would be necessary to resolve this issue.
20

21                         vi.    Damages

22             The non-registrant classes seek to recover statutory damages under the relevant state
23

24   laws. Plaintiffs argue that because the non-registrants seek "a set amount in statutory damages,"

25   class wide issues predominate. Dkt. # 257 at 26. While claims for statutory damages sometimes

26
     obviate the need for individualized inquiry, that does not appear to be the case here. California's
27

28

     ORDER GRANTING PLAINTIFF'S MOTION
     FOR CLASS CERTIFICATION - 21

wiretap law authorizes recovery of $5,000 per violation, while the other relevant state laws provide for liquidated damages at the rate of $100 a day for each day of the violation or $1,000, whichever is higher. Cal. Penal Code § 637.2(a)(1); Fla. Stat. § 934.10(1)(b); Md. Code Ann. Cts. & Jud. Proc. § 10-410(a)(1); N.H. Rev. Stat. Ann. § 570-A:11(a); 18 Pa. Cons. Stat. § 5725(a)(1); RCW 9.73.060. Plaintiffs offer no method or model to determine the number of unauthorized recordings made of each non-registrant, making it impossible to ascertain damages under California law or whether damages are capped under the laws of Florida, Maryland, New Hampshire, Pennsylvania, and Washington. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (while the proposed calculations need not be exact, plaintiffs must provide a model or method evidencing the damages attributable to the liability theory being pursued, otherwise the model "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."). Here, plaintiffs offer no model, simply asserting that they will be able to prove that every non-registrant was surreptitiously recorded and that each such recording is actionable. It is the number of those recordings that will determine the amount of statutory damages, however, an inquiry that will require individualized discovery and fact-finding.

                     vii.     Weighing Prevalence and Importance

        Ultimately, the predominance inquiry requires the Court to determine whether the common issues that lend themselves to representational litigation of the wiretap claims are more prevalent or more important than the issues that will require individualized proof and fact-

finding. They are not. Common evidence will likely lead to common answers regarding Amazon's intent regarding and knowledge of the interception of non-registrant communications, whether Alexa devices are wiretapping "devices" for purposes of the state wiretapping statutes, and whether the universe of publicly-available information regarding how Alexa works was insufficient to establish implied consent for the recordings. While these issues are undoubtedly critical to plaintiffs' success on the wiretapping claims, they do not come close to establishing either liability or damages. Individual evidence will be needed regarding whether class members expressly consented to the recordings through the acts of their agent or through acceptance of Amazon's terms and conditions as part of an amazon.com purchase and/or use of the Alexa app, whether class members impliedly consented to the recordings or had a reasonable expectation of privacy around an Alexa device given their individual knowledge and understanding of how Alexa works, and the number of intercepted communications at issue for each non-registrant (or at least whether than number is less than or exceeds ten). Given the number, breadth, and importance of these issues, the Court cannot find that the questions of law or fact common to the non-registrant class members predominate over the questions that will need to be resolved on an individual-by-individual basis.[3]

### b. Registrant Class

The registrant class has asserted a single cause of action under Washington's CPA. To

---

[3] In light of this conclusion, the Court declines to determine whether the possibility that some portion of the non-registrant classes was never recorded by Alexa (and therefore lacks standing) precludes certification.

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 23

prevail on a CPA claim, plaintiffs must prove "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37 (2009) (citing *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784 (1986)). Plaintiffs assert that common evidence regarding Amazon's conduct will establish most of the elements of their CPA claim, satisfying the predominance inquiry. Defendants appear to concede that whether Alexa devices were advertised and sold in an unfair or deceptive way, whether those sales occurred in trade or commerce, and whether their conduct affected the public interest will be resolved for the class as a whole based on common evidence.

> i.    Injury

The proposed class contains tens of millions of people, some of whom defendants assert were never recorded at all, much less had their recordings transcribed, subjected to human review, or used to better defendants' products.[4] In particular, defendants point out that some registrants use Alexa through a push-to-talk button (eliminating the opportunity for false wakes), may have gifted the device to someone else, or may be non-verbal so that they could not have had their voices recorded. They also argue that almost 900,000 Alexa users have taken advantage of a "do-not-save recordings" function that was introduced in September 2020 and that almost two million Alexa users have opted out of human review. While there is a

---

[4] The CPA claim is also based on allegations that the transcript of a recording was maintained even if the registrant attempted to delete the voice recording and that transcripts, as well as recordings, were stored and used by defendants forever, at their sole discretion.

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 24

hypothetical possibility that someone may have purchased and registered an Alexa device but never used it[5] and/or that a non-verbal customer purchased a device advertised as a cloud-based voice service platform, the Ninth Circuit "do[es] not permit a defendant to support its invocation of individualized issues with mere speculation." *Van v. LLR, Inc.*, 61 F.4th 1053, 1068 (9th Cir. 2023). Rather, "the defendant must invoke individualized issues and provide sufficient evidence that the individualized issues bar recovery on at least some claims" in order to raise "the spectre of class-member-by-class-member adjudication of the issue." *Id.*, at 1067.

With regards to defendants' other arguments, they each address limited facets of the unfair and deceptive conduct of which plaintiffs complain. If, for example, a registrant uses the push-to-talk feature, there may be less chance of a false wake, but his or her voice is still recorded, transcribed, and subjected to review, storage, and use at defendants' sole discretion. If a registrant chose the "do-not-save recordings" function when it became available in September 2020, there is no reason to assume that he or she was not recorded prior to that date. And affirmatively opting out of human review does nothing to avoid false wakes, transcription, storage, and use. There being no logical reason to assume, much less evidence to show, that the individual issues defendants identify would bar any class members' recovery on the CPA claim,

---

[5] The only evidence cited for this scenario is the deposition testimony of Jodi Brust. Ms. Brust purchased at least four Alexa devices, two of which she gave away as gifts. Dkt. # 302-2 at 11-15. This testimony in no way suggests that Ms. Brust was not the subject of false wakes, transcription, human review, and/or continued use of her voice data.

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 25

the Court will not allow speculation and surmise to tip the decisional scales at class certification.

Defendants also argue that an individualized review of every recording associated with a registrant's account will be necessary in order to determine whether there were any false wakes. But, again, defendants misstate the nature of plaintiffs' CPA claim. While false wakes are certainly a facet of the device that plaintiffs believe to be unfair, they are also complaining about defendants' failure to disclose that all recordings – whether intended for Alexa or not -- are transcribed, reviewed, maintained, and used. If plaintiffs prove their allegations regarding how Alexa works and what defendants do with the recordings they collect, the loss of control over their voice data appears to be a class wide injury.

ii.    Causation

Plaintiffs will have the burden of proving that defendants' unfair or deceptive conduct (*i.e.*, the failure to disclose the prevalence of and/or design preference for false wakes, that recordings are transcribed, that recordings and transcriptions are reviewed by humans, stored, and used indefinitely at defendants' sole discretion, and that requests to delete recordings left transcripts untouched) caused them to lose the value of and control over their voice data. Defendants argue that each class member's knowledge regarding how Alexa works and why they purchased the device will have to be evaluated before the fact-finder can determine whether a causal nexus exists. The argument seeks to impose on plaintiffs the task of proving that they would have acted differently in a hypothetical world in which defendants had made adequate

disclosures about what they did with the voice data processed by the Alexa service.

Where the act or practice at issue is an omission of material fact, as is the case here, the causation element of a CPA claim includes a rebuttable presumption of reliance. *Eng v. Specialized Loan Servicing*, 20 Wn. App. 2d 435, 452 (2021); *Deegan v. Windermere Real Est./Ctr.-Isle, Inc.*, 197 Wn. App. 875, 890 (2017). The presumption is "premised on the idea that otherwise the person seeking relief would have to prove a negative." *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1197 n.3 (9th Cir. 2024). Defendants argue that the presumption of reliance is rebutted here because members of the registrant class were exposed to disparate information regarding how Alexa worked.

The presumption can be rebutted in this case by providing evidence that plaintiffs' decision to purchase and use an Alexa device would have been unaffected had the omitted facts been disclosed. *G.G. v. Valve Corp.*, 579 F. Supp. 3d 1224, 1234 (W.D. Wash. 2022), *aff'd sub nom. Galway v. Valve Corp.*, No. 22-35105, 2023 WL 334012 (9th Cir. Jan. 20, 2023). Defendants' assertion that some members of the class had more information regarding Alexa than others is insufficient. Defendants have not provided any evidence that one or more registrants knew all the omitted facts and nevertheless chose to purchase an Alexa or that, in the hypothetical world where defendants had disclosed all of the omitted facts, registrants would have made the same purchasing decision. The presumption would fail of its purpose if it could be rebutted simply by saying "plaintiffs failed to prove reliance." With the presumption in place,

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 27

causation remains a common issue.

iii.    Damages

At the class certification stage, whether the calculation of damages is a common issue susceptible of class wide determination through common evidence or will require individualized proof depends on the proposed path for obtaining the necessary data and the method of computation. *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1032 (9th Cir. 2024), *cert. denied*, No. 24-576, 2025 WL 663695 (U.S. Mar. 3, 2025). Plaintiffs assert that there are common methods for establishing the value of the voice data defendants took and used for their own purposes without compensation, including (a) the fair market value of individual utterances or monthly subscriptions for the data and (b) the costs defendants currently incur to acquire non-Alexa voice recordings. Defendants have not suggested any reason to doubt that a per utterance value can be obtained.[6] But assigning a value to the utterances defendants collected from class members without payment gets plaintiffs only halfway towards proving damages. They will then have to show how many such utterances were taken from each class member in order to calculate a damage amount. Neither party addresses this aspect of the damage calculations, but there is evidence in the record suggesting that a review of registrant accounts would yield the necessary information. While that review would be individualized,

"[t]he amount of damages is invariably an individual question and does not defeat

---

[6] At the class certification stage, plaintiffs need not prove the actual value of the data taken, they simply have to present a model or method for establishing that value which is viable given the facts of the case. They have done so, regardless whether Jonathan Hochman's expert opinions stop short of applying the model or method.

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 28

class action treatment." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir.1975); *see also Yokoyama* [*v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir.2010)] ("The potential existence of individualized damage assessments ... does not detract from the action's suitability for class certification."). . . . Indeed, the Supreme Court clarified in *Dukes* that "individualized monetary claims belong in Rule 23(b)(3)." [564 U.S. at 362]. Thus, the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3).

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

### iv. Standing

Revisiting defendants' Article III standing arguments from Section II.B. of this Order, the Court finds that the concern that a class of all registrants may contain individuals who were never recorded does not preclude certification. While it is clear that federal courts lack the power to grant relief to a plaintiff who suffered no injury, registrants who were never recorded by Alexa can be identified through the same account review that will establish the amount of damages. While the standing issue will necessitate the same individualized review of Alexa account data as the damage issue, it does not predominate over the common issues in the case.

### v.   Weighing Prevalence and Importance

The Court finds that common issues central to resolution of the registrant class claims predominate over individualized inquiries regarding damages and standing.

### 2.  Superiority

In addition to finding that common questions of law or fact predominate with regards to the registrant class, the Court must also find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In

determining whether a class action is superior, the Court must consider the following list of non-exhaustive factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Defendants argue that the proposed registrant class would be unmanageable because (i) the class is comprised of tens of millions of people and (ii) defendants have prevailed in every Alexa arbitration claim to reach a decision on the merits. Neither consideration makes class treatment less fair or less efficient than individual litigation in this case. The fact that millions of people were allegedly injured by the same conduct suggests that representative litigation is the only way to both adjudicate related claims and avoid overwhelming the courts. And whether plaintiffs will be able to prove the elements of the CPA claim is not properly before the Court on class certification. It may well be that defendants prevail, in which case they will be released from the claims of all class members. Class treatment is not precluded simply because plaintiffs may not win.

### V. CONCLUSION

For all of the foregoing reasons, IT IS HEREBY ORDERED that:

1. Plaintiffs' motion to certify a class of registrants under Rule 23(b)(2) to seek injunctive relief under the CPA is GRANTED;

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 30

2.   Plaintiffs' motion to certify six classes of non-registrants under Rule 23(b)(3) to seek

damages under state wiretapping laws is DENIED; and

3.   Plaintiffs' motion to certify a class of registrants under Rule 23(b)(3) to seek damages

under the CPA is GRANTED.


DATED this 7th day of July, 2025.


*MlfS Lasnik*

Robert S. Lasnik
United States District Judge

ORDER GRANTING PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION - 31

# EXHIBIT B
# [Redacted]

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

| | |
|---|---|
| KAELI GARNER et al., | Case No. 2:21-cv-00750-RSL |
| Plaintiffs, | |
| v. | |
| AMAZON.COM, INC., a Delaware Corporation, and A2Z DEVELOPMENT CENTER, INC., a Delaware Corporation, | |
| Defendants. | |

### <u>CONFIDENTIAL EXPERT REPORT OF JONATHAN HOCHMAN</u>

**June 18, 2024**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................ 1

II.    MATERIALS REVIEWED................................................................. 1

III.   QUALIFICATIONS ........................................................................... 1

IV.   ASSIGNMENT AND METHODOLOGY .......................................... 6

V.    BACKGROUND AND DEFINITIONS.............................................. 7

VI.   SUMMARY OF OPINIONS ............................................................ 19

VII.  OPINIONS....................................................................................... 21

      A.   Amazon's use of artificial intelligence. ................................ 21

      B.   Artificial intelligence models require both positive and negative examples for effective training. ................................. 23

           i.    There is a tension between minimizing false wakes and increased latency between the utterance and response. ............................................. 29

      C.   Amazon's collection of utterances is valuable...................... 31

           i.    Amazon obtains incremental value from each utterance. ......................... 37

           ii.   Amazon could protect user privacy by altering utterances, so they do not sound like each user's voice and by filtering out sensitive content.................................................... 39

           iii.  Both the utterance recordings and transcripts are valuable to Amazon. .............................................. 40

           iv.  Amazon stores recordings and transcripts forever because they have value. .............................................. 43

      D.   Each user's data has discrete value................................... 44

           i.    Amazon could program Alexa to only record voices of registered users. .............................................. 46

VIII. CONCLUSION................................................................................ 48

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## I.     INTRODUCTION

1.     My name is Jonathan Hochman. I have been retained by Counsel for Plaintiffs in *Garner et al. v. Amazon.com Inc et al.*, No. 2:21-cv-00750 (W.D. Wash.), to review documents, testimony, and data and provide expert opinions. The opinions I presently intend to offer in response are in the body of this report.

2.     I reserve the right to update my opinions based on any new discovery and/or Court orders in this case in this or other phases of the litigation, in response to expert reports filed by other parties, or as rebuttal to reports or briefing.

## II.    MATERIALS REVIEWED

3.     A list of the materials I have considered in connection with forming my opinions is attached as Exhibit B.

## III.   QUALIFICATIONS

4.     I have more than 35 years of experience in software product development, Internet technology, online marketing, and cybersecurity.

5.     I have a Bachelor of Science (BSc.) degree awarded *summa cum laude* and a Master of Science (MSc.) degree in computer science, from Yale University. I earned both of my degrees in 1990. My master's thesis, entitled *How to Create a Failure Tolerant Distributed System*, focused on distributed

1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

transaction processing and the distributed consensus problem. My coursework at Yale included theory of computation, distributed systems, artificial intelligence, systems programming, and operating systems. My thesis advisor was Dr. Michael J. Fischer, a renowned computer science professor known for his work in distributed computing. I was encouraged to attend Yale by, and then studied with, Dr. Alan Perlis, co-recipient of the first Turing Award, the "Nobel Prize of computing." Over the last 35 years I have kept regular correspondence and meetings with my advisor, Dr. Fischer, which, in addition to my own work, helped me stay informed about the latest academic work in computer science.

6.      In 2022, I re-enrolled at Yale University as a PhD student in the Department of Computer Science. Yale provides me with a full scholarship and a salaried Teaching Fellow position. I have taken advanced classes in software engineering and networking, blockchain, quantum computing, and computer science and global affairs. In addition, I have taught classes on the history of computer science, and sensitive information (privacy). My research relates to computer security, privacy, and distributed computing.

7.      My research at Yale focuses on two areas. First, I am working on security systems, such as one to enable large-scale collection of medical research data

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

for the National Cancer Database. Second, I am working on network optimization protocols for distributing and processing the vast amounts of data generated by the Large Hadron Collider at CERN.

8.    In total, as of the date of this report, I have spoken at thirty conferences across the country relating to online marketing, advertising, and Internet technology. In addition to speaking engagements, I have also published more than thirty articles as of the date of this report about these topics. A list of the articles I have published—including in the previous 10 years—is part of my CV included as Exhibit A.

9.    I am also the founder of Hochman Consultants, an Internet marketing agency, set up in 2004. Hochman Consultants provides clients with analysis, advice, and consulting about marketing strategy, website development, e-commerce, digital advertising (including paid search advertising), and Internet security services.

10.   I have extensive ability in analyzing online data collection practices. I am currently serving as lead technical expert in two class action cases related to Google's collection of private user data: *Brown v. Google LLC*, 4:20-cv-03664 (N.D. Cal.)*,* and *Rodriguez v. Google LLC,* 3:20-cv-04688 (N.D. Cal.). In *Brown*, Google has agreed to remove data that plaintiffs allege was

3

improperly collected while users were engaged in private browsing. News reports say that the value of data to be deleted is approximately $5 billion.[1] *Rodriguez* relates to the data collection practices of Google's Firebase Software Development Kit (SDK).

11. I am a member of the Association for Computing Machinery, the world's largest computing society, whose goal is to advance computing as a science and a profession. I am also a member of the IEEE, the Institute of Electrical and Electronic Engineers. "IEEE is the world's largest technical professional organization dedicated to advancing technology for the benefit of humanity."[2]

12. I am a co-founder of the UNS Project, an Internet security venture to provide secure and private user authentication based on mobile phone technology.

13. I was a co-founder of CodeGuard, a startup information security company. In July 2018 CodeGuard was bought by Sectigo. CodeGuard had more than 250,000 paying customers as of 2018. The CodeGuard product has since been

---

[1] Felner, L. (2023, April 1). *Google agrees to destroy browsing data collected in Incognito mode*. The Verge. https://www.theverge.com/2024/4/1/24117929/google-incognito-browsing-data-delete-class-action-settlement.

[2] *IEEE*. IEEE. Retrieved from https://www.ieee.org/ on June 11, 2024.

4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

integrated into the Sectigo Web Security Platform, which is sold worldwide. CodeGuard was built upon Amazon's AWS infrastructure.

14. From 1999–2004, I served as a Director of Barcoding Inc., a systems integrator, which develops and provides software, mobile applications, mobile computing, automatic data collection, and wireless networking. While I was a Director, Barcoding Inc. was named to the Inc. 500, recognized by Forbes Magazine as one of ten privately held companies to watch, and ranked third on the Maryland Fast 50.

15. I have served as an expert consultant and expert witness in the fields of software development, technology entrepreneurship and Internet advertising, marketing, e-commerce, and security. A complete copy of my *curriculum vitae* is attached as Exhibit A and includes a list of prior cases in which I have testified as an expert at trial or deposition. As of the date of this report, I have testified in eighteen trials and at fifty-six depositions. I have been qualified as an expert in four U.S. District Court cases, five state court cases, eight arbitration tribunals, and one case in Israel.

16. I have worked for clients in numerous industries and government roles. My clients include major corporations, such as 800-Flowers, Delta Air Lines, and Duracell, as well as small businesses and individuals. I have authored many

5

expert reports, some of which are not reflected in my CV because the cases settled pre-testimony.

17. I am being compensated at the rate of $1,200 per hour for my work on this case, and my associates are compensated at their customary rates. My compensation does not depend upon my opinions in this matter or the outcome of this litigation.

## IV. ASSIGNMENT AND METHODOLOGY

18. I understand that this litigation, in part, concerns allegations that Defendants improperly recorded utterances and conversations with associated data via Alexa and via physical devices, such as the Echo, without providing adequate notice or obtaining consent of the people whose utterances were captured, contemporaneously transmitted to Amazon via the Internet, transcribed, and saved in Amazon's data warehouse for use to train algorithms and machine learning platforms.

19. As a first matter, I consider myself to be a neutral party who continually works with both plaintiffs and defendants in litigation in state and federal courts as well as arbitrations and other litigation-like processes. I employ a consistent set of methodologies regardless of which side has retained me.

6

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

20. In my work as an expert, I am often asked to define and explain the terminology used in online marketing and advertising, and computer technology. Based on my experience performing this role, I have seen that evidence in litigation often includes technical details that would not make sense to, or would only be partially understood by, the factfinder without explanation by a qualified expert.

21. Based on my ability, I select appropriate data from reliable sources when tasked with researching technical questions or explaining technical concepts.

22. Finally, I rely upon my educational background and research, as well as my 34 years of experience as a professional business development, marketing, and technology consultant, and I may also refer to external works as proper to demonstrate that my opinions are consistent with widely accepted principles and the opinions of other online marketing professionals.

## V.  BACKGROUND AND DEFINITIONS

23. This case was filed in 2021 in the United States District Court for the Western District of Washington at Seattle. Plaintiffs' Complaint alleges violations of multiple state wiretapping statutes, the Washington Consumer Protection Act,

7

the Federal Wiretap Act, and the Stored Communication Act.[3] Plaintiffs include individuals who reside with Alexa devices registered to themselves as well as individuals who reside with Alexa devices registered to others.[4]

24.    In an Order filed May 6, 2022, the Court granted in part and denied in part Defendants' Motion to Dismiss. The remaining claims are Plaintiffs' claims under the Washington Consumer Protection Act for registered users, the non-Washington state law claims of the non-registered users, the Washington wiretap claim of non-registered users, and the federal wiretap claim of non-registered users to the extent it is based on unintended communication recorded by an Alexa device.[5] Plaintiffs now move for class certification.

25.    As an initial overview, in today's economy, mathematician Clive Humby has described data and the analysis of data as being valuable like oil—a concept that Amazon itself acknowledges: "Data is the new oil. Like oil, data is valuable, but if unrefined, it cannot really be used. Data must be broken down and analyzed for it to have value."[6]

---

[3] First Amended Consolidated Complaint, ECF 59.

[4] *Id.* at 7–9.

[5] Order Granting in Part Defendants' Motion To Dismiss, ECP 91 at 27–28.

[6] Matsuura, B. et al. (2024, February 1). *Building a Data Foundation for Healthcare Transformation with Redox, Cloudwick, ClearDATA, and AWS,*

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

26.     To help the factfinder understand why data, including false wake data has value and is the new oil, I define relevant terms of art in the subsequent paragraphs. Each term of art appears in bold typeface.

27.     **Artificial Intelligence (AI)** is computer software that mimics the capabilities of human intelligence and problem solving to make decisions. These programs are assigned objectives and are capable of learning behavior to maximize their likelihood of success. For instance, a narrowly focused AI dedicated to predicting rainfall based on weather data might determine, without user input, that high humidity is a key indicator of rainfall.[7] [8]

28.     **Neural Networks** are the foundational technology that supports deep learning.[9] Inspired by biological brains, neural networks consist of interconnected processing nodes. These nodes assign weights to each of their connections, apply those weights to incoming data, and measure the result

---

https://aws.amazon.com/blogs/apn/building-a-data-foundation-for-healthcare-transformation-with-redox-cloudwick-cleardata-and-aws/.

[7] Russell, S. & Norvig, P. (2021). *Artificial Intelligence: A Modern Approach, Fourth Edition*. p. 1-5. https://dl.ebooksworld.ir/books/Artificial.Intelligence.A.Modern.Approach.4th.Edition.Peter.Norvig.%20Stuart.Russell.Pearson.9780134610993.EBooksWorld.ir.pdf. Hereafter referenced as "AIMA."

[8] *What is artificial intelligence (AI)?* IBM. Retrieved from https://www.ibm.com/topics/artificial-intelligence on June 11, 2024.

[9] James, G., Witten, D., Hastie, T., Tibshirani, R. & Taylor, J. (2023). *An Introduction to Statistical Learning with Applications in Python*. p. 399. https://hastie.su.domains/ISLP/ISLP_website.pdf.download.html. Hereafter referenced as "Witten et al."

9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

against a threshold. To train a model, training data is fed into the layers of a neural network with randomized weights and thresholds. The weights and thresholds are gradually adjusted upon each iteration, until input data points with the same labels have similar neural network outputs.[10]



Diagram of a simple Neural Network from Witten et al, 2023, p. 400

29. **Deep Learning** is a more recent development in the field of machine learning. It involves the use of different neural networks (Witten et al, p. 399). This

---

[10] Hardesty, L. (2017, April 14). *Explained: Neural networks*. MIT News. https://news.mit.edu/2017/explained-neural-networks-deep-learning-0414.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

subfield is called 'deep' because of the many layers within each neural network. Deep learning is especially effective on data with many dimensions, a dimension being a factor that a model can consider in making an estimation (AIMA, p. 750-751). Deep learning has had a significant impact on and sees wide use in Natural Language Processing (AIMA, p. 783-784). Because of the considerable number of computations involved, deep learning requires more powerful hardware and "also depends on the availability of large amounts of training data" (AIMA, p. 27).

30. **Binary Classification** is a common predictive task where observations are labeled with one of two classes. Often, the underlying model assigns a likelihood to each observation representing the chance that they belong to one of the classes. Binary classification is frequently accomplished with logistic regression or neural networks.[11]

31. **False Positive/False Negative/True Positive/True Negative** – These terms describe the outcomes of a binary classification model. A binary classification model assigns one of two class labels (often yes or no, 1 or 0) to an observation

---

[11] Garrido, F., Verbeke, W., & Bravo, C. (2018). A Robust profit measure for binary classification model evaluation, *Expert Systems with Applications, 92,* 154-160. https://doi.org/10.1016/j.eswa.2017.09.045.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(Witten et al, p. 27). For example, a classification model might decide whether an email is delivered to your spam folder or to your inbox (AIMA, p. 710).

- **False Positives** occur when a model incorrectly identifies a positive class. In terms of the spam example, when a legitimate email lands in the spam folder. (AIMA, p. 710)

- **False Negatives** occur when a model incorrectly identifies a negative class. When a spam email lands in your inbox.[12]

- **True Positives** occur when a model correctly identifies a positive class. When a spam email lands in the spam folder.[13]

- **True Negatives** occur when a model correctly identifies a negative class. When a legitimate email lands in the inbox.[14]

32. **Machine Learning** is a field of study concerning the processes by which a computer can improve its predictive performance via novel observations, often in the form of prepared training data. Simply put, "a computer observes

---

[12] *Classification: True vs. False and Positive vs. Negative.* Developers.google.com. Retrieved from https://developers.google.com/machine-learning/crash-course/classification/true-false-positive-negative on June 11, 2024.

[13] *Id.*

[14] *Id.*

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

some data, builds a model based on the Machine learning data, and uses the model as both a hypothesis about the world and a piece of software that can solve problems." There are three main types of machine learning (AIMA, p. 651-653):

- Supervised: when the data the machine observes is labeled.

- Unsupervised: when the data is unlabeled, and the machine looks for patterns among it.

- Reinforcement: when the machine is given rewards and punishments based on its performance.

33. **Natural Language Processing (NLP)** is the intersection of computer science and linguistics, and a subfield of artificial intelligence. It deals with the automated manipulation and processing of human languages. Common use cases of technology falling under this label include language translation, generating text or graphics, and chatbots. Modern advances in NLP have arisen from the use of Deep Learning techniques with Neural Networks.[15] NLP technologies might use computational linguistics, machine learning, and

---

[15] Holdsworth, J. (2024, June 6). *What is NLP (natural language processing)?* IBM. https://www.ibm.com/topics/natural-language-processing.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

deep learning techniques, and "training NLP algorithms requires feeding the software with large data samples to increase the algorithms' accuracy." [16]

34. The most recent breakthrough in NLP is **Large Language Models (LLM)**. LLM are massive deep learning language models designed to generate text much like a human would write.[17] They rely on a set of neural networks and are capable of unsupervised learning but are pretrained on "vast amounts of data."[18] In the future, they might be used for conversational AI complete with audiovisual input.[19]

35. **Voice To Text** describes a function of certain AI programs whereby they transcribe human speech into text.[20] Voice to text is a key component in the subfield of speech recognition. The goal of a speech recognition program "is to find the most likely sequence of words, given a series of sounds" (AIMA, p. 466). Voice to text software works by converting soundwaves into a digital

---

[16] *What is Natural Language Processing (NLP)?* Aws.amazon.com. Retrieved from https://aws.amazon.com/what-is/nlp/ on June 11, 2024.

[17] Holdsworth, J. (2024, June 6). *What is NLP (natural language processing)?* IBM. https://www.ibm.com/topics/natural-language-processing.

[18] *What are Large Language Models (LLM)?* Aws.amazon.com. Retrieved from https://aws.amazon.com/what-is/large-language-model/ on June 11, 2024.

[19] *Ibid.*

[20] *What is Speech To Text?* Aws.amazon.com. Retrieved from https://aws.amazon.com/what-is/speech-to-text/ on June 18, 2024.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

file and segmenting that file into small units of sound called phonemes. Then the phonemes are "run through a network via a mathematical model that compares them to well-known sentences, words, and phrases." [21]

36. **Big Data** is a phenomenon brought on by more advanced computing and the ever growing internet. As the name suggests, it refers to the creation of large datasets which include "trillions of words of text, billions of images, and billions of hours of speech and video" (AIMA, p. 26). These large datasets have allowed different approaches to machine learning, specifically unsupervised learning. Big data has been integral to the rapid advances in machine learning seen in the last decade. Increasing the size of training data rapidly improves the quality of models (AIMA, p. 26).

37. **Training Data** are observations used to train or teach a model to better make estimations (Witten et al, p. 20). Training data is often split into training and test sets; the training set is used to teach the model to make predictions and the test set to test the model's predictions on unseen data (Witten et al, p. 28-29). Each observation in the training data may contain multiple predictors as pictured below (X1, X2, and X3). In general, "accuracy improves with more

---

[21] *What is Speech To Text?* Aws.amazon.com. Retrieved from https://aws.amazon.com/what-is/speech-to-text/ on June 18, 2024.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

training data" (AIMA, p. 672). Training data can be labeled, unlabeled, or partially labeled (AIMA, p. 705). A labeled dataset would have recorded response variables for each observation, as pictured below (Y: Red or Green).

The table below provides a training data set containing six observations, three predictors, and one qualitative response variable.

| Obs. | $X_1$ | $X_2$ | $X_3$ | $Y$ |
|------|-------|-------|-------|-------|
| 1 | 0 | 3 | 0 | Red |
| 2 | 2 | 0 | 0 | Red |
| 3 | 0 | 1 | 3 | Red |
| 4 | 0 | 1 | 2 | Green |
| 5 | −1 | 0 | 1 | Green |
| 6 | 1 | 1 | 1 | Red |

Image from Witten et al, p. 64

38. **Synthetic Data** is training data that has been artificially generated, either by hand, statistically, or via a computer model. Optimally, synthetic data preserves the statistical properties of equivalent organically collected training data and comes pre-labeled allowing supervised learning.[22] Creating synthetic data is technically challenging and quality control considerations must be

---

[22] *What is synthetic data?* IBM. Retrieved from https://research.ibm.com/blog/what-is-synthetic-data on June 11, 2024.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

taken. Preserving the statistical trends of real-world data is challenging even with expertise.[23]

39.     In addition to terms of art, I will also define several terms used frequently by Amazon.

40.     **ASR** stands for **Alexa/Acoustic/Automatic Speech Recognition**. "Alexa Speech Recognition (ASR) has to work with high accuracy and low latency across genders and ages, across dialects and accents, for all device types, in all placements, when whispered and in noisy conditions, for all skills and features existing and new, and for all forms of speech. Our core mission is to enable fast, accurate, natural, and frictionless interaction with Alexa by recognizing the customer, what they say, and their para-linguistic attributes" (AMZ_GARNER_01164418, See also Fresko Dep. 58:2–9). In addition, "Automatic Speech Recognition (ASR) takes the audio stream and transcribes it (i.e., turns it into a text string or set of possible text strings). Transcriptions are sent to the Natural Language Understanding (NLU) system…These transcriptions, and their related confidence scores, are used to improve speech

---

[23] *What is Synthetic Data?* Amazon. Retrieved from https://aws.amazon.com/what-is/synthetic-data/ on June 11, 2024.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

recognition. The transcription with the highest score (i.e., the one that Alexa acts on) is also stored." (AMZ_GARNER_00048007 at 08).

41. **NLU** stands for **Natural Language Understanding**. "The 'Natural Language Understanding' (NLU) interprets the transcription result and produces an intent-an instruction to the Alexa system to tell it what to respond to" (AMZ_GARNER_00048007 at 08, See also Fresko Dep. 58:17–21).

42. **Latency** is User Perceived Latency (UPL). "Latency can be defined as User Perceived Latency (U PL), which is the time between when the customer stops talking to an Alexa based device until the time that the device starts playing Text-To-Speech (TTS) or has a transition in music state" (AMZ_GARNER_01164418 at 24).

43. A **Wake Word** is a word such as "Alexa" used to activate an Alexa-enabled device. "Customer interactions with Alexa start with an endpoint. The endpoint is responsible for detecting when it has been activated, sending an audio stream to the cloud, and receiving and playing the response. There are many different types of endpoints, but they can be broadly categorized by activation method: either wake word detection or action button. Those devices that use wake word detection can further be categorized by the technology they use to detect the wake word. Regardless of the method or technology

18

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

used to activate Alexa, the process in the cloud … is the same for all Alexa endpoints … [D]evices use on-device technology to detect when the wake word is spoken and then turn on the audio stream to the Alexa system in the cloud" (AMZ_GARNER_00048007 at 09-10).

## VI.    SUMMARY OF OPINIONS

44.    I understand that Amazon Alexa uses "artificial intelligence" models and algorithms to detect the wake word phrase "Alexa,"[24] which activates the recording, interception, and transmission of utterances or speech data[25] to Amazon's servers from the user's device. Amazon also uses artificial intelligence to perform speech to text conversion, and then saves both the "utterance" recordings and the transcribed "utterances" on its computers.

45.    Artificial intelligence models, such as those used by Amazon, require both positive and negative examples to train a classifier, such as the one that detects the "Alexa" wake word. A positive example is an utterance where the user has said "Alexa," and the device starts recording and streaming the contents of the communication to the AWS servers. A negative example is an utterance where

---

[24] "Alexa" is the default wake word setting. An Amazon user can change the wake word.

[25] Although not at issue in this lawsuit, newer models can listen for certain sounds for recording and processing, such as breaking glass.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the user has not said "Alexa" and the device starts recording and streaming the contents of the communication to AWS servers.

46. Amazon's collection of utterances is valuable because it provides Amazon with a competitive advantage in the field of virtual assistants. Not only can a large set of utterances serve as valuable training data for Amazon's proprietary AI models, but the data can also be repurposed for future products, including future uses yet to be conceived. The goal of each company is to have more data, of a higher quality, which is used to continuously improve the algorithms and machine learning platforms driving the product or service. This leads to competitive advantages to, for instance, persuade first purchasers to choose one platform over another, to keep current users engaged at the same or increasing levels, and to persuade third parties with ancillary products to tie that third party's voice command product integration to a particular platform.

47. Each user's data, such as the utterances collected by Alexa, has discrete value by itself. Tech companies have evaluated paying and have actually paid users a monthly fee in exchange for the right to collect user data. Shoshana Zuboff authored a book about this phenomenon and the value of raw data from both

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the consumer and commercial perspectives which she described as "surveillance capitalism."[26]

## VII. OPINIONS

### A. Amazon's use of artificial intelligence.

48. Amazon uses artificial intelligence based on recordings, voice-to-text, and natural language processing algorithms to drive its Alexa virtual assistant. By saying, "Alexa," a consumer can get information, shop for products on Amazon, or learn the status of their Amazon orders (AMZ_GARNER_00057114, AMZ_GARNER_00061171). As Alexa gathers data and trains its algorithms and machine learning platforms to become faster and more accurate Amazon increases customer loyalty and creates business opportunities for Amazon (Taylor Dep. 81:13–17). According to an internal Amazon document, "Our North Star is to make Alexa an indispensable part of everyday life, an instantly familiar, always-ready personal assistant, advisor and companion" (AMZ_GARNEER_01445082).

49. The power of AI to monitor audio at scale to find interesting soundbites is highlighted in an AI textbook which says, "While it is expensive, tedious, and sometimes legally questionable for security personnel to monitor phone lines,

---

[26] Zuboff, Shoshana (2019). *The Age of Surveillance Capitalism. The Fight for a Human Future at the New Frontier of Power.* Profile Books.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

video camera feeds, emails, and other messaging channels, AI (speech recognition, computer vision, and natural language understanding) can be used in a scalable fashion to perform mass surveillance of individuals and detect activities of interest. By tailoring information flows to individuals through social media, based on machine learning techniques, political behavior can be modified and controlled to some extent—a concern that became apparent in elections beginning in 2016" (AIMA, p. 31).

50.    A consequence of AI monitoring is that virtual assistants like Alexa sometimes record and process consumer words and utterances without the user's knowledge, consent, or even intent to engage the Alexa platform. These are called "false wakes" or "false accepts" by Amazon (Vitaladevuni Dep. 72:18–24).

51.    Any time a voice assistant is going to record words and utterances, it is a known phenomenon that words and utterances not intended for the platform will be recorded. ███████████████████████████████ ██████ (Fresko Dep. 18:15–20, ████████████████████ ██████████████████ Rausch Dep. 131:2–4, ████████████ ████████████████████████████

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

52.     Recordings without consent are a recognized downside to AI monitoring: in an internal chat Amazon employees recognized, ████████████

████████████████████████████████████████████

████████████████████████████████████████████

(AMZ_GARNER_00389057).

**B. Artificial intelligence models require both positive and negative examples for effective training.**

53.     The Alexa virtual assistant platform is a cloud-based software incorporated in Alexa devices that allows Amazon to intercept, transmit, transcribe, use, and store communications (AMZ_GARNER_00923715, AMZ_GARNER_00048007, AMZ_GARNER_00061171). This software operates with numerous algorithms, most notably Amazon's Automatic Speech Recognition (ASR) model, Natural Language Understanding (NLU) model, and Response model (AMZ_GARNER_00923715, AMZ_GARNER_00048007, AMZ_GARNER_00061171).

54.     These algorithms and artificial intelligence models used by Alexa require training. The training data should include both positive and negative examples to develop a model that produces accurate output. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

███████████████████████████████████████████████

(Taylor Dep. 112:14–21). ████████████████████████████████

████████████████ (*Id.* at 113:14–15, See also Rausch Dep. 130:16–17,

███████████████████████████████████████████

55. Live data is more effective than Synthetic Data because it accurately reflects real-use conditions, which may include noise or other confounding factors.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████ (Vitaladevuni Dep. 139:7–18). It would be impractical to generate a synthetic data set that reflects the diversity of Amazon's customers.

56. An Amazon internal memo circa 2018 describes occurrences of False Accepts (FA), which are "when the device wakes up when the user was not intending to wake it up." These are the equivalent of a wake word detection model's false positives and can be described as false wakes. Conversely, false rejections are equivalent to a wake word detection model's false negative. Amazon's memo further states that ██████████████████████████ ████████████████████ In contrast, the memo states that ███████████

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███ ████ ██ ██ ██ ██ ██ ████ ████ ████

(AMZ_GARNER_01102379).

57.    Between 2019 and 2020 Amazon considered ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███(AMZ_GARNER_01447707).

58.    In a proposal draft, Amazon recognized ████████████████

██████████████████████████████████████████████████

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

(AMZ_GARNER_01447707). ██████████████████████

██████████████████████████████ (AMZ_GARNER_01447707 at

01447709–10).

59.    Amazon recognized the value of false wake data, stating, "██████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███ ████ ████ ████ ████ ████ █ ████ ████ ██████

(AMZ_GARNER_01447707 at 01447709). In other words, the false wake

data had ongoing value to Amazon, beyond the initial training of its AI

models.

60.    In assessing the risks of making Alexa privacy-friendly, ██████████

███████████████████████████████████████

███████████████████████████████████████

26

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████    ██    ███    █    ████    ██    ████    ████

(AMZ_GARNER_01447707 at 01447712). In summary, ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

61.    In one internal memo ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

(AMZ_GARNER_00853050).

62.    ███████████████████████████████████████

███████████████████████████████████████

██████████████████████

      ███████████████████████████████████
      ███████████████████████████████████
      ███████████████████████████████████
      ██████████████

      ███████████████████████████████████
      ███████████████████████████████████
      ███████████████████████████████████
      ███████████████████████████████████
      ███████████████████████████████████
      ████████████████████

AMZ_GARNER_00336489.

63.    In the same email chain Amazon employee Chandra Rohan stated, ██████

███████████████████████████████████████████

███████████████████████████ (AMZ_GARNER_00336498).

███████████████████████████████████████████

███████████████████████████████████████████

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

███████████████████████████████████████████

███████████████████████████████

### i. There is a tension between minimizing false wakes and increased latency between the utterance and response.

64. It is an engineering decision, based on business objectives, how to balance false wakes with latency (speed of response by Alexa). In a slack message chain between Amazon employees, ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████ (AMZ_GARNEER_00504528).

65. In another Amazon slack chat chain, ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



(AMZ_GARNEER_00931172).

66.     An Amazon goal sheet describes efforts to reduce the false accept rates (false

positive rate) without impacting false reject rate (false negative rate). It

describes ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ █ ████ ████ ████ ████ █████ █ ████

(AMZ_GARNER_00696702, p. 9), ██████████████████████ [28] ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████ ██ ████ ███ ███ █████ ███ █████ ████

---

[27] *What is federated learning?* IBM. Retrieved from https://research.ibm.com/blog/what-is-federated-learning on June 14, 2024.

[28] Settles, B. (2010). *Active Learning Literature Survey*. (Report 1648). p. 5. University of Wisconsin-Madison. https://burrsettles.com/pub/settles.activelearning.pdf.

[29] Qian, J., Kaimin, W., Wu, Y., Zhang, J., Chen, J., & Bao, H. (2024) *GI-SMN: Gradient Inversion Attack against Federated Learning without Prior Knowledge.* Arxiv. https://arxiv.org/pdf/2405.03516.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(AMZ_GARNEER_00063046). ███████████████████

███████████████████████████████████

67.    As apparent in the above examples, efforts to reduce inappropriate collection of user data were hampered by increases in latency. The two being at odds, Amazon would have needed to balance increases in latency with reduced collection of user data. This was important to Amazon since "Latency is something that [they] always tried to minimize." (Fresko Deposition, 19:6-7). "Latency is something that we… are very focused on. [I]f I add five seconds of latency, it can just completely confuse the customer. It can look like a false reject" (Vitaladevuni Dep. 137:11–19).

**C.    Amazon's collection of utterances is valuable.**

68.    Businesses based on artificial intelligence compete across two main axes: the quality of their artificial intelligence software, and the size and quality of their data sets.

69.    Big Data has been at the core of Amazon's competitive advantage since the beginning. A 2012 academic analysis says, "Online retailers could track not only what customers bought, but also what else they looked at; how they navigated through the site; how much they were influenced by promotions, reviews, and page layouts; and similarities across individuals and groups.

31

Before long, they developed algorithms to predict what books individual customers would like to read next—algorithms that performed better every time the customer responded to or ignored a recommendation. Traditional retailers simply couldn't access this kind of information, let alone act on it in a timely manner. It's no wonder that Amazon has put so many brick-and-mortar bookstores out of business."[30]

70.    As an internal Amazon document explained, ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██  █  ██  ██  ███  ██  ██  ██  ████

(AMZ_GARNER_00386864).

71.    By extending their big data collection with utterances, Amazon can improve their predictions about what products a customer might be interested in buying. For example, if a customer asks Alexa, "When is Rings of Power

---

[30] McAffee, A. and Brynjolfsson, E., (2012). *Big Data: The Management Revolution*. Harvard Business Review. https://hbr.org/2012/10/big-data-the-management-revolution.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

going to be on TV?"[31] Amazon can infer that this customer is interested in Rings of Power and fantasy stories in general. Amazon can then tailor the products offered to this customer accordingly. "Alexa is designed to fulfill the customer's intent. Some of those intents reach into other Amazon properties. So if you asked for… shopping for an item on Amazon or playing music from an Amazon music service, those benefit those services and the interaction starts from Alexa. So Alexa is an accurate and delightful product. Those interactions might increase in nature. And so that's overall good for Amazon. That's really the dynamic" (Fresko Dep. 195:16–196:1).

72.    In a 2022 earnings call, Amazon stated, ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ (AMZ_ GARNER_02008597 at 02008609). ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[31] I asked Alexa this question and received a fulsome response, including that *Lord of the Rings: Rings of Power* is currently available for streaming on Amazon Prime as well as the date when the date when the next season will be released.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

████████████████████████████████████████████

████████████████████████████████ (Vitaladevuni

Dep. 139:7–18).

73.    █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ (AMZ_ GARNER_02008597 at 02008609). █████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

74.    In prepared remarks for a September 2020 Q&A, Amazon's position

statement highlighted the value of Alexa recordings: "Customers expect

Alexa will improve over time, and training Alexa with recordings is central to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

making sure that the service works well for everyone. Training Alexa with real world requests from a diverse range of customers helps make sure Alexa responds properly to the variation in our customers' speech patterns, dialects, accents, and vocabulary, and the acoustic environments where customers use Alexa. Voice recordings are also essential to creating new features like the ones we launched today - including Teachable Alexa" (AMZ_GARNER_00059116 at 00059169).

75.     In an email sent by Amazon employee Veerdhawal Pande, it's stated that ███ ██████████████████████████████████████████████ ███████████████ (AMZ_GARNER_00895902). 3P means third-party and 'skills' refers to Alexa capabilities (https://developer.amazon.com/en-US/alexa/branding/alexa-guidelines/communication-guidelines/how-describe-amazon-echo-and-alexa).   Non-DD speech refers to non-device directed speech, including outside conversations (crosstalk) and media playback.

76.     The email goes on to describe a goal of ██████████████████ ███████████████████████ going into 2022. Amazon was aware of privacy issues; it was apparent in their transcriptions of user utterances. However, protecting that privacy was not always an objective.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

77. In another email chain, Amazon employee Bjorn Hoffmeister discusses █

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███ ██ ████ ████ ██ ██ ████ ████ ████

(AMZ_GARNER_00871609).

78. The ███████████████████████████ are pasted into the same

email chain by Amazon employee Karthikeyan Radhakrishna. These notes

include a topic description of ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████

79. The above passages illustrate Amazon's motive in retaining user data for

future projects. In the immediately discussed instance, this data represents

audio merely overheard by Alexa devices, not directed at it.

36

### i.     Amazon obtains incremental value from each utterance.

80.     Once Alexa ingests data and transmits an utterance to Amazon, Amazon has received value. "Amazon uses [utterance data] to build machine learning models… so that the Alexa service can continue to get smarter, get better, more effective for customers" (Taylor Dep. 81:7–17). "Customer data is a key enabler of the services we provide customers, and those services are valuable to our customers. … [And] they're also valuable to Amazon" (Rausch Dep. 154:15–18). Amazon.com's official privacy notice describes customer information as a "business asset[]."[32]

81.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ (Taylor Deposition, 121:7-10)." ███████████████

████████████████████████████████████████████

███ (Taylor Deposition, 121:11-14)." ██████████████

---

[32] Amazon.com Privacy Notice. (2024, March 31). Amazon.
    https://www.amazon.com/gp/help/customer/display.html?nodeId=GX7NJQ4ZB8MHFRNJ.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

████████████████████████████████████████████████

███████████████████

82.     In an Amazon document regarding ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████   █████   ███████████   █████   █████   ████   ██████████

(AMZ_GARNER_01012801).

83.     The document goes on to describe that ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████   (AMZ_GARNER_01012801).

38

**ii. Amazon could protect user privacy by altering utterances, so they do not sound like each user's voice and by filtering out sensitive content.**

84. Technology could be used to anonymize voices when recordings are made. This would help protect user privacy. Amazon explored the impact of such measures in 2020, ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ (AMZ_GARNER_03204848 at -54).

85. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ (AMZ_GARNER_00063009 at -38).

86. In an Amazon goal sheet circa 2022, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

39

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



(AMZ_GARNER_00672445).

### iii. Both the utterance recordings and transcripts are valuable to Amazon.

87.     Amazon gets value from both the recordings and the transcripts. Each utterance can be used to train Alexa to improve Alexa's accuracy. Voice recordings can also be processed to determine sentiment, such as whether the user is satisfied or angry. Such information is useful in determining how a user reacts to the Alexa product. "[T]his is meant to be a personal assistant device. … [S]o it's useful for [the] Alexa system to know if the user was satisfied or not with the given response" (Vitaldevuni Dep. 56:5–8). On the other hand, transcripts are amenable to further processing and indexing using algorithms that focus on text input.

88.     ███████████████████████████████████████████

███████   ███████   (AMZ_GARNER_01012801). Several language corpora have been funded through grants. One 1990's era UCSB corpus of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

just under 250k spoken words, with transcripts, was funded by a series of grants,[33] one of which with an approved award total of $313,734[34] (approximately $650,00 today[35])

89.   In a prepared Q&A document, Amazon explained, ███████████████

███████████████████████████████████████████

███████████████████████████████████████████ (AMZ_GARNER_00062463 at -74). But transcripts alone are not enough because.██████████████████

███████████████████████████████████████████

███████████████████████████████████ (AMZ_GARNER_00062463 at -73).

90.   In a QA style document regarding Amazon's development of Acoustic Event Detection (AED), the importance of audio and transcriptions in tandem is underscored. This technology is used for detecting target events such as "alarm, glass breaking etc," and not deciphering speech. The document

---

[33] *Santa Barbara Corpus of Spoken American English.* UCSB Department of Linguistics. Retrieved from https://www.linguistics.ucsb.edu/research/santa-barbara-corpus on June 14, 2024.

[34] *Award Search > RT-21433-92.* National Endowment for the Humanities. Retrieved from https://apps.neh.gov/publicquery/AwardDetail.aspx?gn=RT-21433-92 on June 14, 2024.

[35] CPI Inflation Calculator. BLS.gov. Retrieved from https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=313734&year1=199501&year2=202404 on June 14, 2024.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

describes the current baseline approach where audio "is sent to Alexa cloud service, is processed and stored. Audio may be annotated unless customer explicitly opts out." ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ (AMZ_GARNER_00063159).

Amazon needs reservoirs of data to draw upon for future endeavors.

91.    Patent US10,096,319 filed in 2017 describes several such future endeavors. It describes the integration of several capabilities into Alexa amounting to the real-time "voiced-based determination of physical and emotional characteristics of users." This includes recognizing a user's emotional state, accent, age, health, and background environment. The development of these features would require a large corpus of utterances (2018-10-09 Amazon's U.S. Patent 10096319 Re Voice-Based Determination of Physical Emotional User Characteristics.pdf). Consumer utterances would be particularly valuable as "[a]ny machine-learning system would require real-world data to

42

train… recordings from people outside of Amazon would likely be used for that process" (Fresko Deposition 24:23-25:1).

### iv. Amazon stores recordings and transcripts forever because they have value.

92.  In a 2018 memo Amazon wrote, ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

(AMZ_GARNER_01159717).

93.  According to a December 2023 Q&A document from Amazon, "In order to improve Alexa and provide customers with a history of their requests, we keep voice recordings until a customer chooses to delete them" (AMZ_GARNER_00062409 at -20). If a customer does not know that they have been recorded or does not know that they can delete these recordings, or does not know how to delete them, Amazon keeps the recordings forever. If a third party happens to be recorded by somebody else's Alexa-capable device, that third party might have no way to delete such recordings, because the device would not be associated with their Amazon account, or they might not even have an Amazon account. "A nonregistered user, by definition, … doesn't have an account that associated with anything. … It's possible to ask

43

to review the utterances [with] the account owner" (Rausch Dep. 98:8–17). "You cannot delete any utterances you can't see in the Alexa app" (*Id.* at 99:3–4).

94.    The fact that Amazon stores recordings and transcripts indefinitely shows the transcripts have value, because storage has a definite cost (Rausch Dep. 92:23–93:1). In addition, long term storage allows Amazon to use data for training new AI models and building new products, such as an AI chatbot. An internal document reveals that ████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████  (AMZ_GARNER_01159717).

**D.    Each user's data has discrete value.**

95.    "Opportunities to trade or sell your personal data are on the rise, with the chance to earn up to $50 a month, some companies claim."[36]

___

[36] Hunter, T. (2023, February 6). These companies will pay for your data. Is it a good deal? Washington Post. https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

96.    "Market research firm Forrester says about a third of business-to-consumer

marketers now go directly to consumers with a relatively cut-and-dried offer:

Your data for a deal."[37]

97.    The correct pricing of sensitive user data has been the subject of substantial

academic research. One recent paper explained, "an individual can share her

(verifiable) data in exchange for a monetary reward or services."[38]

98.    A memo describing goals for Alexa Data Services (ADS) ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[37] Hunter, T. (2023, February 6). These companies will pay for your data. Is it a good deal? Washington Post. https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/

[38] Fallah, A., Makhdoumi, A., Malekian, A., & Ozdaglar, A. (2023). *Optimal and differentially private data acquisition: Central and local mechanisms.* Operations Research. https://arxiv.org/abs/2201.03968.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

████████████████████████████████████████████

████ ████ █ ████ ████ █████ █ ████ ████

(AMZ_GARNER_00672445). ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

### i. Amazon could program Alexa to only record voices of registered users.

99.    It is technologically feasible for products to not record a voice that is not registered or recognized. Amazon launched speaker recognition in Q4'17 (AMZ_GARNER_00696702). An October 2018 Amazon monthly business review stated that, "Voice Recognition uses machine-learning models that match the voice from an incoming utterance to a customer's voice print, thereby identifying the user. With this technology, domain teams can personalize experiences for an individual such as playing songs specifically tailored for mom." Amazon created voice profiles to identify and distinguish users, ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

(AMZ_GARNER_01164418 at -22). This technology, available since at least October 2018, could have been used to ensure that Amazon had obtained permission from each person heard by Alexa before recording, saving, and using their utterances.

100.   In an email chain between employees, Drew DeBruyne notes an issue of

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██  ██  ██  ███  ██  ███  █  ██  █  ███

(AMZ_GARNER_01010621).

101.   As an example, Apple's Siri virtual assistant attempts to recognize the registered phone user's voice, and only wakes when the registered user says, "Hey Siri."

47

## VIII. CONCLUSION

102. To summarize, my opinions include:

    A. Amazon uses artificial intelligence based on recordings, voice-to-text, and natural language processing algorithms to drive its Alexa virtual assistant.

    B. Artificial intelligence models require both positive and negative examples for effective training.

    C. Amazon's collection of utterances is valuable.

    D. Each user's data has discrete value.

103. This report sets forth my opinions based on the information currently available to me. I reserve the right to amend or supplement this report based on other information coming to my attention including, but not limited to, discovery documents, deposition testimony, and evidence presented at the trial of this case.

Respectfully offered by,

Jonathan E. Hochman

JE Hochman & Associates LLC

48

Date: June 18, 2024

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Exhibit A

Jonathan Hochman CV

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# JONATHAN E. HOCHMAN

NEW LONDON, CONNECTICUT
jonathan@hochmanconsultants.com
Tel +1-203-699-2628

## CURRENT POSITIONS

| | |
|---|---|
| 2004 – Present | **HOCHMAN CONSULTANTS – Partner**<br>Founded Internet and search marketing agency as outgrowth of prior position. Provides consulting and software development services to clients, including technology companies, publishers, ecommerce providers and web development firms. |
| 2018 – Present | **UNS PROJECT – Co-Founder**<br>Invented and developed Internet infrastructure service for user authentication, linking of de-identified records, and detection of fake accounts. |
| 2023 – Present | **YALE UNIVERSITY – Teaching Fellow**<br>Discussion leader, grader, and tutor for CPSC427/527 C++ Programming for Stability, Security, and Speed (Fall 2024). CPSC 414/514 Computing Then and Now: How Digital Technology Evolves (Spring 2023, Spring 2024), and CPSC 457/557 Sensitive Information in a Connected World (Fall 2023). |

## PAST POSITIONS

| | |
|---|---|
| 2010 – 2018 | **CODEGUARD, INC. – Co-Founder – Acquired by Sectigo and Francisco Partners**<br>Invented web site security service, built working prototype, and raised initial capital. |
| 2008 – 2019 | **SEMNE (SEARCH ENGINE MARKETING NEW ENGLAND) – Chair and**<br>Founding member of search marketing association in New England. |
| 1999 – 2004 | **BARCODING INC. – Director**<br>Systems integrator provides software, bar code technology, RFID technology, and wireless networks to commercial, manufacturing, warehousing, and government sectors. Named to the Inc. 500 (Nov 2004). Raised 50% of initial funding to grow the business from two to sixty employees. |
| 1999 – 2003 | **UNITED ALLOYS CORPORATION – General Manager**<br>Imported specialty metals and chemicals for sale in North America on behalf of Russian producers. |
| 1996 – 1999 | **INDUSTRIAL METALS & CHEMICALS CORPORATION – General Manager**<br>Sales and marketing of specialty metals and chemicals representing Russian producer worldwide. |
| 1990 – 1996 | **NORTH ATLANTIC RESOURCES, INC. – President**<br>Consulting firm assisted Russian companies with foreign trade in Europe, North America, Middle East, and Asia. Products sold included mainframe computers, software, office equipment, consumer electronics, consumer packaged goods, and construction materials. |

## EDUCATION

| | |
|---|---|
| 2022 – Present | **YALE UNIVERSITY**<br>PhD student in the Yale Applied Cryptography Laboratory. |
| 1990 – 1991 | **COLUMBIA LAW SCHOOL**<br>Completed first year of law school, then departed to spend time managing own venture. |
| 1986 – 1990 | **YALE UNIVERSITY**<br>Co-terminating BSc. and MSc. degrees in Computer Science awarded *summa cum laude*, distinction in the major, Tau Beta Pi (The Engineering Honor Society), Barge Mathematics Prize, Henry Edwards Ellsworth Memorial prize for significant research. |

CERTIFICATES

1. CITI Program, Biomedical Research – Basic 50611315, issued Jan 11, 2023, expiry Jan 11, 2026
2. Google Ads Display Certification – Credential ID 275103033, issued March 23, 2024, expiry March 23, 2025
3. Google Ads Search Certification – Credential ID 275093401, issued March 23, 2024, expiry March 23, 2025

ACADEMIC PAPERS

1. Fischer, M.J., Hochman, J.E., Boffa, D. (2021). Privacy-Preserving Data Sharing for Medical Research. In: Johnen, C., Schiller, E.M., Schmid, S. (eds) Stabilization, Safety, and Security of Distributed Systems. SSS 2021. *Lecture Notes in Computer Science: Vol. 13046*. Springer, Cham. https://doi.org/10.1007/978-3-030-91081-5_6.
2. Hochman, J. (1990). *How to Create a Failure Tolerant Distributed System* (Tech Report No. 799). Yale University Department of Computer Science.

PUBLISHED ARTICLES

1. New Wave of Referrer Spam Wrecking Google Analytics Data, Marketing Land, December 8, 2016
2. What is Search Engine Optimization Manipulation, National Law Review, May 18, 2016
3. A Proposal for Ethical Ad Blocking, Marketing Land, October 5, 2015
4. Web Overload: Why Digital Advertising Needs to Hit the Reset Button, Marketing Land, September 25, 2015
5. Pay-to-Unpublish Sites Practice 'Digital Blackmail', Internet Evolution, November 6, 2013
6. Why Google Should Crack Down Harder On The Mugshot Extortion Racket, Search Engine Land, Feb. 6, 2013
7. How to Avoid Enterprise Password Danger, Internet Evolution, June 27, 2012
8. Tech Group's Open Letter to Its Congressman, Internet Evolution, January 19, 2012
9. SEO Service Spammers: Combating Disinformation, Search Marketing Standard, Winter 2011/2012
10. Deconstructing Microsoft AdCenter's Missed Opportunities, Search Engine Land, February 17, 2011
11. What Every Search Marketer Needs to Know About Web Security, Search Engine Land, December 30, 2010
12. 5 SEO Tips You Can Usually Ignore, Search Marketing Standard, Summer 2010
13. How To Avoid Getting Your Search Rankings Trashed by Malware, Search Engine Land, Sept. 4, 2009
14. Google Turns Blind Eye to Scam Ads, Internet Evolution, Aug. 21, 2009
15. Nasty Malware Attack Targets Web Developers, Internet Evolution, Aug. 19, 2009
16. An Open Letter to Online Ad Networks, SEOBOOK, July 28, 2009
17. Simple Security Steps to Stop Server Spam, Internet Evolution, July 23, 2009
18. How to Protect Your Web Marketing Assets, Internet Evolution, March 4, 2009
19. An Update on JavaScript Menus And SEO, Search Engine Land, January 9, 2009
20. Is Wikipedia Transparent Enough?, Search Marketing Standard, Winter 2008/2009
21. Google SearchWiki - Opportunity or Headache, Search Marketing Standard, Spring 2009
22. Microsoft Announces adCenter Desktop Beta during SMX Advanced Keynote, Search Engine Land, June 2, 2008
23. Twelve Simple Ways to Write Search-Friendly HTML Code, Search Engine Land, May 30, 2008
24. Legitimate, Useful Subversion for Search Engine Marketers, Search Engine Land, April 8, 2008
25. Using Wikipedia to Reveal Web Traffic Data, Search Engine Land, March 12, 2008
26. Virtual Blight & The Ten Commandments for Online Marketers, Search Engine Land, February 18, 2008
27. URL Rewriting & Custom Error Pages in ASP.NET 2.0, Search Engine Land, September 21, 2007
28. Microsoft adCenter Offers Appealing Upgrade, Search Engine Land, September 10, 2007
29. Tracking Hot Topics on Wikipedia, Search Engine Land, September 10, 2007
30. Search Marketing & Web Page Download Speed, Search Engine Land, September 5, 2007
31. How to Get More Pages into Google's Index, Search Engine Watch, August 1, 2007

SELF-PUBLISHED ARTICLES

1. The Cost of Pay Per Click Advertising— PPC Trends and Analysis
2. 302 Redirect vs. 301 Redirect: Which is Better?
3. How to Get Google Sitelinks
4. How to Standardize Multiple Domains for SEO Using 301 Redirects

5. How to Write Meta Descriptions (Code Sample Included)
6. The Cost of Banner Advertising – Trends and Analysis
7. Basic SEO Tips
8. The Benefits of Clean URLs
9. Best Content Management Systems and SEO
10. Best Practices for Managing Online Reviews
11. The Cost of SEO Services
12. External Links & SEO
13. Adobe Flash and SEO
14. The Google Sandbox Effect
15. How to Block Part of a Page from Being Indexed by Google or Other Search Engines
16. The Internet Marketing Process
17. The Danger of Deadlines in Web Development
18. Spam Prevention Techniques

SPEAKING

1. Yale Innovation Summit, New Haven, May 2022
2. 23rd International Symposium on Stabilization, Safety, and Security of Distributed Systems, November 2021
3. Yale Innovation Summit, New Haven, May 2019
4. VT Web Marketing Summit, Burlington, VT, November 2017
5. National Expert Witness Conference, Clearwater Beach, FL, May 2017
6. International Printing & Imaging Conference, Henderson, NV, July 2016
7. VT Web Marketing Summit, Burlington, VT, November 2015
8. VT/NH Marketing Group, Woodstock, VT, May 2015
9. VT Web Marketing Summit, Burlington, VT, November 2014
10. VT Web Marketing Summit, Burlington, VT, November 2013
11. VT/NH Marketing Group, Whitefield, NH, June 2013
12. VT Web Marketing Summit, Burlington, VT, November 2012
13. SMX East, New York, October 2012
14. SMX Advanced, Seattle, June 2012
15. SMX West, San Jose, Feb 2012
16. SMX Advanced, London, May 2011
17. SMX Toronto, April 2011
18. SMX West, San Jose, March 2011
19. SMX West, Santa Clara, March 2010
20. IWLA Marketing and Sales Conference, Chicago, July 2009
21. SMX Advanced, Seattle, June 2009
22. Web 2.0 Expo, San Francisco April 2009
23. Web 2.0 Summit, November 2008
24. SMX East, New York, October 2008
25. SMX Advanced, Seattle, June 2008
26. SMX Social Media, Long Beach, April 2008
27. Search Engine Strategies, San Jose, August 2007
28. Search Engine Strategies, New York, April 2007
29. Search Engine Strategies, Chicago 2006
30. IWLA Marketing and Sales Conference, Chicago, July 2006

PATENTS

1. User Authentication System, Patent No. US11570163.
2. Systems and methods for automated retrieval, monitoring, and storage of online content, Patent No. US9069885B1

TRIAL TESTIMONY

(8 cases prior to Aug 31, 2019: 3 state court cases, 3 arbitrations, and 2 District Court cases )

1. **Behavioral Concepts** v Autism Intervention Specialists, 2012-2484C, Massachusetts Superior Court.
2. Damian v **Courtright**, 1:21-cv-01694, US District Court for the Middle District of Florida.
3. Onyx Enterprises v **Id Parts**, 1:2020-cv-11253, US District Court for the District of Massachusetts.
4. **Client 7** v Party 7, American Arbitration Association, Case No.: 01-20-15-5410, July 2023
5. Party 8 v **Client 8**, American Arbitration Association, Case No.: 01-21-0017-9809, July 2023
6. **Client 6** v Party 6, American Arbitration Association, Claim No. 01-21-0017-2493, June 2023.
7. **Take 5 Media, et al.** v. Advantage Sales & Marketing, et al., AAA No. 01-19-0002-7532.
8. **Client 5** v Party 5, American Arbitration Association, Case 01-20-15-5410.
9. Social Tokens v. **VDOPIA**, Tel Aviv-Jaffa Magistrate's Court (2021).
10. Boppers v. **Rosenay**, HHD-CV19-60104115-S, Connecticut Superior Court, Judicial District of Hartford.

DEPOSITION TESTIMONY

(16 depositions prior to Aug 31, 2019)

1. SIG China Investments v. **Clear Yield Investments,** American Arbitration Association, Case No.: 01-22-0002-6958. *Related case*: **TGC Partners Limited** v. SIG China Investments, 2021-22424, Court of Common Pleas, Montgomery County, Pennsylvania.
2. **Geomatrix** v Eljen, 3:20-cv-01900, US District Court for the District of Connecticut.
3. Digital Media Solutions, LLC v. **Zeetogroup, LLC**, 3:2022-cv-01184, US District Court for the Southern District of California.
4. **Rodriguez** v Google, 3:20-cv-04688, US District Court for the Northern District of California.
5. **Client 7** v Party 7, American Arbitration Association, Case No.: 01-20-15-5410, June 2023.
6. Edible v **800-FLOWERS**, 1:20-cv-2405, , US District Court for the Northern District of Georgia.
7. **Delta** v Marriott, 1:20-CV-01125, US District Court for the Northern District of Georgia.
8. Tireboots by Universal Canvas v. **Tiresocks**, 1:20-cv-07404, US District Court for the Northern District of Illinois.
9. **Client 6** v Party 6, American Arbitration Association, ·Claim No. 01-21-0017-2493, March 2023.
10. Damian v. **Courtright**, 1:21-cv-01694, US District Court for the Northern District of Illinois.
11. **Iraida Hernandez** v Ashish Pal, M.D., 2020-CA-10122-O, Circuit Court, Orange County, Florida
12. **Premier Automotive** v DealerCMO, 19CV344119, Superior Court of California, County of Santa Clara.
13. San Juan Products v **River Pools & Spas**, 8:21-cv-02469, US District Court for the Middle District of Florida.
14. What a Smoke v **Duracell**, 2:19 cv 16657, US District Court for District of New Jersey.
15. **Evox** v AOL, 20-cv-02907, US District Court for the Central District of California. (Supplemental Report)
16. **Brown** v Google, 20-cv-03664, US District Court for the Northern District of California.
17. **Black** v CNN, 5016CA001517, Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida.
18. Legno Bastone v **Provenza Floors**, 20-CA01486, Circuit Court, 20th Judicial Circuit, Collier County, Florida.
19. **Drips** v Teledrip, 5:19-CV-02789, US District Court for the Northern District of Ohio, Eastern Division.
20. **Lane** v Elyassnia, et al., CGC-20-586918, Superior Court of California, County of San Francisco.
21. **Take 5 Media** v. Advantage Sales & Marketing, et al., AAA No. 01-19-0002-7532.
22. Honey Baked Ham Inc. v. **Honey Baked Ham Company LLC**, 8:19-cv-01538, US District Court, Central District of California, Southern Division.
23. **National Rifle Association of America** v. Ackerman McQueen Inc et al, 3:19-cv-02074, US District Court, Northern District of Texas, Dallas Division.
24. **Evox** v AOL, 20-cv-02907, US District Court for the Central District of California.
25. Party 4 v **Client 4**, binding private arbitration.
26. **Zillow** v IBM, IPR2020-01656, USPTO, Patent Trial and Appeal Board.
27. **Zillow** v IBM, IPR2020-01655, USPTO, Patent Trial and Appeal Board.
28. **FurnitureDealter.Net** v Amazon.com and COA Inc, 18-cv-00232, US District Court, Minnesota.
29. **H. Roske** v Christian Burghart, 657328/2017, Supreme Court of New York, New York County.
30. RingCentral v **Nextiva**, 19-cv-02626, US District Court for the Northern District of California.
31. **Davis and Azar** v Yelp, 18-cv-00400, US District Court for the Northern District of California.
32. **Jayda Cheaves** v Walgreens, 19-cv-02970, US District Court for the Northern District of Georgia.

33. Penn Engineering v **Peninsula Components**, 19-cv-00513, US District Court, Eastern District of Pennsylvania.
34. American Airlines v **Delta Air Lines**, 19-cv-01053, US District Court for the Northern District of Texas.
35. Troubleshooter Network v **HomeAdvisor**, 18-cv-02362, US District Court for the District of Colorado.
36. Hotel Airport v **Best Western International**, 2:19-cv-01393, US District Court for the District of Arizona.
37. **Dreamstime** v Google, 3:18-cv-01910, US District Court for the Northern District of California.
38. In re Snap Securities Litigation (for **lead plaintiffs and the class**), 2:17-cv-03679, US District Court, Central District of California.
39. Gree v **Supercell**, IPR2019-00086, USPTO, Patent Trial and Appeal Board.
40. Gree v **Supercell**, IPR2019-00083, USPTO, Patent Trial and Appeal Board.
41. **Ascente** v Digital River, 18-cv-00138, US District Court for the District of Minnesota.


Retaining parties shown in bold.

# Exhibit B

Documents Considered

1. The documents cited in this report.
2. 2018-10-09 Amazon's U.S. Patent 10096319 Re Voice-Based Determination of Physical Emotional User Characteristics.pdf
3. 2019-05-23 Amazon U. S. Patent Application 0190156818 (Pre-WakeWord Speech Processing).pdf
4. 2023-10 Amazon WA Tracking, Profiling, and Ad Targeting in the Alexa Smart Speaker Echosystem Study.pdf
5. 2024-01-31 Nedim Fresko Deposition Transcript FULL Confidential w Exhibits.pdf
6. 2024-02-08 Tom Taylor Deposition Transcript FULL Highly Confidential w Exhibits.pdf
7. AMZ_GARNEER_00056726.pdf
8. AMZ_GARNEER_00059116.pdf
9. AMZ_GARNEER_00062409.pdf
10. AMZ_GARNEER_00063009.pdf
11. AMZ_GARNEER_00063046.pdf
12. AMZ_GARNEER_00107591.pdf
13. AMZ_GARNEER_00325001.pdf
14. AMZ_GARNEER_00428213.pdf
15. AMZ_GARNEER_00504528.pdf
16. AMZ_GARNEER_00931172.pdf
17. AMZ_GARNEER_01445082.pdf
18. AMZ_GARNEER_02008597.pdf
19. AMZ_GARNEER_03204848.pdf
20. AMZ_GARNEER_03505929.pdf
21. AMZ_GARNER_00031485.pdf
22. AMZ_GARNER_00043038.pdf
23. AMZ_GARNER_00045811.pdf
24. AMZ_GARNER_00048007.pdf
25. AMZ_GARNER_00048143.pdf
26. AMZ_GARNER_00049200.pdf
27. AMZ_GARNER_00050562.pdf

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

28. AMZ_GARNER_00050577.pdf
29. AMZ_GARNER_00050591.pdf
30. AMZ_GARNER_00050656.pdf
31. AMZ_GARNER_00051488.pdf
32. AMZ_GARNER_00051986.pdf
33. AMZ_GARNER_00052152.pdf
34. AMZ_GARNER_00052293.pdf
35. AMZ_GARNER_00052921.pdf
36. AMZ_GARNER_00053228.pdf
37. AMZ_GARNER_00053718.pdf
38. AMZ_GARNER_00054201.pdf
39. AMZ_GARNER_00054449.pdf
40. AMZ_GARNER_00054833.pdf
41. AMZ_GARNER_00054956.pdf
42. AMZ_GARNER_00055024.pdf
43. AMZ_GARNER_00055311.pdf
44. AMZ_GARNER_00056465.pdf
45. AMZ_GARNER_00056717.pdf
46. AMZ_GARNER_00057114.pptx
47. AMZ_GARNER_00057126.pdf
48. AMZ_GARNER_00058307.pdf
49. AMZ_GARNER_00058356.pdf
50. AMZ_GARNER_00058796.pdf
51. AMZ_GARNER_00058828.pdf
52. AMZ_GARNER_00059313.pdf
53. AMZ_GARNER_00060168.pdf
54. AMZ_GARNER_00060894.pdf
55. AMZ_GARNER_00061171.pptx
56. AMZ_GARNER_00061670.pdf
57. AMZ_GARNER_00062463.pdf
58. AMZ_GARNER_00063159.pdf
59. AMZ_GARNER_00063303.pdf
60. AMZ_GARNER_00064324.pdf
61. AMZ_GARNER_00067500.pdf
62. AMZ_GARNER_00072579.pdf
63. AMZ_GARNER_00073696.pdf
64. AMZ_GARNER_00074001.pdf
65. AMZ_GARNER_00074255.pdf
66. AMZ_GARNER_00075014.pdf
67. AMZ_GARNER_00079473.pdf

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

68. AMZ_GARNER_00083359.pdf
69. AMZ_GARNER_00087550.pdf
70. AMZ_GARNER_00098033.pdf
71. AMZ_GARNER_00187983.pdf
72. AMZ_GARNER_00191255.pdf
73. AMZ_GARNER_00191886.pdf
74. AMZ_GARNER_00197202.pdf
75. AMZ_GARNER_00305831.pdf
76. AMZ_GARNER_00323704.pdf
77. AMZ_GARNER_00330204.pdf
78. AMZ_GARNER_00330446.pdf
79. AMZ_GARNER_00330453.pdf
80. AMZ_GARNER_00336489.pdf
81. AMZ_GARNER_00336498.pdf
82. AMZ_GARNER_00351665.pdf
83. AMZ_GARNER_00381517.pptx
84. AMZ_GARNER_00386864.pdf
85. AMZ_GARNER_00389057.pdf
86. AMZ_GARNER_00426279.pdf
87. AMZ_GARNER_00487323.pdf
88. AMZ_GARNER_00515265.pdf
89. AMZ_GARNER_00522361.pdf
90. AMZ_GARNER_00528925.pdf
91. AMZ_GARNER_00565802.pdf
92. AMZ_GARNER_00586004.pdf
93. AMZ_GARNER_00596873.pdf
94. AMZ_GARNER_00608661.pdf
95. AMZ_GARNER_00610677.pdf
96. AMZ_GARNER_00631134.pdf
97. AMZ_GARNER_00672445.pdf
98. AMZ_GARNER_00696702.pdf
99. AMZ_GARNER_00853050.pdf
100. AMZ_GARNER_00871609.pdf
101. AMZ_GARNER_00895902.pdf
102. AMZ_GARNER_00923715.pdf
103. AMZ_GARNER_00959903.pdf
104. AMZ_GARNER_01010434.pdf
105. AMZ_GARNER_01010621.pdf
106. AMZ_GARNER_01012801.pdf
107. AMZ_GARNER_01102379.pdf

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

108. AMZ_GARNER_01159717.pdf
109. AMZ_GARNER_01164418.pdf
110. AMZ_GARNER_01177920.pdf
111. AMZ_GARNER_0117992.pdf
112. AMZ_GARNER_01221121.pptx
113. AMZ_GARNER_01434873.pdf
114. AMZ_GARNER_01447707.pdf
115. AMZ_GARNER_01526503.pdf
116. AMZ_GARNER_01631138.pdf
117. AMZ_GARNER_02068199.pdf
118. AMZ_GARNER_02889160.pdf
119. AMZ_GARNER_03042527.pdf
120. AMZ_GARNER_03160327.pdf
121. AMZ_GARNER_03203468.pdf
122. Daniel B. Rausch 031424 FULL Highly Confidential.pdf
123. Shiv Vitaladevuni 042324 FULL 30(b)(6), Attorneys Eyes Only PDFA.pdf
124. wawd-2 2021-cv-00750-00001.pdf
125. wawd-2 2021-cv-00750-00091.pdf

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT C

# [Redacted]

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

KAELI GARNER, et al.,

               Plaintiff,

v.

AMAZON.COM, INC., et al.,

               Defendants.

Case No. 2:21-cv-00750-RSL

HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY

# REBUTTAL REPORT AND DECLARATION OF PROF. LORIN HITT

October 2, 2024

# Table of Contents

I.     Qualifications ............................................................................................... 1

II.    Background .................................................................................................. 3

       A.     Alexa .................................................................................................. 3

              1.     Alexa Software And Alexa Devices ................................................ 3

              2.     Alexa Recordings And Use Of Recordings ............................... 5

       B.     Plaintiffs' Allegations ....................................................................... 8

       C.     Summary Of Plaintiffs' Experts' Reports .......................................... 9

III.   Assignment ................................................................................................ 11

IV.    Summary Of Opinions .............................................................................. 12

V.     None Of Plaintiffs' Experts Have Provided A Common Method To Measure Damages In This Matter .......................................................................... 14

       A.     Plaintiffs Have Not Shown That Members Of The Registrant Putative Class Lost Value Of Their Voice Recordings. .................................. 15

       B.     Any Estimate Of Amazon's Value Of The Alexa Recordings Cannot Be Used To Estimate The Registrant Class Members' Alleged Lost Value. ..................................... 19

              1.     The Value Of Information Is Context-Specific. ....................... 19

              2.     There Is No Market For Alexa Recordings To Train Alexa. .... 23

              3.     Mr. Hochman Has No Valid Support For His Claim That Registrant Putative Class Members Value Alexa Recordings. ............................ 24

              4.     Plaintiffs Have Not Proposed Any Class-Wide Method For Valuing Alexa Recordings. .................................................... 31

       C.     Plaintiffs Fail To Consider The Benefits To Members Of The Putative Classes From Amazon's Retention And Use Of Alexa Recordings For Product Improvements .. 32

VI.    Alexa Usage And Market Data Suggest That Many And Perhaps Most Members Of The Registrant Putative Class Could Not Have Been Harmed. ........................... 34

       A.     Information About Alexa Recordings Disseminated Throughout The Public Domain .................................................................................. 35

       B.     There Was No Negative Response In Usage Of Alexa Devices Following Periods Of High Media Coverage Regarding Alexa Recordings. ................. 39

       C.     There Was No Negative Response In Purchases Of Alexa Devices Following Periods Of High Media Coverage About Alexa Recordings. ............ 44

VII.   Establishing Any Economic Harm To Members Of The Putative Classes Requires Individualized Inquiry ............................................................................... 46

A.      Putative Class Members Have Heterogeneous Privacy Preferences. ................... 47

B.      Putative Class Members Have Heterogeneous Knowledge Of Amazon's Retention And Use Of Alexa Recordings. ...................................................................... 50

C.      Dr. Egleman's And Prof. Hoffman's Literature Confirm Heterogenous Preferences Among Putative Class Members. ................................................. 54

D.      Putative Class Members Have Heterogeneous Experiences With False Wakes. . 59

E.      Prof. Hoffman's Proposed "Just-in-Time" Notifications May Have Negative Impact On Putative Class Members.................................................................... 61

VIII.   Conclusion ...................................................................................................... 63

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY      ii

## I.    Qualifications

1.      My name is Lorin Moultrie Hitt.  I am the Zhang Jindong Prof. of Operations, Information and Decisions ("OID") at the University of Pennsylvania, Wharton School.  As a member of the Information Strategy and Economics Group (ISE), my research and teaching focus on the economics of consumer behavior, firm organization, and market structure, with particular emphasis on the role of information on pricing, performance, and competition.

2.      I received my Ph.D. in Management from the Massachusetts Institute of Technology Sloan School of Management in 1996, and my Sc.B. (1988) and Sc.M. (1989) degrees in Electrical Engineering from Brown University.  The majority of my Ph.D. coursework was in economics and statistics, and my doctoral dissertation was supervised in part by Zvi Griliches (Harvard), a former Chair of the American Economic Association ("AEA") and a pioneer in methods for understanding the relationship between prices and quality change in complex products.  I am a member of the AEA, Sigma Xi (Scientific Research Society), and Tau Beta Pi (Engineering Honor Society) as well as a Distinguished Fellow of the INFORMS Information Systems Society.

3.      I have taught undergraduate, masters, doctoral, and executive education level courses at the University of Pennsylvania and the Massachusetts Institute of Technology on competition and customer pricing in a variety of commercial and consumer markets, especially as it relates to information goods and services, information systems management (including privacy and security), economics of technology, and data analysis.  In my Ph.D. seminar, I cover a variety of empirical methods used in economic research, including methods for estimating product demand and supply, pricing products, measuring the effect of external events on market prices, and valuing individual product features in differentiated products using techniques developed by both econometricians and marketing researchers.  I am a thirteen-time winner of the Wharton Undergraduate Teaching Award and have received the Wharton-wide Hauck Award and University-wide Lindback Award for distinguished teaching.

4.      My research is characterized by rigorous economic analysis, and I am well versed in econometric and statistical methods.  I have written theory and application papers related to pricing and management of information products and information technology services, as well as

the influence of information on consumer behavior in online retail. In addition, much of my published work is developing empirical approaches for modeling demand in consumer and commercial markets, assessing these models using market data, and using this information for pricing or product design. Some of my recent work has examined the economic impact of analytics and artificial intelligence and how privacy concerns influence consumer choices. My research has been published in top-tier economics and management journals, including the *Quarterly Journal of Economics*, the *Review of Economics and Statistics*, the *Journal of Economic Perspectives*, *Brookings Papers on Economic Activity*, *Management Science*, *Information Systems Research*, and *Management Information Systems Quarterly.*

5.    I formerly served as a Department Editor at *Management Science,* a Senior Editor at *Information Systems Research*, and as an editorial board member of the *Journal of Management Information Systems*. I have also served as a reviewer for many management and economics journals including *American Economic Review*, the *Quarterly Journal of Economics*, *Information Economics and Policy*, *Journal of Industrial Economics*, *Journal of Law, Economics, and Organization*, *Managerial and Decision Economics*, *Marketing Science*, *Review of Economics and Statistics*, and *MIT Sloan Management Review*, among others.

6.    I have prior experience evaluating the value of products and product features in information goods and services such as software, online travel platforms, operating systems, and information security services; information technology hardware products such as smartphones, tablets, memory devices, microprocessors, communications chips, cloud storage services, and personal computers; and other products such as cosmetics, automobiles, and flat panel televisions. I co-authored a book chapter discussing proposed methods in consumer class actions to assess potential harm from unauthorized access and misuse of personal information. In recent years, I have also worked extensively on the economics of digital devices and ecosystems.

7.    I have specific experience in consumer class actions, including the use of a variety of modeling techniques from economics and marketing, such as using surveys, market data or internal corporate data for the purposes of class certification, and measurement of economic injury. I also have specific experience in class actions involving data security incidents and alleged misuse of personal information.

8.    My expert opinions in these matters have been accepted in federal and state courts.

9.     My Curriculum Vitae is attached as **Appendix A**, and a list of my testimony in the past four years is attached as **Appendix B**.

## II.     Background

### A.     Alexa

#### 1.     Alexa Software And Alexa Devices

10.    Alexa is a virtual voice operated technology (or "voice assistant") developed by Amazon Inc. ("Amazon"), used to respond to voice requests and execute commands to provide information and entertainment to its users.[1]  Launched in 2014, Alexa is powered by cloud computing technology and is capable of performing tasks such as voice interaction, creating to-do lists, setting alarms, streaming podcasts, audio books, or music, providing weather, traffic, sports, news, or other information.[2]  The capabilities of devices with Alexa can be extended by software applications ("skills") available from Amazon or third-party software developers.[3] Alexa is available on several Amazon devices such as smart speakers (including the Echo Dot, Echo Pop, Echo Studio, and Amazon Tap speakers), smart displays (including Echo Show), Echo Hub (a controller for smart-home devices), and on-the-go devices (such as Echo frames and Echo buds).[4]  Alexa is also available in some devices manufactured by third-parties,[5]

---

[1]  "Alexa Features," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=21576558011, accessed September 4, 2024; "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024.

[2]  Rohit Prasad, "Alexa at Five: Looking back, Looking Forward," *Amazon Science*, November 6, 2019, https://www.amazon.science/blog/alexa-at-five-looking-back-looking-forward; "Alexa Features," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=21576558011, accessed September 4, 2024; "Multi-Room Music and Alexa Home Theater," *Amazon*, https://www.amazon.com/alexa-multi-room-audio/b?ie=UTF8&node=21480962011&ref=pe_alxhub_aucc_en_us_IC_HP_15_HUB_MRM, accessed September 4, 2024; "Alexa Productivity," *Amazon*, https://www.amazon.com/alexa-productivity-hacks/b?ie=UTF8&node=21588422011&ref=pe_alxhub_aucc_en_us_IC_HP_2_HUB_PRO, accessed September 4, 2024; "Alexa Information," *Amazon*, https://www.amazon.com/alexa-information/b?ie=UTF8&node=2158840011&ref=pe_alxhub_aucc_en_us_IC_HP_10_HUB_INFO, accessed September 4, 2024; "Alexa News," *Amazon*, https://www.amazon.com/alexa-news-flash-briefing/b?ie=UTF8&node=21362891011&ref=pe_alxhub_aucc_en_us_IC_HP_7_HUB_NEWS, accessed September 4, 2024; "Traffic," *Amazon*, https://www.amazon.com/Amazon-Traffic/dp/B071VM1RMH, accessed September 15, 2024.

[3]  "What is the Alexa Skills Kit?" *Amazon Alexa*, https://developer.amazon.com/en-US/docs/alexa/ask-overviews/what-is-the-alexa-skills-kit.html, accessed September 5, 2024.

[4]  "Which Echo Device Do I Have?" *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=GHRYQ6GHE4A5TUD2, accessed September 4, 2024.

[5]  "How to Describe Alexa: Connected Devices, Services, and Features," *Amazon Alexa*, https://developer.amazon.com/en-US/alexa/branding/alexa-guidelines/communication-guidelines/how-describe-amazon-echo-and-alexa, accessed September 4, 2024.

including some smart watches, smart televisions, and smart refrigerators.[6] For purposes of this report, I refer to all devices in which Alexa is installed as "Alexa Devices."

11.    Most Alexa Devices allow users to activate the device by saying a "wake word" (such as "Alexa" or other wake words defined by the user).[7] Once activated, Alexa Devices typically display a visual or audible cue indicating Alexa is activated, such as the light ring at the top or bottom of Echo dot devices turning blue (*see* examples in **Figure 1**), or the device's display turning on (for devices with displays).[8] Echo devices also have a button to mute the microphone and prevent the device from processing audio.[9] Some Alexa Devices that can be activated using a wake word can also be activated by pressing a physical Action button on the device.[10] In addition, some Alexa Devices (such as certain Fire TV devices) require the user to click a button to activate Alexa's listening mode and cannot be activated using a wake word.[11]

---

[6] "Alexa Built-In Devices," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=15443147011, accessed September 4, 2024; "Learn More About Alexa on Your Samsung Fridge," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=24783556011, accessed September 4, 2024.

[7] "How Alexa Works: Wake Word," *Amazon*, https://www.amazon.com/b/?node=23608571011, accessed September 4, 2024.

[8] Declaration of Nedim Fresko, September 14, 2024 ("Fresko Declaration"), ¶ 22 ("Alexa-enabled devices are specifically designed to alert people when the device detects the wake word and is streaming audio to the cloud. Whenever an Alexa-enabled device detects the wake word, a visual or audible indicator (or both) will signal to the user that audio is streaming to the cloud for processing and recording by the Alexa service. On Echo devices, for example, the light ring turns blue to alert the user that Alexa is activated."); "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024. *See also* "What Do the Lights on Your Echo Device Mean?" *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=GKLDRFT7FP4FZE56, accessed September 4, 2024.

[9] Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=201602230, accessed September 4, 2024.

[10] "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024 ("When Echo devices detect the wake word or when the Action button available on some Echo devices is pressed to activate Alexa, a visual indicator appears on the device to indicate that the device is recording your request to stream to the cloud … When Alexa on your Fire tablet detects the wake word, or when you press and hold the Home button to access Alexa, a blue line appears at the bottom of your screen to indicate that Alexa is streaming audio to the cloud.").

[11] Jason Cipriani, "How to Set Up the Amazon Dash Wand," *CNET*, June 19, 2017, https://www.cnet.com/tech/mobile/how-to-setup-the-amazon-dash-wand/; "Learn to Use Alexa with Fire TV," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=202104940, accessed September 12, 2024; Fresko Declaration, ¶ 12 ("Certain Alexa-enabled devices cannot be activated by a wake word at all, but instead require a user to press an Action button. For instance, some models of Fire TV devices require users to push a button on the Fire TV remote to send a voice request to Alexa.").

*Figure 1: Examples of Alexa Devices and Visual Active Cues*



Echo Dot, 3rd generation



Echo Dot, 5th generation

Source: "Amazon Echo Dot (5th Gen, 2022 Release) | With Bigger Vibrant Sound, Helpful Routines and Alexa | Charcoal," *Amazon*, https://www.amazon.com/All-New-release-Smart-speaker-Charcoal/dp/B09B8V1LZ3/ref=s9_acsd_al_ot_c2_x_3_t, accessed September 11, 2024; "Amazon Echo Dot (3rd Gen) Smart Speaker with Alexa - Charcoal (2 Pack)," *Walmart*, https://www.walmart.ca/en/ip/Amazon-Echo-Dot-3rd-Gen-Smart-speaker-with-Alexa-Charcoal-2-Pack/PRD69N7RQYZSU95, accessed September 11, 2024.

## 2.     Alexa Recordings And Use Of Recordings

12.     Once an Alexa Device is activated (whether by a wake word or an activation button), the Alexa Device starts streaming information to Amazon's secure cloud environment ("Alexa Recordings").[12]  Amazon then feeds the Alexa Recordings into Amazon's automatic speech recognition model for transcription, Amazon's natural language understanding model interprets the transcription result and produces an intent or instruction, and finally information derived from the Alexa Recordings is used to generate a response by Alexa.[13]  Amazon stores the copy of the Alexa Recording in ███████ Amazon's primary storage system.[14]  An Alexa user can view, hear, and delete Alexa Recordings associated with their account in the Alexa mobile app or website.[15]  The user can also choose privacy settings such that the Alexa Recordings from their

---

[12] "Alexa, Echo Devices, and Your Privacy," *Amazon*, available at https://www.amazon.com/gp/help/customer/display html?nodeId=GVP69FUJ48X9DK8V, accessed September 5, 2024; "Follow the Journey of a Voice Request," *Amazon*, https://www.amazon.com/b/?node=23608618011, accessed September 15, 2024.
[13] "Follow the Journey of a Voice Request," *Amazon*, https://www.amazon.com/b/?node=23608618011, accessed September 4, 2024.
[14] Deposition of Shiv Naga Prasad Vitaladevuni, August 31, 2023 ("Naga Prasad Vitaladevuni August 2023 Deposition"), p. 127:4–15 ("So -- so you have the wake word verification has happened. The device is lit up. You open the stream to the cloud, and then you have ASR, ████████ they process all through, and then you have downstream systems that are taking action. The ASR system does endpointing, which means it determines when the customer has stopped talking to the device. At that point that stream is shut off. Then you -- you take from the beginning, which is the wake word, to the point -- to the endpoint. And that is your utterance, and you save that in ████████."), p. 124:20–21 ("Q. What are Alexa's primary storage systems? A. ███ ███."").
[15] "Personalize Your Alexa Privacy Settings," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=23608614011, accessed September 15, 2024.

Alexa Device are not sent to the cloud, retained, or used by Amazon for training purposes.[16] The user can also delete Alexa Recordings or change their privacy preferences by voice commands, such as "Alexa, delete everything I've ever said," to delete all Alexa Recordings associated with their voice ID.[17]

13.     Consistent with Amazon's developer definitions, I use in this report the following terms:

    a.  An "utterance" is a word or sequence of consecutive words a user says to Alexa to convey what they want to do, or to provide a response to a question Alexa asks.[18] An utterance may also consist of audio transmitted to Amazon's servers after the Alexa Device interprets another word or sound to be the wake word.[19]

    b.  An "interaction" is an exchange of information between the user and Alexa—this may be a single request-response, or a more extended set of turns.[20]

    c.  A "dialog" is a series of interactions with multiple turns between the user and the Alexa Device.[21]

14.     At the individual user level, Alexa Recordings are used to receive and respond to the user's request. The Alexa Recordings are also retained to improve the user's experience from using the Alexa Device. For example, as noted in Amazon's Alexa Frequently Asked Questions ("FAQ") webpage, "keeping track of the songs you have listened to helps Alexa choose what songs to play when you say, 'Alexa, play music.'"[22]

---

[16] "Personalize Your Alexa Privacy Settings," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=23608614011, accessed September 15, 2024. Certain Alexa Devices include settings whereby the user can prevent commands from being sent to Amazon's cloud servers and have them completed locally instead. *See, e.g.*, "Turn on Do Not Send Voice Recordings," *Amazon*, https://www.amazon.com/gp/help/customer/display html?ref_=hp_left_v4_sib&nodeId=GQXLLWHBCVL6L5QD, accessed September 11, 2024.

[17] "Top Customer Questions," *Amazon*, https://www.amazon.com/b/?node=23608568011&REF=MARS_NAV_desktop_privacy_Learn_more, accessed September 4, 2024. To delete by voice, a user needs to be enrolled in voice ID.

[18] "Amazon Skills Kit Glossary," *Amazon*, https://developer.amazon.com/en-US/docs/alexa/ask-overviews/alexa-skills-kit-glossary html, accessed September 11, 2024. *See also* "Alexa Utterance Guidelines," *Amazon Alexa*, https://developer.amazon.com/en-US/alexa/branding/alexa-guidelines/brand-guidelines/speech-bubble, accessed September 4, 2024.

[19] These are referred to as "false wakes," which I discuss further below. *See, e.g.*, "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024 ("In some cases, your Alexa-enabled device might interpret another word or sound as the wake word (for instance, the name 'Alex' or someone saying 'Alexa' on the radio or television). When this happens, we call that a 'false wake.'").

[20] "Amazon Skills Kit Glossary," *Amazon Alexa*, https://developer.amazon.com/en-US/docs/alexa/ask-overviews/alexa-skills-kit-glossary html, accessed September 11, 2024.

[21] "Dialog Interface Reference," *Amazon Alexa*, https://developer.amazon.com/en-US/docs/alexa/custom-skills/dialog-interface-reference.html, accessed September 4, 2024.

[22] "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024.

15.     Alexa Recordings are used to train Alexa's speech recognition and natural language understanding systems, so Alexa can better understand users' requests (including understanding different accents and dialects or coping with different acoustics) and responds accordingly.[23]  The use of Alexa Recordings in training of Alexa includes supervised machine learning, which requires humans to review "an extremely small sample of requests to help Alexa understand the correct interpretation of a request and provide the appropriate response in the future" (henceforth, "human annotation").[24]

16.     Further, Amazon declared as part of this litigation that it "does not earn income or revenue from the sale or trade of voice profiles, recordings, transcripts, or False Wakes."[25]  I understand this to mean that Amazon does not sell Alexa Recordings to third parties.

17.     Alexa Devices that are activated by voice are programmed to constantly listen (not record) in order to detect when a wake word is uttered.[26]  With every word an Alexa Device hears, it runs audio through algorithms designed to minimize incorrect detection of a wake word (false positives or "False Wakes").[27]  When a wake word is identified by the local computing capability of an Alexa Device, the device starts capturing audio and transmits the information (including a fraction of a second before the wake word was identified) to Amazon's cloud

---

[23] "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024 ("Alexa is designed to get smarter every day. For example, we use your requests to Alexa to train our speech recognition and natural language understanding systems using machine learning. Training Alexa with real world requests from a diverse range of customers is necessary for Alexa to respond properly to the variation in our customers' speech patterns, dialects, accents, and vocabulary and the acoustic environments where customers use Alexa.").

[24] "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024.

[25] Order Regarding Requests for Production Nos. 70–75, *Kaeli Garner, et al. v. Amazon.com, Inc., et al.*, June 20, 2023, p. 2 ("Amazon does not earn income or revenue from the sale or trade of voice profiles, recordings, transcripts, or False Wakes, and after a diligent search and reasonable inquiry, Amazon has no documents in its possession, custody, or control showing income or revenue related to the sale or trade of those items.").

[26] "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024 ("Is Alexa recording all my conversations? No. By default, Echo devices are designed to detect only your chosen wake word (e.g., Alexa, Ziggy, Amazon, Computer or Echo). The device detects the wake word by identifying acoustic patterns that match the wake word. No audio is stored or sent to the cloud unless the device detects the wake word (or Alexa is activated by pressing a button).").

[27] "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024 ("Alexa and Echo devices are designed to record as little audio as possible and minimize the amount of background noise streamed to the cloud. By default, Alexa-enabled devices only stream audio to the cloud if the wake word is detected (or Alexa is activated by pressing a button). When an Alexa-enabled device detects the wake word and begins streaming audio to the cloud, Alexa performs a 'cloud verification' of the wake word using the more powerful processing capabilities of the cloud to double-check the audio to confirm detection of the wake word. If the cloud verification does not also detect the wake word, Alexa stops processing the audio and ends the audio stream to the cloud. If Alexa confirms that the wake word was spoken, Alexa will continually attempt to determine when your request has ended and then immediately end the audio stream.").

computing to reanalyze and verify the wake word was spoken.[28]  Amazon has been continually working to improve Alexa's voice recognition capability, including efforts to reduce the frequency of False Wakes.[29]  Part of the efforts to improve Alexa's voice recognition and reduce False Wakes includes human annotation to listen to anonymized Alexa Recordings, as noted above.[30]  Amazon also attempts to minimize cases in which the user indeed attempted to activate the Alexa Device but the wake word was misidentified (false rejects).[31]

18.    In this report, I use "Amazon's retention and use of Alexa Recordings" to refer to Amazon's retention of Alexa Recordings (including recordings resulting from False Wakes), and its use for training purposes (including the use of human annotation).

### B.    Plaintiffs' Allegations

19.    Plaintiffs seek to certify two types of classes (collectively, "Putative Classes"):[32]

a.    Nationwide Registrant Class: "All persons in the United States who registered one or more Alexa devices" ("Registrant Putative Class"), and

b.    State-Law Non-Registrant Classes: "All [California, Florida, Maryland, New Hampshire, Pennsylvania, Washington] residents who never registered an Alexa

---

[28] "Top Customer Questions," *Amazon*, https://www.amazon.com/b/?node=23608568011&ref=MARS_NAV_desktop_privacy, accessed September 4, 2024; "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024.

[29] Naga Prasad Vitaladevuni August 2023 Deposition, p. 106:3–13 ████████████████████████████████ ████████████████████████ "); Brian Heater, "Amazon is Helping to Remove False Wake Words from Alexa's Vocabulary," *TechCrunch*, May 15, 2017, https://techcrunch.com/2017/05/15/amazon-is-helping-to-remove-false-wake-words-from-alexas-vocabulary/.

[30] Naga Prasad Vitaladevuni August 2023 Deposition, pp. 105:9–14 ██████████████████████████

[31] Naga Prasad Vitaladevuni August 2023 Deposition, pp. 47:13–48:7 ("Q. So what is false rejection rate? … A. When a user is trying to talk to the device and -- so there is an on-device detector that is processing audio to detect when the wake word is uttered, whatever wake word is chosen by the user, for example, are Alexa or Amazon. Sometimes the device can make a mistake and miss the wake word. So I'm saying the word -- let's say the word Alexa, and the device for some reason fails to spark the wake word in the audio, so we call this a false reject because it was a rejected and it was a false reject because I did say the wake word, but the device recognize -- accept it. And then we call the rate -- the term rate means that -- let's say for me as a user, if I say the wake word a hundred times, how many times does the device falsely reject it?"), p. 130:1–9 ██████████████████████████████ ██████████████████████████████████████████████████████████████████ ; Fresko Declaration, ¶ 24 ("Amazon continually improves the Alexa service to minimize the occurrence of false wakes *and* false rejects, including by updating the on-device wake word detection algorithms automatically on a regular basis, and constantly improving cloud-side wake word verification." (emphasis in original)).

[32] Plaintiffs' Motion for Class Certification, *Kaeli Garner, et al. v. Amazon.com, Inc., and Amazon.com Services LLC*, June 18, 2024 ("Plaintiffs' Motion for Class Certification"), p. 2.

device and resided with a Registrant while an Alexa device was active and operational" ("Non-Registrant Putative Classes").

20.    Plaintiffs in this matter allege that Amazon knowingly intercepted and recorded conversations that were not intended for Alexa, due to being activated by False Wakes. Plaintiffs allege that Amazon records and stores these conversations permanently, and that Amazon failed to disclose this information to members of the Putative Classes.[33]  Plaintiffs further assert Amazon could have reduced False Wakes by training and improving Alexa in ways that do not involve "surreptitious recording," but such methods are costly.[34]  Plaintiffs also allege that Amazon allowed "human annotators" to listen to Alexa Recordings but did not disclose this to members of the Putative Classes.[35]  According to Plaintiffs, Amazon's retention and use of Alexa Recordings to train and develop Alexa used valuable user data without paying for it. Plaintiffs assert harm to members of the Registrant Putative Class in the form of lost "value of their information."[36]

21.    Last, Plaintiffs allege that Amazon violated states' wiretapping laws by intercepting conversations of members of the Non-Registrant Putative Classes.[37]  Plaintiffs seek statutory damages to members of the Non-Registrant Putative Classes.[38]

### C.    Summary Of Plaintiffs' Experts' Reports

22.    Plaintiffs retained three experts in support of their motion for class certification.

23.    Prof. David Hoffman submitted an expert report on June 18, 2024.[39]  Prof. Hoffman was asked to "opine on the degree to which Amazon disclosed, and ordinary individuals understand, how their voice may be recorded when in the proximity of … Alexa-enabled devices … Specifically … whether individuals whose voices are recorded by Amazon's Alexa devices know when such recordings are made and that such recordings are used by Amazon."[40]  In his report, Prof. Hoffman asserts that Amazon did not follow industry best practices in how they delivered

---

[33] Plaintiffs' Motion for Class Certification, pp. 1, 5.
[34] Plaintiffs' Motion for Class Certification, pp. 1–2.
[35] Plaintiffs' Motion for Class Certification, p. 2.
[36] Plaintiffs' Motion for Class Certification, p. 22.
[37] Plaintiffs' Motion for Class Certification, pp. 2, 9, 13.
[38] Plaintiffs' Motion for Class Certification, pp. 19, 24.
[39] Expert Report of David Hoffman, June 18, 2024 ("Hoffman Report").
[40] Hoffman Report, ¶ 1.

information regarding Alexa Recordings, including data collection practices and how these practices changed over time.[41]  Specifically, he asserts that "Amazon's [p]olicies [a]re [v]oluminous and [d]ecentralized;"[42] "[l]ack [c]lear [p]lacement [w]ithin the [d]ocuments;"[43] and "[c]ontain [u]nclear [u]pdates and [c]ontradictions."[44]  In addition, Prof. Hoffman asserts that people who did not register to Alexa "cannot have any understanding" of terms in Amazon's policies.[45]  Prof. Hoffman further asserts that statements in Amazon's policy documents conflict with its marketing materials and other privacy policy documents and that "[i]ndividuals cannot reasonably be expected to read all Amazon privacy policies or terms of use documents."[46]  He then concludes that the language in these documents cannot support the concept that individuals have consented to these terms.[47]  Prof. Hoffman claims that best practices for Alexa would be to deploy "just-in-time or short form notice" so individuals can understand when they are being recorded.[48]

24.     Another expert retained by Plaintiffs, Mr. Jonathan Hochman, submitted an expert report on June 18, 2024.[49]  Mr. Hochman provides opinions regarding the alleged value that Alexa Recordings have to Amazon.[50]  Mr. Hochman acknowledges that "false wakes" and "false accepts" (*i.e.*, recordings of utterances not intended for the Alexa platform) are "a known phenomenon" of voice assistants.[51]  He further alleges that "Amazon's collection of utterances is valuable because it provides Amazon with a competitive advantage in the field of virtual assistants," serving as "valuable training data … but the data can also be repurposed for future products, including future uses yet to be conceived."[52]

25.     The third expert retained by Plaintiffs, Dr. Serge Egelman, submitted an expert report on June 18, 2024.[53]  Dr. Egelman opines on certain technical aspects of Amazon's data collection

---

[41] Hoffman Report, ¶ 3.a.
[42] Hoffman Report, Title Header, V.A.
[43] Hoffman Report, Title Header, V.B.
[44] Hoffman Report, Title Header, V.C.
[45] Hoffman Report, ¶¶ 3.b, 64.
[46] Hoffman Report, ¶ 3.c and d.
[47] Hoffman Report, ¶ 3.c.
[48] Hoffman Report, ¶ 3.e.
[49] Confidential Expert Report of Jonathan Hochman, June 18, 2024 ("Hochman Report").
[50] Hochman Report, ¶¶ 46–47.
[51] Hochman Report, ¶¶ 50–51.
[52] Hochman Report, ¶ 46.
[53] Expert Report of Serge Egelman, Ph.D., June 18, 2024 ("Egelman Report").

practices and usage, and on the public's awareness of and perceived privacy expectations to in-home recorded audio data.  Dr. Egelman claims that Amazon collected and benefitted from Alexa Recordings (some of which, collected without the users' knowledge and consent) and that it shared the Alexa Recordings with human beings.[54]  Dr. Egelman further asserts that people consider in-home audio recordings to be highly sensitive,[55] citing his own research.[56]  Therefore, in his opinion, "consumers would have found these practices [in which Amazon recorded interactions and shared the audio with humans] objectionable."[57]

### III.    Assignment

26.    I was asked by counsel for Amazon and Amazon.com Services LLC to assess, analyze, and respond to the opinions of Plaintiffs' experts, including the reports of Prof. Hoffman, Mr. Hochman, and Dr. Egelman.  I was also asked to assess whether the opinions of Prof. Hoffman, Mr. Hochman, and Dr. Egelman support a finding that: (i) Plaintiffs or other members of the Registrant Putative Class suffered economic harm as a result of the alleged conduct; and (ii) such alleged economic harm (if any) can be determined using common evidence on a class-wide basis.

27.    In forming my opinions, I relied on my experience and expertise in economics.  I have examined online materials related to Alexa Devices, legal pleadings, deposition testimony, produced documents and data, and other publicly available materials.  I have also reviewed the following Plaintiffs' Experts' Reports: the Hoffman Report, the Hochman Report, and the Egelman Report.  I also reviewed the deposition testimony by the same experts in this matter. **Appendix C** lists the materials I have considered in forming my opinions in this matter.

28.    I am being compensated at a rate of $1,250 per hour.  I am being assisted in this matter by staff at Cornerstone Research who are working at my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in

---

[54] Egelman Report, ¶ 7.
[55] Egelman Report, Section VII.
[56] Egelman Report, ¶¶ 43–44.
[57] Egelman Report, ¶ 7.

any way contingent on the content of my opinions or the outcome of this or any other matter. This report reflects my opinions in this matter at the time of writing. I reserve the right to update or supplement my opinions as further information is made available to me.

## IV.    Summary Of Opinions

29.    In their Motion for Class Certification, Plaintiffs claim that they can establish class members' damages with common evidence. However, none of Plaintiffs' experts have provided a common class-wide damages model, let alone one that is consistent with Plaintiffs' theory of harm, and they admitted they were not asked to do so. Additionally, Plaintiffs have not articulated a testable economic theory of how Amazon's retention and use of Alexa Recordings has *caused* a reduction in the value that Registrant Putative Class members can extract from their information, nor have they provided evidence to support such a theory. At most, Plaintiffs' experts opine that Alexa Recordings have value to *Amazon*. Even if Alexa Recordings have value to Amazon and that the value could be reliably determined, any value received by Amazon does not provide a measure of the value to any Registrant Putative Class member. There is no evidence in this matter suggesting members of the Putative Classes tried selling the data at issue, Alexa Recordings, and could not do so because of Amazon's retention and use of Alexa Recordings. Last, I note that Plaintiffs and their experts fail to consider that Amazon's retention and use of Alexa Recordings for the purpose of training Alexa's voice recognition algorithms and ultimately improving Alexa Devices directly benefits members of the Putative Classes through lower costs of higher quality Alexa Devices. *See* **Section V**.

30.    Evidence suggests that many and perhaps most Putative Class Members do not behave as if the at-issue information had value to them or that they were harmed by Amazon's alleged failure to adequately disclose their retention and use of the Alexa Recordings. In particular, consumers (in aggregate) do not appear to materially change their behavior when information about Amazon's retention and use of Alexa Recordings became more available. Analysis of Alexa usage data and market data show that there is no observable aggregated negative impact on either the usage or purchases of Alexa Devices following periods of higher intensity in media coverage of Amazon's retention and use of Alexa Recordings. Indeed, some Named Plaintiffs continued using Alexa Devices on a regular basis even after becoming involved in this litigation.

Members of the Registrant Putative Class who knew about Amazon's retention and use of Alexa Recordings yet continued to use the Alexa Devices or purchased new Alexa Devices reveal by their own actions that either they were not harmed at all by such practices or, at most, any alleged harm to their privacy interests that they suffered is lower than the benefit they gained from continued use of their Alexa Devices.  The fact that consumer usage and purchase behavior does not substantially change following periods of higher intensity in media coverage of Amazon's retention and use of Alexa Recordings suggests that many and perhaps most members of the Registrant Putative Class could not have been harmed under a theory that they were deprived of substantial value of their information or under a theory that Amazon failed to adequately disclose these practices.  *See* **Section VI**.

31.     Establishing harm, if any, to members of the Putative Classes would require individualized inquiry, as any harm would depend on numerous individualized factors.  For example, Named Plaintiffs' depositions as well as interviews with Alexa users demonstrate that some members of the Putative Classes knew of at least some of Amazon's retention and use practices, while others did not (prior to them being informed by Plaintiffs' counsel).  Some members of the Putative Class stated privacy concerns and took actions consistent with those concerns, such as unplugging their device, while others continued using their devices with the knowledge of Amazon's practices (reflecting they suffered no harm from Amazon's conduct).  Notably, the heterogeneity across members of the Putative Classes in their privacy preferences and information is also demonstrated by studies conducted by Dr. Egelman and work cited by Prof. Hoffman.  *See* **Section VII**.

32.     Last, Prof. Hoffman's purported best practices for disclosures and his proposed "just-in-time" notifications fail to consider the negative impact they may have on members of the Putative Classes through a worse user experience of Alexa Devices.  Regardless, both the cost and benefits associated with such notifications are likely to differ across Alexa users, necessitating individualized inquiry to ascertain any potential impact.  *See* **Section VII.E**.

## V.     None Of Plaintiffs' Experts Have Provided A Common Method To Measure Damages In This Matter.

33.     Citing to the Egelman Report, Plaintiffs claim that "[b]y surreptitiously taking that information for its own benefit, Amazon wrongly *deprived the Registrants of the value* of that information. … The *loss of the value of that data* constitutes a common injury for the Registrants."[58]  Citing to the Hochman Report, Plaintiffs claim that "each Registrant suffered the same injury, having been *deprived of the inherent value* of their personal data,"[59] and they further claim that they have "propose[d] a common Class-wide damages model."[60]

34.     While Plaintiffs claim that they can establish class members' damages with common evidence, I have not identified in their pleadings nor in any of the three Plaintiffs' expert reports a proposed model to estimate damages consistent with Plaintiffs' theory of harm resulting from any alleged loss of the value of their information.  Plaintiffs' experts—Prof. Hoffman, Mr. Hochman, and Dr. Egelman—testified in deposition that they did not opine on damages in this matter or propose a method to calculate the lost value of information to members of the Putative Classes.[61]  Further, neither Plaintiffs nor Plaintiffs' experts have shown that a reliable model exists or can be developed to estimate damages on a class-wide basis.  At most, Plaintiffs' expert opine that Alexa Recordings have value *to Amazon.*

---

[58] Plaintiffs' Motion for Class Certification, p. 23 (emphasis added).

[59] Plaintiffs' Motion for Class Certification, p. 14 (emphasis added).

[60] Plaintiffs' Motion for Class Certification, p. 3.

[61] Deposition of Jonathan Hochman, September 5, 2024 ("Hochman Deposition"), pp. 67:17–68:1 ("In general, I provide some opinions, usually, that -- that are -- may be relied upon by a damages expert, who's going to do the full economic analysis -- the full workup. I provide some prerequisite information that they may use. I generally am not providing a final number in that sort of matter. Although, in some other matter, for example, I might provide some number. But generally, I'm not providing a bottom-line damages number."), pp. 99:8–100:7 ("And I -- I just want to be clear. Are you in your -- in your report are you providing a model by which one can calculate the value of utterances, the false-wake utterances captured by Amazon Alexa? … A. … I think I've done something less than that, which is I've opined that the false-wake utterances have value to Alexa. They have val- -- value as a group, they have value individually. They also have value to the users. I haven't set forth a formula for how someone else would go about calculating an actual numerical value to that. There are a lot of other inputs that might need to be known to -- to do -- to come up with a, sort of, closed-form formula. I haven't proposed that. I wasn't asked to do that."); Deposition of David Hoffman, September 4, 2024 ("Hoffman Deposition"), p. 194:15–24 ("Q. Are you offering any opinions in this case regarding the value of consumer recordings to Amazon? A. I don't recall. Q. You're not proposing a damages model to quantify the alleged benefit to Amazon of having recordings in its possession, correct? A. My observations are limited to the scope in Section 1 of my report and those that are underneath the summary of my conclusions in Section 3 -- or Paragraph 3 of the report."); Deposition of Serge Egelman, Ph.D., Volume I, September 6, 2024, pp. 33:17–34:10 ("Q. Okay. I think we -- we already established, you're not -- you have not offered any opinion about damages or calculation of damages in this case, correct? … THE WITNESS: No, I have not. BY MR. WAKEFIELD: Q. And you have not provided any opinion about whether Plaintiffs were deprived of value; is that right? …. THE WITNESS: I'm not sure what you're asking exactly. BY MR. WAKEFIELD: Q. Well, let me rephrase it. Have -- have you -- in your report, do you provide any opinion about whether Plaintiffs were deprived of the value of -- of recordings or other data?  … THE WITNESS: I don't believe so.").

35.     Even if Alexa Recordings have value to Amazon and that the value could be reliably determined, any value received by Amazon does not provide a measure of the value to any Registrant Putative Class member.  Indeed, neither Plaintiffs nor their experts have shown that Registrant Putative Class members express any specific value for the data or that the value can be estimated on a class-wide basis.

36.     Furthermore, even if there is a reliable method to estimate the value of Alexa Recordings, or of voice recordings more generally, to members of the Registrant Putative Class, neither Plaintiffs nor their experts have shown (i) that there exists any market or other mechanism where they could realize the value of such data, (ii) that any member of the Registrant Putative Class has or would contemplate selling their data in such a market, or (iii) that even if a member of the Registrant Putative Class were to sell such data in such a market, their ability to do so has been impaired by Amazon's retention and use of Alexa Recordings.

37.     Last, I discuss in this section that Plaintiffs and their experts fail to consider that Amazon's use of Alexa Recordings for training purposes directly benefits members of the Putative Classes through lower costs of higher quality Alexa Devices.  That is, the use of Alexa Recordings generated a potential economic benefit that would offset the lost value of such data (if any) and that this cost-benefit tradeoff is likely favorable for many or perhaps most members of the Putative Classes.  To assess the loss in value (if any) net of the benefit derived from the improved Alexa devices at lower costs would require individualized inquiry (as discussed in more detail in **Section VII**).

>    **A.     Plaintiffs Have Not Shown That Members Of The Registrant Putative Class Lost Value Of Their Voice Recordings.**

38.     Neither Plaintiffs nor their experts have demonstrated any specific harm resulting from Amazon's retention and use of Alexa Recordings or the alleged failure to disclose these practices.  Specifically, Plaintiffs' experts have not demonstrated that Amazon's retention and use of Alexa Recordings has caused a reduction in the value that Registrant Putative Class members can extract from their Alexa Recordings, or their voice recordings more generally.  In other words, neither Plaintiffs nor their experts have established a causal link between Amazon's behavior and harm to specific Registrant Putative Class members under their theory of harm.

This fundamental flaw implies that Plaintiffs and their experts have not provided a common method to estimate damages.

39.    Establishing causality is not a novel concept or a legal opinion, but rather it is a fundamental objective of economic and statistical analysis.[62]  As social scientists, economists study causal relationships, seeking to develop better prediction models for economic phenomena:[63]

> In the beginning, we should ask, *What is the causal relationship of interest?*  Although purely descriptive research has an important role to play, we believe that the most interesting research in social science is about questions of cause and effect, such as the effect of class size on children's test scores…A causal relationship is useful for making predictions about the consequences of changing circumstances or policies; it tells us what would happen in alternative (or "counterfactual") worlds.

40.    To determine causation, it is critical to establish the difference between what actually occurred (the "actual" world) and what would have occurred if the alleged misconduct had not occurred (the "but-for" world):[64]

> The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event. In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position…Because the but-for scenario differs from what actually happened only with respect to the harmful act, damages measured

---

[62] The study of causal relationships is a common objective of statistical studies in a wide variety of settings such as medicine, political science, and finance.  One of the hurdles researchers need to confront in these studies is the presence of confounding factors.  These can prevent causal inference and must be properly accounted for.  *See, e.g.*, Kaye, David H., and David A. Freedman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, Third Edition (Washington, D.C.: The National Academies Press, 2011), pp. 211–302, pp. 216–217 ("In many cases, statistical studies are used to show causation.  Do food additives cause cancer?  Does capital punishment deter crime?  Would additional disclosures in a securities prospectus cause investors to behave differently?  The design of studies to investigate causation is the first topic of this section."), pp. 219–221 ("[A] confounding variable may be correlated with the independent variable and act causally on the dependent variable.  If the units being studied differ on the independent variable, they are also likely to differ on the confounder.  The confounder—not the independent variable—could therefore be responsible for differences seen on the dependent variable … Confounding remains a problem to reckon with, even for the best observational research.  For example, women with herpes are more likely to develop cervical cancer than other women.  Some investigators concluded that herpes caused cancer: In other words, they thought the association was causal.  Later research showed that the primary cause of cervical cancer was human papilloma virus (HPV) … The association [seen in observational studies] holds when effects of confounding variables are taken into account by appropriate methods, for example, comparing smaller groups that are relatively homogeneous with respect to the confounders.").
[63] Angrist, Joshua D., and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion* (Princeton, NJ: Princeton University Press, 2009), p. 3 (emphasis in original).
[64] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, Third Edition (Washington D.C.: The National Academies Press, 2011), pp. 425–502, p. 432.

in this way isolate the loss of value caused by the harmful act and exclude any change in the plaintiff's value arising from other sources.

41.     As the above passage demonstrates, if the economic outcomes in the actual and but-for worlds are the same, then there can be no economic harm. Similarly, any economic harm only occurs to the extent the actual and but-for worlds differ in some type of economic outcome. Since none of Plaintiffs' experts nor Plaintiffs establish in what way Plaintiffs' economic condition in the but-for world would have been different from the actual world, their work cannot be used to estimate economic damages that are causally related to Amazon's retention and use practices or its failure to disclose such practices.

42.     From an economic perspective, to be harmed by a loss of value of their information due to Amazon's retention and use of Alexa Recordings, Plaintiffs would have to engage in, or expect to engage in, a transaction in which they sell their voice recording data *and* that the transaction would occur at a lower price, *and* that any reduction in price would have to have been caused by the Amazon's retention and use of Alexa Recordings. Indeed, none of the Named Plaintiffs claimed to have tried to sell (or attempt to monetize more generally) their Alexa Recordings, much less experience a diminished ability to do so due to Amazon's retention and use of Alexa Recordings.[65] Similarly, none of the Plaintiffs claimed receiving a lower price at a transaction involving the sale of their voice recordings or being offered a lower price.

43.     Further, to the extent that Plaintiffs consider the retention of Alexa Recordings to be the mechanism by which consumers were deprived of value, Amazon does not prevent consumers from managing their Alexa Recordings, including obtaining them for their own or secondary use (*e.g.*, sale of the recording, if possible) or deleting them entirely.[66] Thus, Amazon provides an

---

[65] Deposition of Ricky Babani, August 15, 2023 ("Babani Deposition"), p. 156:10–13 ("Q. Okay. Have you ever tried to monetize your own either voice recordings or computer inputs, online inputs yourself? A. Monetize, no."); Deposition of Ronald E. Johnson, II, October 12, 2023 ("Ronald Johnson Deposition"), p. 186:13–20 ("Q. Have you ever tried to sell your voice recordings? A. No. Q. What about selling your personal data? A. No. Q. If you wanted to sell your voice recordings, would you know how to do that? A. No."); Deposition of Jodi Brust, August 1, 2023 ("Brust Deposition"), p. 222:17–24; Deposition of Kaeli Garner, September 26, 2023 ("Garner Deposition"), pp. 217:16–218:14; Deposition of Jeffrey J. Hoyt, August 8, 2023 ("Hoyt Deposition"), pp. 177:19–178:19; Deposition of Selena M. Johnson, October 11, 2023 ("Selena Johnson Deposition"), pp. 203:22–204:7; Deposition of Diane McNealy, September 21, 2023 ("Diane McNealy Deposition"), pp. 241:25–242:7; Deposition of Michael McNealy, September 20, 2023 ("Michael McNealy Deposition"), p. 228:8–23; Deposition of Lorlie Tesoriero, August 9, 2023 ("Tesoriero Deposition"), pp. 221:21–222:8; Deposition of Caron Watkins, January 25, 2024 ("Watkins Deposition"), pp. 188:14–189:2.

[66] Users can delete Alexa Recordings or change the Alexa Device privacy preferences by voice commands, such as "Alexa, delete everything I've ever said," to delete all Alexa Recordings associated with their voice ID. "Top Customer Questions,"

avenue through which registered users can obtain or delete their Alexa Recordings, and I have not seen any case evidence suggesting that anyone tried to sell their Alexa Recordings and was prevented from doing so due to Amazon's alleged conduct.

44.     The fact that no Plaintiff in this case has indicated an ability or willingness to sell their Alexa Recordings is not surprising since individuals are typically *not* a party to a transaction involving the sale of such information.  As I discuss below, there is no market in which an individual can go and sell their own Alexa Recordings.[67]  If there is no market, there is no market price, and therefore Plaintiffs and members of the Registrant Putative Class could not have experienced loss in market value resulting from Amazon's retention and use of Alexa Recordings.  Further, some Named Plaintiffs explicitly admitted they did not lose money as a result of Amazon's retention and use of Alexa Recordings.[68]

45.     Even when individuals are a party to a transaction in which they can extract value from their information (in this case – their voice recordings), the value of this exchange is not necessarily lost if the same information is also used by Amazon.  Indeed, it is well recognized in the economic literature that except in unusual circumstances, information is a "non-rival"

---

*Amazon*, https://www.amazon.com/b/?node=23608568011, accessed September 15, 2024.  Registered users can also submit data requests through the Amazon website to access personal information (such as voice recordings from Alexa Devices) that are not readily available from Amazon's "Your Account" page.  *See* "Request Your Personal Information," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=TP1zlemejtTn6pwYKS, accessed September 11, 2024.  Clicking the "Request My Data" link on this page takes the user to a screen where they can indicate the type of data they would like to request.  One of the options is "Alexa and Echo Devices," which includes "information about your use of the Alexa voice search service such as your voice history (e.g., voice recordings, text transcripts)."

[67] There are examples of companies paying individuals to read statements for the purposes of creating voice data to use to train voice recognition algorithms.  *See, e.g.,* Jay Peters, "Facebook Will Now Pay You for Your Voice Recordings," *The Verge*, February 20, 2020, https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununciations-app.  However, such arrangements do not involve the collection of naturally occurring speech or capture of a series of interactions between a human and a computer as captured through the regular use of voice assistant devices, as is the case with the Alexa Recordings in this matter.  *See* "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024.  As I discuss further below and as acknowledged by Mr. Hochman, these synthetically created voice recordings are not the same as Alexa Recordings in meaningful ways.  Hochman Report, ¶ 55.  Further, the compensation for such synthetic recordings is likely related to the time participants spend generating them and is not related to participants' valuation of the voice recordings being created.  In the context of this matter, Alexa Recordings are used by Amazon solely to train and improve Alexa.  As such, any alleged value associated with Alexa Recordings is derived from their usefulness for training purposes.  Importantly, the value of the Alexa Recordings is *not* derived from the information content of the recordings themselves beyond its usefulness for improving Alexa.  Mr. Hochman appears to accept that the value of the Alexa Recordings is derived from their value from training Alexa.  Hochman Deposition, pp. 117:20–118:4 ("Q. Is it your opinion -- or do you have an opinion that each false-wake utterance has the same value to -- and let's start with, to Amazon?  A. I don't think that I have said that each false-wake utterance has the same value to Amazon. I think that they have value. I just pointed out that they have value, because they have utility. They can be used for -- for training, for testing, for evaluating models.").

[68] Hoyt Deposition, p. 177:12–18 ("Q. Do you think you've lost any money as a result of your use of Alexa? … A. Not that I'm aware of.").  Brust Deposition, pp. 222:25–223:6; Selena Johnson Deposition, p. 202:10–15.

good—the value of the information is not impaired by its use.[69]  In other words, Amazon's retention and use of the Alexa Recordings is not expected to reduce the value of such recordings (if any) if members of the Registrant Putative Class wanted to sell such data.

46.     The non-rivalry of information and Plaintiffs testimony are consistent with the notion that Amazon's retention and use of Alexa Recordings did not "deprive[] the Registrants of the value of that information," nor has Amazon caused Plaintiffs "loss of the value of that data."[70]

**B.      Any Estimate Of Amazon's Value Of The Alexa Recordings Cannot Be Used To Estimate The Registrant Class Members' Alleged Lost Value.**

**1.      The Value Of Information Is Context-Specific.**

47.     It is well understood in the academic literature that the value of information is context-specific.

48.     First, academic literature has shown that individuals' behavior often indicates that they do not value their personal data or information.  The well-known "privacy paradox," which explores the relationship between individuals' intentions to disclose personal information and their actual behavior, has shown that people tend to report a high degree of value in protecting against the disclosure of their personal information when asked about that subject in the abstract but then do not take actual actions to protect that information consistent with such statements.[71]

49.     In general, it is difficult to observe or determine the value users may place on their personal information.  Studies that examine the privacy paradox have relied on a "revealed preferences" analysis, a scientifically grounded method used in economics to determine

---

[69] Jones, Charles I., and Christopher Tonetti, "Nonrivalry and the Economics of Data," *American Economic Review* 110, no. 9, 2020, pp. 2819–2858, p. 2819 ("Data is nonrival: a person's location history, medical records, and driving data can be used by many firms simultaneously [without being depleted]").  A good is characterized as "rival in consumption" when "one person's use diminishes other people's use."  A good is defined as "non-rival in consumption," in contrast, when "one person's use of the good [does not] reduce another person's ability to use it."  *See* Mankiw, N. Gregory, *Principles of Economics*, Eighth Edition (Boston, MA: Cengage Learning, 2018), p. 212.

[70] Plaintiffs' Motion for Class Certification, p. 23.

[71] *See* Spiekermann, Sarah, Jens Grossklags, and Bettina Berendt, "E-Privacy in 2nd Generation E-Commerce: Privacy Preferences Versus Actual Behavior," *Paper Presented at EC'01: Proceedings of the Third ACM Conference on Electronic Commerce*, 2001, pp. 38–47, p. 38; Norberg, Patricia A., Daniel R. Horne, and David A. Horne (2007), "The Privacy Paradox: Personal Information Disclosure Intentions Versus Behaviors," *The Journal of Consumer Affairs* 41, no. 1, 2007, pp. 100–126, pp. 100, 118; Adjerid, Idris, Eyal Peer, and Alessandro Acquisti, "Beyond the Privacy Paradox: Objective Versus Relative Risk in Privacy Decision Making," *MIS Quarterly* 42, no. 2, 2018, pp. 465–488, pp. 465–466; Acquisti, Alessandro, Laura Brandimarte, and George Loewenstein, "Privacy and Human Behavior in the Age of Information," *Science* 347, no. 6221, 2015, pp. 509–514 ("Acquisti, Brandimarte, and Loewenstein (2015)"), p. 510; Kokolakis, Spyros, "Privacy Attitudes and Privacy Behaviour: A Review of Current Research on the Privacy Paradox Phenomenon," *Computers & Security* 64, 2017, pp. 122–134, p. 122.

consumer preferences (as relevant here, privacy and valuation of their information).  In essence, the revealed preferences approach examines how users behave in relevant settings (sometimes referred to as "natural experiments") and use this actual behavior in real choice settings to make inferences about valuations.  Such methods are widely used in empirical economics and have been specifically applied to the study of privacy issues.[72]  For example, some studies have noted that many people voluntarily share personal information on social media (including their name, date of birth, city of residence, education, current and prior employment, their relationship status, etc.) without applying any limits on who can see the information, even when the cost of adding such filters is low (*i.e.*, they are readily available).  This behavior is consistent with people having little or no concern about this information being publicly available.[73]

50.     Evidence of the privacy paradox can be seen in this matter by Named Plaintiffs' testimony.  When asked, nearly all Named Plaintiffs described their voice recordings as having value, yet none of the Named Plaintiffs could assign a dollar value to their privacy (three Named Plaintiffs, in fact, described it as being "invaluable," "can't quite put a price on that," and worth "everything").[74]  While they testified their voice recordings were valuable, perhaps even "invaluable," several Named Plaintiffs testified they made no effort to read Amazon's data privacy policy page or review other relevant sources of information to learn of Amazon's retention and use of Alexa Recordings.[75]  Named Plaintiffs also did not take actions to delete their voice recordings from Amazon's servers.[76]  Some Named Plaintiffs even continued using their Alexa Device after learning about Amazon's retention and use of Alexa Recordings.  For

---

[72] *See* Preibusch, Sören, "Guide to Measuring Privacy Concern: Review of Survey and Observational Instruments," *International Journal of Human-Computer Studies* 71, no. 12, 2013, pp. 1133–1143, pp. 1140–1141; Bian, Bo, Xinchen Ma, and Huan Tang, "The Supply and Demand for Data Privacy: Evidence from Mobile Apps," *Working Paper*, 2021, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3987541, p. 27.

[73] *See* Gross, Ralph, and Alessandro Acquisti, "Information Revelation and Privacy in Online Social Networks," *Workshop on Privacy in the Electronic Society (WPES)*, 2005, pp. 71–80, pp. 75–79.

[74] For example, Ms. Caron Watkins testified she believes her privacy is "invaluable."  Watkins Deposition, p. 188:3–7.  Mr. Ronald Johnson testified his voice recordings are "worth everything in the world."  Ronald Johnson Deposition, p. 186:9–12.  Mr. Ricky Babani testified "I think that privacy is the most valuable thing tied to a person. … you can't quite put a price on that."  Babani Deposition, p. 156:5–9.  Ms. Diane McNealy testified she did not know the dollar value of her voice recordings.  Diane McNealy Deposition, p. 238:22–25.

[75] Ronald Johnson Deposition, pp. 78:23–79:17 ("Q. Have you ever looked at Alexa's terms of use? A. No. Q. What about the privacy policy? A. No. ... Q. Are you aware of a frequently asked questions page for Alexa? A. I'm pretty sure they have one. I'm not -- like I said, I don't -- I can't remember. Q. But you do remember looking at it; is that right? A. No, I don't think ...  I've never – I've never looked at a frequently asked questions."); Garner Deposition, p. 89:12–15; Michael McNealy Deposition, p. 70:1–8; Hoyt Deposition, pp. 41:11–42:4.

[76] Selena Johnson Deposition, p. 197:10–17 ("Q. Did you delete any recordings from your account? A. No. Q. Did your husband? A. No. Q. Did anyone else delete recordings from your account? A. No."); Garner Deposition, pp. 118:24–119:10; Ronald Johnson Deposition, pp. 93:22–94:4.

example, Mr. and Ms. McNealy both testified they continued using their Alexa Device to turn on and off the light in their bedroom days before their respective depositions.[77]

51.     In summary, even though Named Plaintiffs knew about Amazon's retention and use of Alexa Recordings and even though they claim to value these recordings, the actions of many Named Plaintiffs demonstrate from their own behavior they have not lost value from having their voice captured as Alexa Recordings and are not concerned by the way Amazon retains and uses such data.

52.     Second, not only do privacy preferences vary across people, but privacy preferences also vary across contexts within a given person.[78]  In the matter at-issue, a user may assign little to no value to an Alexa Recording of a command to turn on or off a room light while the same user may assign a large value to an Alexa Recording of a search for information related to a sensitive health issue.  For example, Plaintiff Jeffrey Hoyt's testimony reflects differences in his privacy preferences over different contexts:[79]

> Q. So let me ask you this question, Mr. Hoyt. Do you object as part of this lawsuit to Amazon storing recordings of your voice when you ask a question like "What is the weather today"? … A. So if you were to ask me that question today, and I answer it today knowing what I know today, knowing that Amazon now -- knowing now that Amazon records and stores that information, I'm okay with them recording and storing that, you know, that type of question and the answer to that question, that specific question. Q. Same question, but if the recording is "Play Adele," do you have an objection to that? … A. Yeah, so speaking only for myself, questions that I would ask Alexa today are going to be questions that I'm okay with Alexa storing, the question and the answer.
>
> …
>
> Q. Do you object to Amazon storing communications from you where Alexa records your voice, but you did not intend to engage with Alex[a]? A. …I

---

[77] Diane McNealy Deposition, p. 22:1–8 ("Q. When was the last time you made a voice command to an Alexa-enabled device? A. Probably the night before I left for -- to come to New York to tell them to turn the light on and off. Q. And when was that? A. Monday evening. Q. So you've continued to use Alexa after the lawsuit? A. Yes.").  Michael McNealy Deposition, pp. 21:8– 22:6.

[78] *See, e.g.*, Martin, Kirsten, and Katie Shilton, "Why Experience Matters to Privacy: How Context-Based Experience Moderates Consumer Privacy Expectations for Mobile Applications", *Journal of the Association for Information Science and Technology* 67, no. 8, 2016, pp. 1871–1882, pp. 1871–1872; Nissenbaum, Helen, "Privacy as Contextual Integrity," *Washington Law Review* 79, no. 1, 2004, pp. 119–158, p. 119; John, Leslie K., Alessandro Acquisti, and George Loewenstein, "Strangers on a Plane: Context-Dependent Willingness to Divulge Sensitive Information," *Journal of Consumer Research* 37, no. 5, 2011, pp. 858–873, pp.858–859, 868.

[79] Hoyt Deposition, pp. 203:6–205:16.

> would say yes to that, I do object. If I'm not intending to interact with Alexa
> and it's recording information, I do object to that."

53.     Consequently, the value that an individual may assign to particular personal information varies depending on the specific nature of that information. In other words, there is no generic "value" of information that transcends the context and the nature of the information. Further, context also likely matters in terms of users' assigned value to Alexa Recordings and specifically False Wakes. For instance, a user may assign little to no value to an Alexa Recording that has accidentally captured audio from a television, a dog barking, or distant undiscernible voices. However, the same user may assign a larger value to an Alexa Recording accidently capturing discernible audio of users' voices when they were not intending to engage with Alexa.

54.     Third, the context in which the Alexa Recordings are *used* will influence the value of the data. It is well understood that the value of information in a decision context depends on how that information can potentially change a decision.[80] How information can change a decision depends on what other information is already available and how this information can affect that decision.[81] User data can be valuable to companies because it helps them to make better decisions (*e.g.*, decide what activities would improve the performance of a product). Such information does not have the same value for users because they do not face the same types of decisions. Similarly, the value of the same information to one company may differ from the value to another company if the two companies do not face the same types of decisions.

55.     Moreover, whether that application is potentially valuable to Amazon is not relevant to assess whether any particular Alexa Recordings are valuable to the Alexa user or to other companies facing different types of decisions. That is, even across companies that can derive some value from aggregating consumer data, the value of the data differs based on the information itself and on the use cases for the information contained in the data.

---

[80] *See*, for example, Birchler, Urs, and Monika Bütler, *Information Economics* (Abingdon, England: Routledge, 2007) ("Birchler and Bütler (2007)"), p. 32 ("The main source of the value of information is action. The possibility of *reacting* to information increases an individual's expected utility … *The value of information … is the increase in utility an individual expects from receiving the information … and from optimally reacting to it.*").

[81] For instance, companies with customer service call centers may leverage historical data on call volumes, call times, and the topic and resolution of those calls to optimize staffing in a way that reduces wait times for customers and improves resolution of customer issues. These data are directly valuable to the company in that they help improve service and customers' experience. However, the data themselves generally have no direct value to consumers and only benefit consumers through the way companies use the data to improve customers' experience.

56.     Another (consistent) perspective on the value of the Alexa Recordings can be derived from consumer demand theory.  The price of a product or service, including information, is derived from the interaction of supply and demand.  Supply is determined by the preferences of sellers.  Demand is determined by the preferences of buyers.  The interaction of the supply for the product and the demand for the product will determine the market price for the product.[82]  As such, even if there is a price which Amazon pays or paid to gain data similar in nature to that of Alexa Recordings, there is no reason to believe that any such price would represent the value Registrant Putative Class members assign to Alexa Recordings because such individuals do not represent the supply side of the market as discussed earlier.  As discussed in this subsection, the price of information is context specific, therefore, the price of information sold in a specific context says nothing about the preferences of individuals or organizations that do not participate in the market for such data.

### 2.     There Is No Market For Alexa Recordings To Train Alexa.

57.     Amazon does not buy Alexa Recordings nor is there a market where users can sell such data.  Since there is no market in which users can participate and sell Alexa Recordings, they could not experience loss of value of their information.  Moreover, as discussed above, even if such a market existed, since information is typically non-rival, Amazon's use of Alexa Recordings does not diminish the value of the recordings to others.

58.     First, as noted above, all Named Plaintiffs who were asked whether they tried selling their information testified that they did not attempt to monetize their voice recordings, and the majority further testified that they would not know how to do so.[83]  Further, in his deposition, Mr. Hochman testified that he has no opinion on whether an Alexa user could sell their Alexa Recordings.[84]

---

[82] *See* Mankiw, N. Gregory, *Principles of Economics*, Eighth Edition (Boston, MA: Cengage Learning, 2018), pp. 67–78.
[83] Babani Deposition, p. 156:10–13 ("Q. Okay. Have you ever tried to monetize your own either voice recordings or computer inputs, online inputs yourself? A. Monetize, no."); Ronald Johnson Deposition, p. 186:13–20 ("Q. Have you ever tried to sell your voice recordings? A. No. Q. What about selling your personal data? A. No. Q. If you wanted to sell your voice recordings, would you know how to do that? A. No."); Brust Deposition, p. 222:17–24; Garner Deposition, pp. 217:16–218:14; Hoyt Deposition, pp. 177:19–178:19; Selena Johnson Deposition, pp. 203:22–204:7; Diane McNealy Deposition, pp. 241:25–242:7; Michael McNealy Deposition, pp. 228:8–23; Tesoriero Deposition, pp. 221:21–222:8; Watkins Deposition, pp. 188:14–189:2.
[84] Hochman Deposition, p. 199:13–18 ("Q. Do you have an opinion, one way or the other, that a – a user who asked for a copy of their -- and – and received a copy of their recordings from Amazon could sell those? A. I haven't been asked that question, and I -- I don't have any opinion on that.").

59.     Second, the nature of the data in this matter (Alexa Recordings for training purposes) does not lend itself to a market. Alexa interactions analyzed by human annotators (whether False Wakes or not) derive their value for training purposes by the fact that these are real interactions in which Alexa may or may not have responded to the utterance correctly. Moreover, as discussed above, even if such market existed, since information is typically non-rival, Amazon's use of Alexa Recordings does not diminish the value of the recordings to others.

### 3. Mr. Hochman Has No Valid Support For His Claim That Registrant Putative Class Members Value Alexa Recordings.

60.     Mr. Hochman claims that "Amazon obtains incremental value from each utterance" as it uses them to build and continue to improve the machine learning models underlying Alexa.[85] Further, he opines that "[e]ach user's data has discrete value."[86] To support his opinion, Mr. Hochman refers to three sources: (i) an academic paper which claims "an individual can share her (verifiable) data in exchange for a monetary reward or services," (ii) a Washington Post article about services that offer payments for consumers sharing data, and (iii) an Amazon document presenting dollar amounts associated with consumers' voice recordings collected by Amazon.[87] None of these sources describe a market for the Alexa Recordings or directly support the idea that each Alexa Recording has discrete value. Further, Mr. Hochman testified in his deposition that he is not offering an opinion on either (i) the relative value of one utterance versus another, or (ii) whether an utterance has a different value to Amazon versus the person who spoke the utterance.[88]

---

[85] Hochman Report, ¶¶ 80–81.
[86] Hochman Report, Section Header VII.D.
[87] Hochman Report, ¶¶ 95–98.
[88] Hochman Deposition, pp. 117:20–118:22 ("Q. Is it your opinion -- or do you have an opinion that each false-wake utterance has the same value to -- and let's start with, to Amazon? A. I don't think that I have said that each false-wake utterance has the same value to Amazon. I think that they have value. I just pointed out that they have value, because they have utility. They can be used for -- for training, for testing, for evaluating models. Q. And are you offering an opinion that -- one way or the other, that each false-wake val- -- has the same value to an Alexa user? A. I don't think I've said -- I've said that, either. I think I've said that they have value. Q. But the comparative value of one versus another is not what you're opining on? A. I -- I -- I wasn't asked -- … I wasn't asked to opine about that, because -- I -- wasn't asked, first of all, to fix the value. And I wasn't asked to opine about the relative value of a -- of one utterance to another."), pp. 200:22–201:20 ("In the first sentence of paragraph 47, you state, 'Each user's data, such as the utterance [sic] collected by Alexa, has discrete value by itself.' What do you mean by the term 'discrete value by itself' with respect to utterances? A. Well, discrete is -- I would use that the same way I use discrete math. It -- it's separate. It's got a value. Each utterance has a value. Q. And are -- are you offering any opinion on whether utterance -- one utterance has more or less value than another? A. We've covered this before, so I'll just mention that I -- I answered this before and said that the -- I wasn't asked that question. And I -- and I haven't performed that analysis, and I haven't offered that opinion.

### a) Mr. Hochman's Academic Support For The Idea That The Alexa Recordings Have Value To Members Of The Registrant Putative Class Is Purely Theoretical.

61.     Mr. Hochman appears to misinterpret an academic paper about a model for paying consumers for data, when he states that "[o]ne recent paper explained, 'an individual can share her (verifiable) data in exchange for a monetary reward or services.'"[89]  This quote is taken out of context.  While Mr. Hochman uses this quote as evidence that individuals sell their personal data, the quote in fact relates to describing a *theoretical* model, and the underlying paper that Mr. Hochman cites to provides *no evidence* that an actual market exists in which individuals can sell their personal data.[90]

62.     Further, while Mr. Hochman contends that "[t]he correct pricing of sensitive user data has been the subject of substantial academic research,"[91] he provides no examples from the literature of actual marketplaces where users can sell personal data similar to the at-issue data in this matter, and much of the literature to which he appears to be referring is theoretical and does not study any actual markets for consumers' personal data.[92]

---

Q. Are you offering an opinion as to whether each discrete utterance -- or each utterance has different value to Amazon as opposed to the person who utters it? A. Again, I -- I wasn't asked that, and I haven't offered that opinion."). Mr. Hochman also testified that his opinions concern only False Wakes and not Alexa Recordings generally.  Hochman Deposition, p. 79:6–14 ("Q. Is your opinion only about false wakes? Or is it about when -- does your opinion consider -- concern intentional interactions with Alexa? A. I – I've been asked to focus on false wakes. There may be additional information in my report for context. But the -- the focus is false wakes.").

[89] Hochman Report, ¶ 97.

[90] Fallah, Alireza, et al., "Optimal and Differentially Private Data Acquisition: Central and Local Mechanisms," *Working Paper*, 2023, https://arxiv.org/abs/2201.03968, p. 2 ("We formulate this question as a mechanism design problem, in which an individual can share her data in exchange for a monetary reward or services, but at the same time has a heterogeneous privacy sensitivity that represents her cost per unit privacy loss.").

[91] Hochman Report, ¶ 97.

[92] For example, Fallah et al. (2023) describe Ghosh and Roth (2015) as a "pioneering paper" in the literature on optimal data acquisition from strategic privacy conscious users.  Fallah, Alireza, et al., "Optimal and Differentially Private Data Acquisition: Central and Local Mechanisms," *Working Paper*, 2023, https://arxiv.org/abs/2201.03968, p. 4.  Ghosh and Roth (2015) contemplate a theoretical mechanism design problem and do not study an actual marketplace in which consumers can sell personal data; the authors motivate their study using two 2010 New York Times articles related to companies compensating consumers for use of their data.  Ghosh, Arpita, and Aaron Roth, "Selling Privacy at Auction," *Games and Economic Behavior* 91, 2015, pp. 334–346, p. 334 ("Up until recently, the purchase and sale of access to private information was the exclusive domain of aggregators – it was obtained for free from the actual owners of the data, for whom it was sensitive. However, recently, companies such as 'mint.com' and 'Bynamite' have started acting as brokers for private information at the consumer end, paying users for access to their sensitive information").  These New York Times articles—like the Washington Post article cited by Mr. Hochman—are not applicable to this matter; they do not include any examples of users selling personal voice recording data.  Tatum Hunter, "These Companies Will Pay You for Your Data. Is it a Good Deal?" *The Washington Post*, February 6, 2023, https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/; Stephanie Clifford, "Web Start-Ups Offer Bargains for Users' Data," *The New York Times*, May 30, 2019, https://www.nytimes.com/2010/05/31/business/media/31privacy.html; Steve Lohr, "You Want My Personal Data? Reward Me for it," *The New York Times*, July 17, 2010, https://www.nytimes.com/2010/07/18/business/18unboxed.html.

b)    Mr. Hochman Cites No Suitable Proxy For The Value Of Alexa Recordings.

63.    In his deposition, Mr. Hochman confirmed he has not put forward a damages model of any kind in his expert report,[93] and he clarified that he has not proposed any pricing benchmarks to use for valuing Alexa Recordings.[94]  However, Mr. Hochman has referenced public press and internal Amazon documents presenting dollar amounts associated with consumers' personal data and with voice recordings collected by Amazon.[95]  To the extent Plaintiffs or Plaintiffs' other experts rely on these sources as a proxy for the value of Alexa Recordings, I explain in this subsection that such an approach is flawed.  The sources cited by Mr. Hochman cannot be used as a proxy for the value of Alexa Recordings since the compensation discussed in these sources compensates for either a very different type of data or the compensation is for participants' time, not the data they provide.  I illustrate these issues for each of the sources cited by Mr. Hochman.

64.    To start with, Mr. Hochman references a Washington Post article which claims that "[o]pportunities to trade or sell your personal data are on the rise, with the chance to earn up to $50 a month, some companies claim."[96]  As an initial matter, the Washington Post article cited by Mr. Hochman does *not* claim individuals actually received up to $50 per month for any type of data.  Instead, the article mentions a mobile application, Caden, that "*plans* to give users cash if they'll pair their online accounts such as Netflix and Amazon," and that Caden "*expects* users to make $5 to $50 per month in the near future."[97]  Therefore, the range of $5 to $50 does not reflect actual market prices.  More generally, the article's claim that "[o]pportunities to trade or sell your personal data are on the rise, with the chance to earn up to $50 a month"[98] suggests that the

---

[93] Hochman Deposition, pp. 67:17–68:1 ("In general, I provide some opinions, usually, that -- that are -- may be relied upon by a damages expert, who's going to do the full economic analysis -- the full workup. I provide some prerequisite information that they may use. I generally am not providing a final number in that sort of matter. Although, in some other matter, for example, I might provide some number. But generally, I'm not providing a bottom-line damages number.").

[94] Hochman Deposition, pp. 115:18–116:10 ("███████████████████████████████████ A. I -- I – I'm not suggesting what benchmarks to use. I've just pointed out some data points. And if someone were to sit down and try to ac- -- actually determine a value of the -- the utterances, beyond merely that they have value, to go further and say, Okay what is that economic value? Obviously, there are different ways to do valuation that you -- you -- you know, could be done based on cost; based on utility; based on where you'd have to go to buy them; replacement costs. I mean, there are different ways to think about value. And I haven't -- I haven't weighed into that. I wasn't asked to do that.").

[95] Hochman Report, ¶¶ 83, 95.

[96] Hochman Report, ¶ 95, citing Tatum Hunter, "These Companies Will Pay You for Your Data. Is it a Good Deal?" *The Washington Post*, February 6, 2023, https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/.

[97] Tatum Hunter, "These Companies Will Pay You for Your Data. Is it a Good Deal?" *The Washington Post*, February 6, 2023, https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/ (emphasis added).

[98] Hochman Report, ¶ 95; Tatum Hunter, "These Companies Will Pay You for Your Data. Is it a Good Deal?" *The Washington Post*, February 6, 2023, https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/.

amount of such payments (and perhaps their existence) is speculative and has a wide range. For example, the article notes that Tapestry's CEO claims he pays users about "$8 to $25 a month;" another application, TIKI, "declined to estimate what users could earn or save;" and "Invisibly … said it *plans* to let users trade their data for digital subscriptions worth between $4 and $15 per month."[99]

65.    Regardless, even assuming actual payments to consumers for information could be accurately estimated, the potential monthly earnings range for the sale of personal data cannot be used as an estimate of the value lost by members of the Registrant Putative Class for several reasons.

66.    First, the setting and types of data described in the Washington Post article are not applicable to this matter. Specifically, the article focuses on companies acquiring user data and selling the data to third parties or using it for their own tracking purposes.[100] In contrast, Amazon does not sell Alexa Recordings to any third parties—rather, it uses Alexa Recording data to improve Alexa's voice recognition and responses, thereby improving the user experience.[101] As discussed earlier, the value of data to a user depends on how they will use the data, and the uses of data described in the Washington Post article are not applicable to the Alexa Recordings.

67.    Second, the Washington Post article does not discuss any examples of data collected in a manner like the manner in which Alexa Recordings are collected. The data collection discussed in the article appears to require either an investment of time sharing the information (in a form of a survey) or a constant sharing of information (location, bank account transactions, or user behavior on an application). In contrast, Alexa Recordings are collected only when a wake word is uttered or falsely identified. Collection of Alexa Recordings does not require additional effort

---

[99] Tatum Hunter, "These Companies Will Pay You for Your Data. Is it a Good Deal?" *The Washington Post*, February 6, 2023, https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/.

[100] *See, e.g.*, Tatum Hunter, "These Companies Will Pay You for Your Data. Is it a Good Deal?" *The Washington Post*, February 6, 2023, https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/ ("Tapestri, a Chicago-based start-up, offers users cash in exchange for near-constant access to their locations ... Tapestri, for instance, sells location data to third parties and gives you a chunk of that revenue;" "Payment-for-data app TIKI says it will present users with contracts from various advertisers and let them decide whether to agree to the terms, said founder and CEO Mike Audi. A contract may ask for access to your behavior across apps in exchange for a 10 percent discount on an app subscription, for example;" "Another start-up, Invisibly, offers access to paywalled news articles in exchange for demographic and behavioral data, including whether you've vaccinated your children and your political affiliation;" "The app Caden, which plans to give users cash if they'll pair their online accounts such as Netflix and Amazon, said it expects users to make $5 to $50 a month in the near future.").

[101] "Amazon.com Privacy Notice," *Amazon*, March 31, 2024, https://www.amazon.com/gp/help/customer/display html?nodeId=GX7NJQ4ZB8MHFRNJ, accessed September 5, 2024; "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024.

by the user and does not entail the collection of data at all times by the device. Mr. Hochman references this article without mentioning these notable differences rendering his analysis, at best, incomplete.[102]

68.     Third, the wide range of prices cited by Mr. Hochman, $5 to $50, demonstrates that the value of data depends on the data collected and its use. That is, the value of the data is context-specific, and one cannot use a price of one data type collected in one context to another type of data collected in a different context.

69.     In addition to the Washington Post article, Mr. Hochman also cites an internal Amazon document which he claims references historical costs paid by Amazon for voice recording data ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████[103] Such prices cannot be used as an estimate of the value of data to Putative Class Members for several reasons.

70.     First, the ███████████ per utterance figures cited by Mr. Hochman represent the cost Amazon incurred to collect recordings collected in a "controlled environment,"[104] which I understand to mean using participants in lab-like environment rather than occurring in the natural use of a device at one's home.[105] Mr. Hochman has not considered whether a portion of the payment for the participants' recordings (perhaps the full amount) is a compensation for the opportunity cost of participants' time, and thus the payment is not tethered to any alleged value of the recordings. Documentation and academic research related to the process of conducting a survey suggest that payments in these settings are typically designed to compensate participants for their time and effort.[106] The estimated cost paid to lab participants for their utterances is not

---

[102] Further, when asked about it in deposition, Mr. Hochman did not identify any companies that purchase voice utterances from individuals, aside from the example of Amazon collecting utterances. Hochman Deposition, pp. 135:17–136:2 ("Q. Based on the sources that you cited and your knowledge and -- and experience, have you identified any companies that will purchase voice utterances from any individuals? A. I don't think that I've o- -- opined about that. And I -- and I wasn't asked to identify businesses who will purchase voice utterances. That's, of course, a -- a very specific thing, and the -- well there's a first time for everything.").

[103] AMZ_GARNER_01012801–3.

[104] AMZ_GARNER_01012801–3.

[105] In his deposition, Amazon's director in applied sciences differentiated between data collected through the use of vendors to develop new features from "actual usage, you know, when customers are using these devices." Deposition of Shiv Naga Prasad Vitaladevuni 30(b)(6), April 23, 2024 ("Naga Prasad Vitaladevuni 30(b)(6) Deposition"), pp. 139:25–140:6, 141:19–142:11.

[106] See, e.g., Grady, Christine, "Money for Research Participation: Does it Jeopardize Informed Consent?" The American Journal of Bioethics 1, no. 2, 2001, pp. 40–44, p. 40 ("Money is offered to research subjects as reimbursement for their expenses, compensation or reward for their time and effort, and/or as an incentive for studies that might otherwise have difficulty recruiting."); "Research Incentives 101: Setting Appropriate Compensation," Virtual Incentives, November 15, 2023, https://www.virtualincentives.com/research-incentives-101-setting-appropriate-compensation-2/ ("Incentives serve several

applicable as a proxy for the value of Alexa Recordings because members of the Registrant Putative Class did not spend incremental time to produce the Alexa Recordings beyond their ordinary use of the Alexa Device. Determining if any payment for information collected in a controlled environment goes beyond payment for opportunity cost requires individualized inquiry as (at a minimum) opportunity costs vary by individual.[107]

71.     Second, the cost described in the document cited by Mr. Hochman may include additional costs incurred by Amazon beyond the amounts paid by Amazon to participants to provide voice recordings. As Mr. Hochman acknowledged in his deposition, the costs described in the source cited by Mr. Hochman may include costs other than payment to participants, including technology, storage, personnel, and management.[108] To the extent that these costs include costs beyond the payments to participants, Mr. Hochman's calculation of ███████ ████ per utterance is necessarily higher than the payment received by paid participants to provide their voice recordings in the controlled environment.

---

critical functions in the research process. At the most basic level, they compensate participants for contributing their time and effort … The key is setting compensation at appropriate levels – high enough to show value for time yet consistent across groups within a study to avoid influencing behavior."); George Kuhn, "How Much Should You Pay Participants in Market Research?" *Drive Research*, March 9, 2020, https://www.driveresearch.com/market-research-company-blog/how-much-should-you-pay-participants-in-market-research/ ("How long is the time commitment? It will impact the reward payout for both qualitative and quantitative market research. For qualitative, you will need to pay more for a 2-hour session than a 60-minute session. Similarly, for a survey, you will need to offer a more extensive raffle or pay more in rewards for a 20-minute study than a 5-minute. As a general range, aim for at least $1 to $2 per minute for qualitative as the baseline.").

[107] *See*, Varian, Hal R., *Intermediate Microeconomics: A Modern Approach* (New York, NY: W.W. Norton & Company, 2014), p. 364 ("We have seen that economic costs like these are often referred to as **opportunity costs**. The name comes from the idea that if you are using your labor, for example, in one application, you forgo the opportunity of employing it elsewhere. Therefore those lost wages are part of the cost of production." (emphasis in original)), p. 174 ("Economists sometimes say that the wage rate is the **opportunity cost** of leisure." (emphasis in original). As people earn different wages, opportunity cost of time are understood to vary across people.").

[108] Hochman Deposition, pp. 107:4–109:3 (



A. Well I -- … THE WITNESS: Yeah. A. I haven't taken a position on that. I haven't -- I certainly haven't asserted that. … A. Well no matter where -- … THE WITNESS: Sorry. A. No matter where you get the utterances, you have -- you have costs to collect, process, and store, and curate data. You have costs. Data isn't free."), pp. 110:20–111:11 ████████████████████████ ).

72.     Last, based on testimony in this matter, ██████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████ [109] ██████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████

<strong>c)     Mr. Hochman's Claim That Amazon Can Use Alexa<br>Recordings For Product Predictions Is Speculative.</strong>

73.     In his expert report, Mr. Hochman hypothesizes a potential avenue through which Amazon may commercially benefit from Alexa Recordings, stating that "[b]y extending their big data collection with utterances, Amazon can improve their predictions about what products a consumer might be interested in buying."[110]  However, in his deposition, Mr. Hochman admitted he has no evidence of Amazon's present use of Alexa Recordings to improve predictions about their users' purchase interests, but rather that "having that big corpus of data creates all sorts of interesting opportunities in the future."[111]  Further, Mr. Hochman admitted in deposition that he has no opinion on the profitability of the Alexa service.[112]

---

[109] Naga Prasad Vitaladevuni 30(b)(6) Deposition, pp. 139:25–140:6 (████████████████████████████████████████████████████████████████
███████████████████████████████████████).

[110] Hochman Report, ¶ 71.

[111] Hochman Deposition, pp. 206:3–207:5 ("Q. All right. And in circumstances where Alexa is not reaching into other Amazon properties, for example, if a -- a user asks Alexa for a recipe for marinated chicken, are you offering any -- an opinion that Amazon uses that information for the purposes of understanding what people might want to buy? … A. So I'll -- I guess I can just say it again. The -- I haven't offered that opinion. But again, if Amazon collects the data and they -- let's say there comes a time in the future when Amazon wants to identify foodies or they want the identify people who like to cook, they might be able to run a query against their databases of utterances or transcripts and figure out who are the users that have really often been asking for recipe information. And that -- that might be very valuable information. Okay? Data has value. There are lots of ways to use data. And many of those ways could be future uses that haven't even been conceived of today. But having that data -- having that big corpus of data creates all sorts of interesting opportunities in the future.").

[112] Hochman Deposition, pp. 163:20–164:9 ("Q. Do you know whether the Alexa service is profitable for Amazon? … A. I wasn't asked to investigate that. And I think that's a -- a very complicated question. BY MR. NEWBY: Q. Have you seen any public documentation about the profitability, or lack thereof, of the Alexa service? A. I, again, haven't opined about that. I haven't in -- investigated the profitability of Alexa. So I -- I have no position on that."). ██████████████████████
████████████████████████████████████████████████████████████████

### 4. Plaintiffs Have Not Proposed Any Class-Wide Method For Valuing Alexa Recordings.

74.     As noted earlier, the economic value of information in a decision context is determined by how that specific information can change decisions which, in turn, change economic outcomes (*see* **Section V.B.1**).  Therefore, the value of any particular information item depends critically on the context as well as what other information is available.  Not only does this make the value of information specific to a particular setting, but it also raises difficulties in establishing the value of a particular unit of information.  Plaintiffs' experts have not presented a method that can establish the value of any particular Alexa Recording.  Mr. Hochman, Plaintiffs' only expert opining that Alexa Recordings have value, in fact admitted he did not attempt to do so.[113]  I am not aware of any class-wide method that can accurately estimate its value.

75.     First, from an economics perspective, determining the value of a single unit of information in the data used to train Alexa is challenging, if not impossible.  Specifically, the data collected of Alexa Recordings can be thought of as a large bundle of many individual recordings.  Economic research on bundling has shown that optimal price of collection of information may be different (either larger or smaller) than the sum of the prices of the individual components if they were sold on a stand-alone basis.[114]  Multiple methods are frequently used in practice to allocate value among items in a bundle, such as assigning an equal

---

[113] Hochman Deposition, pp. 99:8–100:7 ("And I -- I just want to be clear. Are you in your -- in your report are you providing a model by which one can calculate the value of utterances, the false wake utterances captured by Amazon Alexa? … A. … I think I've done something less than that which is that I've opined that the false-wake utterances have value to Alexa. They have val- -- value as a group, they have value individually. They also have value to the users. I haven't set forth a formula for how someone else would go about calculating an actual numerical value to that. There are a lot of other inputs that might need to be known to -- to do -- come up with a, sort of, closed-form formula. I haven't proposed that. I wasn't asked to do that.").

[114] The framework to solving product bundling problems is well understood, albeit complex.  *See, e.g.,* Spence, A. Michael, "Multi-Product Quantity-Dependent Prices and Profitability Constraints," *The Review of Economic Studies* 47, no. 5, 1980, pp. 821–841; Hitt, Lorin M., and Pei-Yu Sharon Chen, "Bundling with Customer Self-Selection: A Simple Approach to Bundling Low-Marginal-Cost Goods," *Management Science* 51, no. 10, 2005, pp. 1481–1493.  In general, a seller sets prices for each possible bundle to maximize its profits.  If marginal cost is zero, this is also the same as maximizing revenue.  If a bundle is not offered, that can be treated as setting a price of "infinity," which means that it would never be purchased.  In general, for $N$ goods, there are $2^N - 1$ possible bundles that can be priced (every possible combination of goods except the "bundle" of no goods).  Due to other aspects of the problem, if there are $K$ different types of consumers with distinct preferences there will in general be no more than $K$ bundles offered.  The seller's pricing problem must account for constraints related to consumer behavior.  The first set of constraints, called "individual rationality," require that a consumer will only buy a bundle when the willingness to pay exceeds the price (there will be one such constraint for every consumer type for each bundle).  The second set of constraints, called "incentive compatibility" states that a consumer will only buy a particular bundle when that bundle creates more surplus (willingness to pay less price) than any other bundle offered (there will in general be one of these constraints for every consumer type for every two-way comparison of every bundle).

value to each item, however, research demonstrates that such methods do not measure precisely the economic value of all the individual items in the bundle across all circumstances.[115]

76.     Second, I note that the value of the data is also connected to the processing of the data. For example, in this matter, the processing of information by human reviewers in the randomly selected utterances generates the value of the data. ████████████████████████████████
████████████████████████████████████████████████████████████████[116]

### C.     Plaintiffs Fail To Consider The Benefits To Members Of The Putative Classes From Amazon's Retention And Use Of Alexa Recordings For Product Improvements.

77.     As described above, Plaintiffs allege that Amazon's retention and use of Alexa Recordings deprived Registrant Putative Class members the value of said recordings.  This allegation ignores the benefit that members of the Putative Classes derive from the lower costs of higher quality Alexa Devices.  Amazon's retention and use of Alexa Recordings for the purpose of training Alexa's voice recognition algorithms ultimately improves Alexa Devices and benefits Alexa users.

78.     To start with, as acknowledged by Mr. Hochman, ████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████.[117]  Had Amazon continued to incur costs to acquire voice recordings to continually improve Alexa, these costs may have been passed through to consumers in the form of higher prices,[118] or in a

---

[115] Shiller, Benjamin, and Joel Waldfogel, "The Challenge of Revenue Sharing with Bundled Pricing: An Application to Music," *Economic Inquiry* 51, no. 2, 2013, pp. 1155–1165, pp. 1155–1156, 1161.
[116] Naga Prasad Vitaladevuni August 2023 Deposition, pp. 105:9–106:2



Amazon specifically states, "

AMZ_GARNER_00063159–61 at 59.

Hochman Report, ¶ 90.
[117] Hochman Report, ¶ 81.
[118] "Pass-through" refers to the cost of a product changing in response to an increase (or decrease) in the cost of producing that product.  *See, e.g.*, "Cost Pass-Through: Theory, Measurement, and Potential Policy Implications: A Report Prepared for the Office of Fair Trading," *RBB Economics*, February 2014, https://assets.publishing.service.gov.uk/media/5a74a3a940f0b619c86593b8/Cost_Pass-Through_Report.pdf, p. 1 ("'Cost pass-through' describes what happens when a business changes the price of the products or services it sells following a change in the cost of producing them.").

reduction in the quality of Alexa Devices.[119]  More specifically, if the cost of acquiring voice recordings were higher, Amazon would have likely used a smaller number of utterances in its training of Alexa.  If each utterance is valuable (as Plaintiffs' theory of harm suggests), and each contributes to training of Amazon's voice recognition model, the use of a smaller number of utterances would have slowed the rate of improvement of Alexa.  As a result, consumers would not have experienced the same improvements in the Alexa Devices.

79.     Second, Mr. Hochman also acknowledges the value of voice recordings captured in real-world settings: "[l]ive data is more effective than Synthetic Data because it accurately reflects real-use conditions, which may include noise or other confounding factors … It would be impractical to generate a synthetic data set that reflects the diversity of Amazon's customers."[120] As such, were Amazon to rely on synthetic data to train Alexa rather than on users' Alexa Recordings, Alexa may not have improved at the same rate, and users may have experienced increased False Wakes.

80.     The cost-benefit tradeoff of product improvements and cost of training is well established in the information technology literature—no software product is perfect and the number of defects will be related to the cost of identifying them.[121]  To reduce costs associated with product improvements, many companies resort to using user-generated data.[122]  As Dr. Egelman

---

[119] Indeed, Mr. Hochman asserts "[e]ach utterance can be used to train Alexa to improve Alexa's accuracy."  Hochman Report, ¶ 87.

[120] Hochman Report, ¶ 55.  In his deposition, Mr. Hochman acknowledged that False Wakes in particular help Amazon improve its models.  Hochman Deposition, p. 121:3–19 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[121] Cavusoglu, Hasan, Huseyin Cavusoglu, and Jun Zhang, "Patch Management: Share the Burden or Share the Damage?" *Management Science* 54, no. 4, 2008, pp. 657–670.

[122] *See,* for example, "User-Generated Data," *Garrett Technologies*, September 25, 2023, https://www.garrett-tech.com/gt-blog/user-generated-data ("The user data generated by-products is a powerful and as yet underutilized solution. Many products are already produced with embedded usage analytics tools … Feedback collected by embedded usage analytics tools is objective and reliable, but there's a lot of it. A combination of artificial intelligence technologies, including automation analytics, natural language generation, predictive analytics, and machine learning can help companies to make sense of all of this data and leverage it to create better, safer, more reliable products, and to get them to market faster. In terms of R&D, it can save companies time and money, and can make companies more agile with regard to responding to problems and preventing them before they begin."); Andrei Hagiu, and Julian Wright, "When Data Creates Competitive Advantage: and When it Doesn't," *Harvard Business Review*, January–February 2020, https://hbr.org/2020/01/when-data-creates-competitive-advantage ("Gathering customer information and using it to make better products and services is an age-old strategy, but the process used to be slow, limited in scope, and difficult to scale up. For automakers, consumer-packaged-goods companies, and many other traditional manufacturers, it required crunching sales data, conducting customer surveys, and holding focus groups. But the sales data often wasn't linked to individual customers, and since surveys and focus groups were expensive and time-consuming, only data from a relatively small number of customers was collected. That changed dramatically with the advent of the cloud and new

acknowledges, "collecting customer data to train and improve machine learning models is an industry standard practice."[123]

81.     There is ample evidence that consumers routinely are willing to share data (without monetary compensation) for the purposes of improving the services which they use.  For example, consumers are willing to share data to train ChatGPT or Tesla Autopilot without compensation, and routinely participate in providing product reviews and answer customer feedback surveys without explicit compensation.[124]  There is no reason to believe that for the purposes of improving Alexa *all* Alexa users would object to sharing their Alexa Recordings or would only be willing to do so if they were paid.

82.     Amazon's retention and use of Alexa Recordings for training and improving Alexa thus reduces costs and is more cost-effective than using synthetic data (as acknowledged by Mr. Hochman) to train Alexa.  As such, Amazon's retention and use of Alexa Recordings for training leads to a higher quality product provided at a lower cost to consumers, likely making many of them better off relative to a but-for world in which Amazon must purchase training datasets.

## VI.     Alexa Usage And Market Data Suggest That Many And Perhaps Most Members Of The Registrant Putative Class Could Not Have Been Harmed.

83.     Any member of the Registrant Putative Class who assigns little to no value to the information captured in Alexa Recordings was not harmed from any alleged lost value of their information.  As explained in the previous section, the revealed preferences approach examines how users behave in relevant settings to evaluate their true preferences and valuations.  As relevant here, members of the Registrant Putative Class who knew about Amazon's retention and use of Alexa Recordings yet continued to use their Alexa Device or purchased new Alexa

---

technologies that allow firms to quickly process and make sense of vast amounts of data. Internet-connected products and services can now directly collect information on customers, including their personal details, search behavior, choices of content, communications, social media posts, GPS location, and usage patterns. After machine-learning algorithms analyze this 'digital exhaust,' a company's offerings can be automatically adjusted to reflect the findings and even tailored to individuals. These developments make data-enabled learning much more powerful than the customer insights companies produced in the past.").
[123] Egelman Report, ¶ 27.
[124] *See*, for example, "Customer Privacy Notice," *Tesla*, https://www.tesla.com/legal/privacy, accessed September 14, 2024 ("If you choose to enabled data sharing, your vehicle may collect the data and make it available to Tesla for analysis. This analysis helps Tesla improve its products, features, and diagnose problems quicker."); "Privacy Policy," *OpenAI*, November 14, 2023, https://openai.com/policies/row-privacy-policy ("We may use Personal Information … [t]o improve our Services and conduct research."); "Community Guidelines," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=GLHXEX85MENUE4XF, accessed September 14, 2024 ("We don't allow reviews that are created, edited, or removed in exchange for compensation.").

Devices reveal by their own actions that either their privacy interests were not harmed at all by such practices or, at most, any alleged harm they suffered is lower than the benefit they gained from continued use of their Alexa Device. As shown in this section, while information about Amazon's retention and use of Alexa Recordings became more available over time at varying degrees of intensity (*i.e.*, through periods of increased news coverage) and across different media outlets, there is no observable aggregated negative impact on either the usage of Alexa Devices or on the sales of Alexa Devices. The fact that consumer usage or purchase behavior does not substantially change following periods of higher intensity in media coverage of Amazon's retention and use of Alexa Recordings suggests that many and perhaps most members of the Registrant Putative Class could not have been harmed under a theory that they were deprived of substantial value of their information or under the theory that Amazon failed to adequately disclose these practices.

A.     **Information About Alexa Recordings Disseminated Throughout The Public Domain.**

84.     To assess the salience of information regarding Amazon's retention and use of Alexa Recordings, I conducted a search on Factiva for news articles that include "Amazon" and either "Alexa" and/or "Echo" within 500 words of at least one of the relevant keywords described below. I limited the analysis to news and business publications identified as "major" by Factiva.

85.     To identify relevant keywords, I reviewed the First Amended Complaint and Plaintiffs' Motion for Class Certification and searched for words used to describe the alleged conduct. The following keywords have been identified: analy, annotat, audit, captur, collect, consent, data, decept, deceiv, delet, disclos, eavesdrop, false wak, human, intercept, listen, monitor, notice, preserv, priva, record, retain, retention, review, sav, stor, and transcri.[125]  With this keyword search approach, and after removing duplicate reporting, I found 4,995 unique news articles from 2014 to 2024.[126]  I then manually reviewed the headlines of these news articles to remove articles

---

[125] I search word stems rather than exact words in situations where there are likely many similar relevant phrases with the same word stem. For instance, "transcri" would match "transcribe", "transcribed", "transcribes", "transcript" and "transcription." *See, e.g.,* Plaintiffs' Motion for Class Certification, p. 2 ("And even when purportedly allowing for user deletion of voice recordings, Amazon stored *transcripts* of these private conversations."), p. 6 ("Each Plaintiff identified countless communications that were intercepted, *transcribed*, used, and/or stored by Amazon without Plaintiffs' knowledge or consent.") (emphasis added).
[126] I remove articles which appear to be duplicates from this count. Duplicates are identified as articles with the same headline published on the same day regardless of the media outlet, or articles that are from the same media outlet, have the same headline, and are published in in the same month.

in which the headline suggests the article is unrelated to Amazon's retention and use of Alexa Recordings or False Wakes.[127] The manual review reduced the count of unique articles to 765.[128]

86. **Figure 2** shows the monthly unique article count that are potentially related to Amazon's retention and use of Alexa Recordings. The figure also depicts a few quotes from articles identified in the search. While I did not review each article included in the monthly count, all articles meet the criteria of the keyword search described above. The figure demonstrates various points in time in which there were larger volumes of reporting by major news outlets concerning Alexa and keywords related to the matter at-issue. In other words, the intensity of information evolved over time.

---

[127] For example, an article titled "Press Release: 'Alexa, Play Spotify': Spotify Now Available on Amazon Echo" was removed during the manual review as it suggests the main topic of the article is unrelated to the alleged conduct in this matter.
[128] All analyses of the news articles described in this section are robust to the decision to filter out the articles that appear unrelated to the alleged conduct. In particular, the periods of increased news coverage in May 2018 and April 2019 (discussed below) are apparent in the 4,995 unique news articles that meet the Factiva search query.

*Figure 2: Article Counts Potentially Related to Amazon's Retention and Use of Alexa Recordings, 2014–2024*



Source: Factiva; Christopher Mele, "Bid for Access to Amazon Echo Audio in Murder Case Raises Privacy Concerns," *The New York Times*, December 28, 2016, https://www.nytimes.com/2016/12/28/business/amazon-echo-murder-case-arkansas.html; Danny Hakim, "An Alexa Holdout Wants to Know Who's Listening?" The New York Times, December 8, 2017, https://www.nytimes.com/2017/12/08/business/echo-alexa-amazon.html; Laura Stevens, "Amazon Alexa-Powered Device Recorded and Shared User's Conversation Without Permission," *The Wall Street Journal*, May 24, 2018, https://www.wsj.com/articles/amazon-alexa-powered-device-recorded-and-shared-users-conversation-without-permission-1527203250; Hayley Tsukayama, "How Closely is Amazon's Echo Listening?" *The Washington Post*, November 11, 2014, https://www.washingtonpost.com/news/the-switch/wp/2014/11/11/how-closely-is-amazons-echo-listening/;Tom Knowles and Mark Bridge, "Amazon Listens to Conversations Through Alexa," *The Times*, April 12, 2019, https://www.thetimes.co.uk/uk/politics/article/amazon-listens-to-conversations-through-alexa-qh328jlw0
Note:
[1] Articles with the same headline published on the same day regardless of the media outlet are only counted once for a given month. Articles that are from the same media outlet, have the same headlines, and are published in in the same month are also only counted once for a given month.
[2] Article headlines were manually reviewed to determine if they potentially related to Amazon's retention and use of Alexa Recordings.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

87.     As reflected in the chart, already in November 2014, a Washington Post's blog focused on technology policy ("The Switch") reported to its readers that Alexa records information and transmits it to Amazon's cloud computing.  The article also informed its readers that "things you ask Echo are recorded and kept on the company's servers unless you delete them. To do that, users have to go into the 'History' settings in a companion app for the Echo, which will let you view all your queries and nix the ones you don't want individually. You can also delete the queries in bulk. Doing so will also delete the information off of Amazon's servers, a company spokesperson confirmed."[129]   Other news articles from 2016 and 2017 discuss False Wakes.[130]

88.     It is also noticeable in the chart that there are two periods with a substantially higher number of articles that potentially discussed information relevant for the matter at-issue (substantially higher relative to surrounding months).  The two periods of increased news coverage correspond to events and disclosure of information relevant for the matter at-issue:[131]

> a.  In May 2018, a family in Oregon reported having Alexa record their voices accidently and then share the recording with another person.[132]  A number of articles reported the event (including articles by Fox News, CNBC, The New Yorker, The New York Times, Forbes, and Business Insider).  Some of the articles explained to readers that Alexa retains users' previous commands so it can serve users better in their future requests, and how to delete the recordings.[133]

---

[129] Hayley Tsukayama, "How Closely is Amazon's Echo Listening?" *The Washington Post*, November 11, 2014, https://www.washingtonpost.com/news/the-switch/wp/2014/11/11/how-closely-is-amazons-echo-listening/.

[130] *See, e.g.*, Danny Hakim, "An Alexa Holdout Wants to Know Who's Listening?" *The New York Times*, December 8, 2017, https://www nytimes.com/2017/12/08/business/echo-alexa-amazon html ("Still, in some cases, the devices can be triggered by mistake.").

[131] I note that a third period of increased news coverage took place in December 2016 and continued in January 2017.  This period of increased news coverage is related to a murder case in which Amazon was subpoenaed to turn over Alexa Recordings of a suspect in the case.  The event spurred discussions on privacy versus public safety.

[132] Laura Stevens, "Amazon Alexa-Powered Device Recorded and Shared User's Conversation Without Permission," *The Wall Street Journal*, May 24, 2018, https://www.wsj.com/articles/amazon-alexa-powered-device-recorded-and-shared-users-conversation-without-permission-1527203250.

[133] *See, e.g.,* Niraj Chokshi, "Is Alexa Listening? Amazon Echo Sent Out Recording of Couple's Conversation," *The New York Times,* May 25, 2018, https://www.nytimes.com/2018/05/25/business/amazon-alexa-conversation-shared-echo html; USA Today Network, "How to Listen to What Amazon's Alexa has Recorded in your Home," *Chicago Sun Times*, May 29, 2018, https://chicago.suntimes.com/2018/5/29/18377440/how-to-listen-to-what-amazon-s-alexa-has-recorded-in-your-home.

b. In April 2019, the Bloomberg article describing human annotation (and cited in Plaintiffs' Complaint in this matter[134]) was released.[135] The article spurred coverage by other news outlets, including articles by Fox News, Forbes, Business Insider, Venture Beat, and PC Magazine. The various news outlets provided details as to Amazon's retention and use of Alexa Recordings and explained to readers how they can delete such recordings.[136]

89.    **Figure 2** demonstrates that regardless of the information directly disclosed by Amazon in its privacy policy and on its terms of use webpages, and regardless of whether Alexa users reviewed those pages, information about Amazon's retention and use of Alexa Recordings and the occurrence of False Wakes became more available in the public press, exposing members of both the Registrant Putative Class and Non-Registrant Putative Classes to the information and conveying it in what would be an approachable manner for the typical reader of these major news outlets.[137]

### B.    There Was No Negative Response In Usage Of Alexa Devices Following Periods Of High Media Coverage Regarding Alexa Recordings.

90.    As discussed above, a known approach in economics to identify consumer preferences is to observe their behavior (the concept of "revealed preferences" discussed in **Section V.B.1**). In this matter, users of Alexa Devices who were aware of Amazon's retention and use of Alexa Recordings yet continued to use Alexa Devices demonstrated in their actions that their privacy interests were not harmed, and that the benefits of using the device outweigh its costs. For example, a New York Times article from 2017 notes consumers' revealed lack of privacy

[134] First Amended Consolidated Complaint-Class Action, *Kaeli Garner, et al. v. Amazon.com, Inc., et al.*, November 17, 2021, ¶ 107.
[135] *See also* Matt Day, Giles Tuner, and Natalia Drozdiak, "Is Anyone Listening to You on Alexa? A Global Team Reviews Audio," *Bloomberg*, April 10, 2019, https://www.bloomberg.com/news/articles/2019-04-10/is-anyone-listening-to-you-on-alexa-a-global-team-reviews-audio. Bloomberg News is not included in Factiva's database. Therefore, the Bloomberg article released on April 10, 2019 is not included in the data I analyze. However, I note that the Bloomberg article was published by at least one other news outlet that is included in Factiva's database, and thus is included in the data I analyze. *See, e.g.*, Matt Day, Giles Tuner, and Natalia Drozdiak, "Thousands of Amazon Workers Listen to Alexa Users' Conversations," *Time*, April 11, 2019, https://time.com/5568815/amazon-workers-listen-to-alexa/.
[136] *See*, for example, Anthony Cuthbertson, "Amazon Admits Employees Listen to Alexa Conversations," *The Independent*, April 11, 2019, https://www.independent.co.uk/tech/amazon-alexa-echo-listening-spy-security-a8865056 html.
[137] News outlets that covered Amazon's retention and use practices and the occurrence of False Wakes have large digital audiences. For example, in April 2019, an analysis by Comscore published on the Washington Post's website found that 96 million people visited The New York Times Brand, 82.4 million visited The Washington Post, and 34.6 million visited The Wall Street Journal Online. *See* "More Than 82 Million People Visited The Washington Post in April," *The Washington Post*, May 15, 2019, https://www.washingtonpost.com/pr/2019/05/15/more-than-million-people-visited-washington-post-site-april/.

concerns: "In the past three years, the Better Business Bureau … had received 9,876 complaints about Amazon.com. Seventy-nine were related to the Echo speaker, which features Alexa, and *just a single one of those complaints mentioned privacy concerns*."[138]

91.    Additionally, academic literature on privacy has demonstrated that while people often react to privacy concerns related to sharing of their data when prompted, their behavior does not adjust to sharing less information even after they have been made aware of a privacy issue with a service or a product.[139]

92.    In order to empirically determine whether Alexa use substantially changed after the various intense cycles of news coverage about Amazon's retention and use of Alexa Recordings, I analyze "active accounts," "dialogs," and "interactions" from Alexa Devices over time.[140]  As I describe below, user data demonstrate that Alexa usage did not decline following periods of intense news coverage regarding Alexa privacy issues.  While different data are available at different frequency (ranging from annually to monthly) and, in some cases, for only certain Alexa devices, the results show a consistent picture that that there is no evidence of a systematic decline in usage of Alexa Devices following periods of increased awareness regarding Amazon's retention and use of Alexa Recordings.

93.    **Figure 3** shows total annual Alexa user interactions per active account in the United States from 2018 to 2022.[141]  As the figure demonstrates, Alexa interactions per active U.S. account remained steady over this period.  Notable for this matter, customer interactions following the news cycles in 2019 (*see* **Figure 2** above) did not decline, and even increased in 2020 (data prior to 2018 were not available).

---

[138] Danny Hakim, "An Alexa Holdout Wants to Know Who's Listening?" *The New York Times*, December 8, 2017, https://www.nytimes.com/2017/12/08/business/echo-alexa-amazon.html.

[139] *See, e.g.*, Acquisti, Brandimarte, and Loewenstein (2015), p. 513 ("People are often unaware of the information they are sharing, unaware of how it can be used, and even in the rare situations when they have full knowledge of the consequences of sharing, uncertain about their own preferences. Malleability, in turn, implies that people are easily influenced in what and how much they disclose.").

[140] I define "dialogs" and "interactions" in **Section II** above.  Additionally, I understand from counsel that Amazon defines an "active account" in a given month as an account which had in that month an utterance, registration, or interaction with the interface of an Alexa Device, such as swiping screens.

[141] Higher frequency "interactions" data (for example, monthly or quarterly) were not available to analyze in this matter. Nevertheless, the annual data in **Figure 3** still show that interactions per active account did not decline following periods of increased news coverage in 2018 and 2019.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

94.     More granular level data is available for certain measures and product lines that is informative about consumer behavior regarding Alexa devices.  **Figure 4** plots Alexa active accounts in the U.S. on a monthly basis.  The figure shows two lines—one with unadjusted (*i.e.*, "raw") active account data, and one which adjusts for seasonal effects (*e.g.*, the holiday season or Amazon's Prime Day, which typically occurs in July).[142]  As the figure shows, the number of Alexa active accounts in the United States increased consistently over time.  Further, visual inspection of **Figure 4** indicates that the trend in the number of Alexa active accounts in the United States following periods of higher intensity of information dissemination regarding

---

[142] I seasonally adjust the data based on standard techniques used by the U.S. Census Bureau.  Specifically, the "seasonal" package in R uses the functionality of the X-13ARIMA-SEATS program developed by the U.S. Census Bureau to take a time series, transform it if needed, check for outliers, and find an appropriate ARIMA model to fit the data.  I use the "seas" function within the "seasonal" package, which generates a time series with the seasonal component removed from the raw data based on the estimated ARIMA model.  *See* Christoph Sax and Dirk Eddelbuettel, "Seasonal Adjustment by X-13ARIMA-SEATS in R," *The Comprehensive R Archive Network,* 2018, https://cran r-project.org/web/packages/seasonal/vignettes/seas.pdf.

Amazon's retention and use of Alexa Recordings in May 2018 or April 2019 was in line with the trend of the preceding months.[143]   That is, as information about privacy issues became increasingly available in the public domain, there was no evidence that consumers materially changed their usage of Alexa Devices.



---

[143] I also perform statistical tests to assess whether there was a structural change in both the unadjusted and seasonally adjusted active accounts time series before and after April 2019.  Specifically, I perform a Chow test, which is a statistical test that evaluates whether the estimated coefficients of a linear regression model are the same for two subsamples of data (*e.g.*, before and after a certain period in a time series).  Chow, Gregory C., "Tests of Equality between Sets of Coefficients in Two Linear Regressions," *Econometrica* 28, no. 3, 1960, pp. 591–605.  The regression that I estimate is a linear time trend model, and I use the R package "strucchange" and the "sctest" function to perform Chow tests on the Alexa devices' usage and market data.  *See* Achim Zeileis, et al., "Package 'Strucchange,'" *The Comprehensive R Archive Network*, September 2, 2024, https://cran r-project.org/web/packages/strucchange/strucchange.pdf.  I test a pre/post period length of 12 months before and after the month of potential break to account for seasonal fluctuations in the data.  For April 2019, I find no evidence of a statistically significant negative structural change in monthly active accounts.  *See* **Workpaper 1** (wkp_1).  The monthly active account data produced in this matter begin in January 2018, so I do not perform a Chow test for the potential May 2018 structural break given insufficient data available to establish the "pre" period trend.

95.     Similarly to Alexa active accounts in the U.S., users' engagement with Alexa devices also steadily increased over the same time period.  **Figure 5** plots the number of monthly dialogs of Alexa U.S. users, including both unadjusted and seasonally adjusted data.  As the figure shows, after accounting for expected seasonal variation, dialog growth was consistent over time,[144] including during months following the periods of higher intensity of information dissemination related to Amazon's retention and use of Alexa Recordings in May 2018 and April 2019.[145]



---

[144] The notable increase in the number of dialogs per month after seasonal adjustment in April 2020 is possibly related to the COVID-19 outbreak.

[145] Similar to the active account data, I perform statistical tests to assess whether there was a structural change in both the unadjusted and seasonally adjusted dialogs time series before and after April 2019.  I find no evidence of a statistically significant negative structural change in monthly dialogs.  *See* **Workpaper 2** (wkp_2).  The monthly dialogs data produced in this matter begin in January 2018, so I do not perform a Chow test for the potential May 2018 structural break given insufficient data available to establish the "pre" period trend.

### C.    There Was No Negative Response In Purchases Of Alexa Devices Following Periods Of High Media Coverage About Alexa Recordings.

96.    Similar to the analysis of user engagement data, I analyze market data to assess whether there was any impact on purchases of Alexa Devices after the extensive news coverage about Amazon's retention and use of Alexa Recordings.  The market data produced in this matter include annual net units sold for Alexa Devices and monthly unit sales for Amazon Echo products.

97.    **Figure 6** shows the annual net units sold for Alexa Devices in the United States from 2017 to 2022.  Notably, aside from ████████████████████████████████ ████████████████████—annual trends show no evidence of a systematic decline in units sold for Alexa Devices following the aforementioned news cycles in 2018 or 2019.  Thus, despite increased information dissemination regarding Amazon's retention and use of Alexa Recordings, False Wakes, and human annotation, consumers continued to purchase Alexa Devices at roughly the same rate.



98.     As with the Alexa usage data, more granular market data is available for certain categories of Alexa Devices. **Figure 7** presents monthly units sold for Echo devices in the United States from 2017 to 2022. As the figure demonstrates, while the monthly data do clearly show seasonality, ███████████████████████████████████████████ ████████████████████████████████ fluctuations in sales of Echo devices do not appear to be correlated with the news cycles in May 2018 or April 2019.[146]

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

---

[146] Similar to the Alexa usage data, I perform statistical tests to assess whether there was a structural change in both the unadjusted and seasonally adjusted Echo units sold time series, before and after both May 2018 and April 2019. I find no evidence of a statistically significant negative structural change in Echo units sold following either May 2018 or April 2019. Further, I repeat this analysis for Echo monthly revenues over the same time period (2017–2022) and similarly find no evidence of a statistically significant negative structural change in Echo revenues following either May 2018 or April 2019. *See* **Workpaper 3** (wkp_3).

**VII.   Establishing Any Economic Harm To Members Of The Putative Classes Requires Individualized Inquiry.**

99.      In prior sections, I support my opinions that Plaintiffs failed to provide a common method to assess harm to members of the Registrant Putative Class due to loss of value of their information and that academic research on privacy and empirical analyses of case evidence suggest that many and perhaps most Registrant Putative Class members suffered no harm due to loss of value.  In this section, I explain that even if such harm existed, such harm is tied to the value members of the Registrant Putative Class assign to their information, which is context-specific (as discussed earlier).  As such, the harm, if any, is individualized and would require individualized inquiry to establish accurately.

100.     As described in **Section II.B**, Plaintiffs claim that Amazon knowingly intercepted and recorded utterances that were not intended for Alexa, that Amazon retains the Alexa Recordings permanently unless users delete them, and that Amazon failed to disclose this information. Plaintiffs allege that members of the Registrant Putative Class suffered harm in the form of lost "value of their information."[147]  As explained in this section, establishing such harm (if any) would require establishing, among other things, the following information for members of the Registrant Putative Class: (i) what they knew and when, (ii) their reactions to such knowledge, and/or (iii) their preferences toward privacy of information captured in Alexa Recordings in the specific context of how they deployed and used the Alexa Device.  As I discuss below, members of the Registrant Putative Class are heterogenous in each of these dimensions.  Further, the studies cited by Dr. Egelman and Prof. Hoffman regarding consumer concerns about data privacy, if anything, provide additional support that individualized inquiry is necessary to establish harm consistent with Plaintiffs' theory of harm.

101.     Last, I explain in this section that Prof. Hoffman's proposed "just-in-time" notifications fail to consider the negative impact they will have on members of the Putative Classes through a worse user experience of Alexa Devices.

102.     I note here that while Plaintiffs appear to seek only statutory damages for members of the Non-Registrant Putative Classes and do not seek compensation due to loss of value of their

---

[147] Plaintiffs' Motion for Class Certification, pp. 1–2, 5, 22.

information, aspects of heterogeneity discussed in this section pertain to both the Registrant and Non-Registrant Putative Classes. Indeed, many of the members of the Non-Registrant Putative Classes are positioned similarly to their co-residents that are members of the Registrant Putative Class. For example, Mr. McNealy purchased the Echo Plus device himself and used it daily, but his wife registered the device on her account.[148]

103. The fact that members of the Non-Registrant Putative Classes were not registered users (allegedly) does not prevent them from either being aware of Amazon's retention and use of Alexa Recordings or from engaging in efforts that are consistent with having a concern about their privacy in the presence of Alexa Devices. To the extent that the existence of economic harm is relevant to the determination of statutory damages, I also note that establishing whether members of the Non-Registrant Putative Class were harmed from Amazon's retention and use of Alexa Recordings would also require individualized inquiry, as discussed in this section.

### A. Putative Class Members Have Heterogeneous Privacy Preferences.

104. As discussed above, privacy concerns and the value of privacy vary considerably across individuals and across contexts.[149] While some individuals may be concerned about protecting the privacy of all their private or personal information, others do not display a concern about sharing many types of personal information, including pictures, videos, life events and feelings, as they often do on social media platforms.[150] Moreover, preferences may vary not only across individuals but also within the same individual across different circumstances (*see* **Section V.B** above).[151] As such, the economic harm they suffered from Amazon's retention and use practices or its alleged failure of adequate disclosure is heterogenous across members of the Putative Classes.

---

[148] Michael McNealy Deposition, pp. 49:19–23, 71:13–22, 75:17–24, 77:22–78:1.

[149] *See, e.g.*, Acquisti, Brandimarte, and Loewenstein, (2015), pp. 510–511; *See also* Smith, H. Jeff, Sandra J. Milberg, and Sandra J. Burke (1996), "Information Privacy: Measuring Individuals' Concerns About Organizational Practices," *MIS Quarterly* 20, no. 2, 1996, pp. 167–196, p. 190.

[150] *See, e.g.*, Tesoriero Deposition, Exhibit 9. This exhibit includes screenshots of Named Plaintiff Jeffrey Hoyt's Facebook profile and posts (Jeffrey Hoyt is the husband of Named Plaintiff Lorlie Tesoriero). Tesoriero Deposition, p. 11:9–12.

[151] I note that Mr. Hochman testified that he is not offering an opinion on the heterogenous preferences of Alexa users with respect to the Alexa Recordings. Hochman Deposition, pp. 194:20–195:4 ("Q. Do you believe that Alexa users have heterogenous [p]references regarding privacy of their Alexa voice recordings? … THE WITNESS: Yeah … A. That's -- that's way outside the scope of my report -- way outside the scope and -- and not going to be informative.").

105.     As explained in **Section V**, members of the Registrant Putative Class who do not assign value to the information captured by Alexa Devices or who value the benefit of continued use of the Alexa Device more than the disutility of Amazon's retention and use of the information are not harmed in a form consistent with Plaintiffs' theory of harm.  More generally, the harm (if any) experienced by members of the Putative Classes will vary based on each individual Putative Class member's assigned value—which may be zero—to the information captured in Alexa Recordings.  Moreover, as explained in **Section V.B**, there is no market for Alexa Recordings and the value of information is context-specific, varying across individuals and across circumstances for a given individual.  Therefore, identifying the value Putative Class members assign to the information captured in Alexa Recordings and their preferences for privacy of such information will require individualized inquiry.

106.     The idea that individuals may have substantially different preferences regarding the privacy of their interactions with Alexa Devices is evident from information in the public domain.  Take for example the wide privacy preferences stated in one AP article, back in July 2015:[152]

> a.  One teenage user was so worried her Echo device was "eavesdropping on conversations" that she decided to unplug the device and hide it.
>
> b.  Another user, the president of a community college noted he is not concerned because "[s]omebody would have to have a real interest in me, and I don't think I am that interesting for someone to come after my data."
>
> c.  A third user, a man aged 61, expressed concern that government agencies are using Alexa Devices for surveillance.  However, as noted in the article, "that concern hasn't been enough to cause him to turn off the device's microphone."

107.     One approach for empirical identification of privacy preferences—based on the concept of revealed preferences referenced above—is to *observe* users' behavior: the actions of members of the Putative Classes who knew about Amazon's retention and use practices reveal their preferences toward privacy relative to the benefits they gain from using Alexa Devices.  The description of three users' behavior in the article cited above and the behavior of the Named

---

[152] Michael Liedtke, "Will the Internet Listen to Your Private Conversations?" *AP News*, July 29, 2015, https://apnews.com/general-news-191e14ac28244bab86ab849aee92407e.

Plaintiffs demonstrate heterogeneity among members of the Putative Classes in their revealed actions following knowledge of Amazon's retention and use of Alexa Recording. Some members of the Putative Classes did not take the steps to protect their data by deleting existing Alexa Recordings or by stopping to use their Alexa Device altogether (or in the case of members of the Non-Registrant Putative Classes, limiting their own exposure to active Alexa Devices),[153] yet others did take actions such as stopping to use the Alexa Devices or periodically unplugging them.[154]

108.    In **Section VI.A** above, I presented information showing that Amazon's retention and use of Alexa Recordings became more available in the public domain, including popular news outlets and other forums. Such information reached at least some Putative Class members. For example, Plaintiff Jodi Brust testified she "saw on the news and on Facebook that Amazon had been recording and keeping these recordings."[155] In addition to information in the public press, information about Amazon's retention and use of Alexa Recordings was revealed in various Amazon webpages. As shown below, these webpages ██████████████████████████ ████ demonstrating that users were exposed to Amazon's data retention and use practices.

109.    Thus, there is reason to believe that some—and perhaps a large portion of—members of the Putative Classes were exposed to this information yet continued using Alexa Devices. Individualized inquiry is necessary to establish if and when members of the Putative Classes acquired knowledge of this information, their reactions to such knowledge, and their preferences toward privacy of information captured in Alexa Recordings in the specific context of how they deployed and used the Alexa Device.

110.    Furthermore, empirical evidence on the purchase and use of Alexa Devices (*see* **Section VI** above) is consistent with the observation that many Alexa users did not change their behavior following periods of increasing availability of information regarding Amazon's retention and use of Alexa Recordings. This may be because: (i) these users do not have a privacy concern about

---

[153] For example, Mr. and Ms. McNealy both testified they continued using their Alexa Device to turn on and off the light in their bedroom days before their depositions. Diane McNealy Deposition, p. 22:1–8; Michael McNealy Deposition, pp. 21:8–22:6.
[154] For example, Ms. Selena Johnson testified she stopped using the Alexa Device when she authorized the lawyers to sue. Selena Johnson Deposition, pp. 20:8–21:1. *See also* Diane McNealy Deposition, pp. 109:25–110:7 ("Q. Okay. If you don't want the device to listen, what do you do? A. Unplug it. Q. Have you done that? A. Yep. Q. And when did you start doing that? A. When I found out they were recording my conversations."); Michael McNealy Deposition, p. 22:17–21 ("Q. How have you changed how you use Alexa? A. Well, sometimes I unplug Alexa now because I'm horrified of different conversations I'm having in my house.").
[155] Brust Deposition, p. 18:19–20.

Amazon's retention and use of Alexa Recordings; (ii) they are willing to contribute to the improvement of voice recognition algorithms that such voice recordings are used for; or (iii) any privacy concern these users may have regarding Amazon's retention and use practices is outweighed by the benefit from the use of their Alexa Devices. Identifying the subset of members of the Putative Classes who changed their behavior based upon this information due to privacy concerns would require individualized inquiry.

111.    Last, for members of the Non-Registrant Putative Classes, individualized inquiry is necessary to establish whether they in fact used the Alexa Device, whether their voices were recorded in a False Wake in their residence, and what the content of any Alexa Recording was. Per Plaintiffs' theory of harm, members of the Putative Classes cannot be harmed if their voices were never recorded.

112.    To summarize, members of the Putative Classes are heterogeneous in the value they assign to their voice recordings. Further, members of the Putative Classes who were aware of Amazon's retention and use practices and did not change their behavior do not demonstrate through their behavior that they were harmed in a form consistent with Plaintiffs' theory of harm. Isolating the portion of the Putative Classes who could potentially have experienced harm from those that did not would therefore require individualized inquiry into their knowledge, behavior and/or preferences.

### B.    Putative Class Members Have Heterogeneous Knowledge Of Amazon's Retention And Use Of Alexa Recordings.

113.    In his expert report, Prof. Hoffman claims that "Registrants are highly unlikely to understand that they may be recorded in situations other than when a wake word is used."[156] Prof. Hoffman's opinion fails to consider that many members of the Putative Classes—including both Registrants and Non-Registrants—learned about False Wakes through media coverage, customer reviews or forums, and through their own use of Alexa Devices, among other ways. Similar to False Wakes, members of the Putative Classes may have learned of Amazon's retention and use of Alexa Recordings practices more generally and, thereby, are not harmed from Amazon's alleged failure to disclose such information. Further, Mr. Hochman contradicts

---

[156] Hoffman Report, ¶ 70.

Prof. Hoffman's claim by acknowledging that "[a]ny time a voice assistant is going to record words and utterances, it is a known phenomenon that words and utterances not intended for the platform will be recorded,"[157] and admitting in his deposition that he has experienced false activations on every voice assistant he has used.[158] Members of the Putative Classes who were aware of Amazon's retention and use practices could not have been harmed by Amazon's alleged failure to disclose the information. Thus, I discuss below some of the mechanisms through which information about Amazon's retention and use of Alexa Recordings was learned by users over time, demonstrating that identifying which members of the Putative Classes knew of Amazon's retention and use practices (and when they learned about them) would require individualized inquiry.

114.   First, I understand that Amazon informs the user about Alexa Recordings through a number of web pages that are available online and can be accessed by both registered and non-registered users. These web pages include "Alexa and Alexa Devices FAQs," "Alexa Terms of Use," "Alexa and Alexa Device Terms," "Alexa, Echo Devices and Your Privacy," and "Amazon Conditions of Use" (collectively, "Amazon's Policy Pages").[159] Many of the pages contain similar disclosures.[160]

115.   **Figure 8** presents the monthly number of pageviews for Amazon's Alexa-specific policy pages. As presented in the figure, these policy pages have received ████████████ ████████████████████████████████████████████████████████████████████ ██████.[161] Thus, there is likely a sizable population of users that have become aware of Amazon's retention and use of Alexa Recordings through viewing these pages. Whether a

---

[157] Hochman Report, ¶¶ 51–52. Mr. Hochman also notes in his report that "[R]ecordings without consent are a recognized downside to AI monitoring."

[158] Hochman Deposition, pp. 170:22–171:5 ("Q. Have -- have you ever experienced a false wake when using Siri? A. Yes, I've experienced false wakes on -- on all the devices that have voice assistants. Q. And -- and that includes the -- the Google assistant? A. I believe I've had a false wake on Google assistant. Yeah. I think so. Yes.").

[159] For example, Amazon's Alexa and Alexa Device FAQs page informs the user, "we use your requests to Alexa to train our speech recognition and natural language understanding systems." "Alexa and Alexa Device FAQs," Amazon, https://www.amazon.com/gp/help/customer/display html?nodeId=201602230, accessed September 4, 2024.

[160] "Alexa and Alexa Device FAQs," Amazon, https://www.amazon.com/gp/help/customer/display.html?nodeId=201602230, accessed September 4, 2024 ("When you speak to Alexa, a recording of what you asked Alexa is sent to Amazon's cloud so we can process and respond to your request."); "Alexa Terms of Use," Amazon, https://www.amazon.com/gp/help/customer/display html?nodeId=201809740, accessed September 12, 2024 ("Alexa records and sends audio to the cloud when you interact with Alexa."); "Alexa, Echo Devices, and Your Privacy," Amazon, https://www.amazon.com/gp/help/customer/display html?nodeId=GVP69FUJ48X9DK8V, accessed September 5, 2024 ("When you speak to Alexa, a recording of what you asked Alexa is sent to Amazon's cloud, where we process your request and other information to respond to you.").

[161] **Workpaper 4** (wkp_4).

member of the Putative Classes reviewed these pages and what they may have learned from doing so would require individualized inquiry, and their prior knowledge would directly affect whether they could be plausibly harmed by the claimed failure to properly inform customers of Amazon's privacy practices regarding Alexa Recordings.[162]



116.    Second, as discussed in **Section VI.A**, from the launch of Alexa and at various degrees of intensity, news outlets discussed Amazon's retention and use of Alexa Recordings and the

---

[162] ████████████████████████████████████████████████████████ Thus—and as I discussed in **Section VII.A**—to the extent some members of the Putative Classes have concerns over the privacy of their Alexa Recordings, identifying those individuals and their level of concern would require individualized inquiry.

existence of False Wakes (*see* **Figure 2**).[163]  Notably, regardless of Amazon's alleged failure to disclose its retention and use practices, some members of the Putative Classes were exposed to this information through news coverage.  Additionally, as the news coverage spans a long period of time (*i.e.,* the launch of Alexa in November 2014 through the present), and since various news outlets published articles regarding Amazon's retention and use practices, some members of the Putative Classes acquired information about Amazon's retention and use practices at varying points in time.  Determining which members of the Putative Classes were aware of Amazon's retention and use of Alexa Recordings through media coverage and when they were aware would require individualized inquiry.

117.   Third, while some users may not have been exposed to Amazon's Policy Pages or news coverage describing Amazon's retention and use practices, some members of the Putative Classes—even among the Named Plaintiffs—had an understanding of Amazon's retention and use practices or at least some aspect of these practices through their prior perceptions and experiences of using Alexa Devices or other voice assistant devices.  For example, Mr. Babani (an allegedly unregistered user) testified that he had heard about human review of Alexa Recordings *before* using an Alexa Device.[164]  Diane McNealy (registered user), testified that she knew Alexa Recordings are created but that she did not know Amazon would keep those recordings.[165]  Further, Caron Watkins (an allegedly unregistered user) testified she understood that Alexa had to connect to the internet and that it needed to capture and process a command to provide a response, but that she didn't think Alexa Recordings were retained because of the volume of recordings and the space that retaining them would require.[166]  The heterogeneity in the understandings of Named Plaintiffs alone demonstrates the need for individualized inquiry to establish which members of the Putative Classes knew of Amazon's retention and use policies.

---

[163] I note that Prof. Hoffman's opinions regarding Amazon's disclosure practices rely solely on what Amazon published on its website and in its marketing materials for users to be made aware of Amazon's policies.  He ignores that Amazon is not the only source of information.  Members of the Putative Classes could, and did, receive information through other channels.

[164] Babani Deposition p. 91:19–23 ("Q. Okay. What's your best estimate of when you heard about human review of voice recordings, Alexa voice recordings? A. Before I owned -- before I was in the house that owned the device.").

[165] Diane McNealy Deposition p. 123:9–16 ("Q. So was it your understanding before the lawsuit that Amazon would create a temporary recording but not a permanent one? A. Right. Q. Okay. But your understanding was that Amazon did have to create some sort of a recording in order to process the command? A. Yes.").

[166] Watkins Deposition, pp. 153:19–154:6 ("Q. Earlier we talked about 'temporarily processed.' Was it your understanding at the time that Alexa would take your command, temporarily process it, transmit that information, and then send you back a response of what you wanted Alexa to do? … A. Yeah, I said that …But then I also said that I didn't think they would retain based on just practicality and storage availability.").

118.    Last, users of Alexa Devices may acquire knowledge of the way Alexa Devices work through continued use of the devices over time.  For example, in order to alert the user that Alexa is listening to a user's request, a light indicator appears on Echo devices or an audible tone will sound.[167]  Much like "On the Air" signs that light up in television studios during a broadcast, these indicators notify the user that their device has detected the wake word and Alexa is now processing their request.[168]  While they may not have been aware of these features initially, it is possible that some, perhaps many, users who were subject to False Wakes noticed the device's visual or audible cue when the device was activated even when the user did not use a wake word.[169]  Similarly, from continued use, some users may have noticed Alexa had information of prior searches, reflecting that the Alexa Device stored past commands.  The harm in this matter, if any, experienced by members of the Putative Classes who used an Alexa Device with an understanding of Amazon's retention and use of Alexa Recordings is different than that experienced by members of the Putative Classes who did not have such an understanding.

### C.    Dr. Egleman's And Prof. Hoffman's Literature Confirm Heterogenous Preferences Among Putative Class Members.

119.    Not only do they not support Plaintiffs' theory of harm, the studies cited by Dr. Egelman and Prof. Hoffman are in fact consistent with the notion that members of the Putative Classes are heterogeneous in aspects that matter for assessing harm in this matter (if any), such as: (i) the information they had regarding Amazon's retention and usage policies, (ii) their privacy concerns broadly and their privacy concerns over Amazon's retention and use of Alexa Recordings more specifically, and (iii) their revealed privacy preferences and attitude toward the value of their voice recordings.  I explain these in this section.

---

[167] "How Alexa Works: Wake Word," *Amazon*, https://www.amazon.com/b/?node=23608571011, accessed September 14, 2024.
[168] *See* "How Alexa Works: Wake Word," *Amazon*, https://www.amazon.com/b/?node=23608571011, accessed September 14, 2024, under the heading "How do I know when Alexa is listening?".
[169] For example, Mr. Babani, an allegedly unregistered user, also testified that the Alexa enabled device would wake up and try to process a command even when he had not intended to give it a command.  Babani Deposition, p. 71:4–14 ("Q. Okay. And it looks like there was an Alexa response even though you didn't want to activate it, and the next recording is just the word 'cancel.' Do you see that? So does that refresh your recollection that there were times when it would -- it would activate and start to give a response as if you had given it a command when in fact you had not intended to give it a command? ... A. Yes, I'm aware that happened sometimes.").  As another example, Kaeli Garner, an allegedly unregistered user, also testified being aware of the fact that the Alexa Device sometimes activates without a wake word being said.  Garner Deposition, p. 115:1–6 ("A. Like we could be having a conversation and then something along the lines of like, I am sorry, I didn't hear what you said, or some clarification the device was asking her, but we were not speaking to Alexa and then she would tell it to stop.").

120.     First, the surveys cited by Prof. Hoffman and Dr. Egelman in their expert reports support my opinion that members of the Putative Classes are *heterogeneous in the information they had regarding Amazon's retention and usage policies*.  For example, a survey of owners of in-home voice assistants conducted by Dr. Egelman and co-authors in February 2019—a period between the first and second dates of intense media coverage discussed above—found that almost 90 percent of the respondents believed that recordings of voice assistants are retained for some amount of time.[170]  44 percent of respondents knew they can review their recordings on their device's company website.[171]  This likely understates the percentage of users who know that they can review recordings because Alexa users can also review recordings in the Alexa mobile app, which this question did not consider.[172]  Of the fraction of users who knew they can review recordings on their device's company website, 55 percent of respondents knew they can delete their recordings.[173]

121.     As another example, according to the 2019 Pew report that Prof. Hoffman cites, "About six-in-ten Americans say they follow privacy news at least somewhat closely."[174]  Therefore, to the extent this survey is representative of members of the Putative Classes, some were exposed to news coverage described above of Amazon's retention and use of Alexa Recordings as captured in privacy-focused news articles.  The same Pew study also states that "About one-in-five Americans say they always or often read privacy policies before agreeing to them" and that "about two-thirds of U.S. adults who read privacy policies say they understand at least some of them."[175]  The study's results imply that some members of the Putative Classes read and understood Alexa's privacy policies and some did not.  Therefore, individualized inquiry is necessary to determine which members of the Putative Classes were aware of Amazon's

---

[170] To the question "After you ask <Assistant> a question or say a command, what do you believe happens to the audio of your interaction?," 48.3 percent responded that "It gets saved indefinitely" and 41.4% responded that "It gets saved temporarily." Malkin, Nathan, et al., "Privacy Attitudes of Smart Speaker Users," *Proceedings on Privacy Enhancing Technologies*, no. 4, 2019, pp. 250–271 ("Malkin, et al. (2019)"), pp. 255, 268.

[171] Malkin, et al. (2019), p. 260.

[172] "Review Your Alexa Voice History," *Amazon*, https://www.amazon.com/gp/help/customer/display html?nodeId=GHXNJNLTRWCTBBGW, accessed September 11, 2024.

[173] Malkin, et al. (2019), p. 260.

[174] Brooke Auxier, et al., "Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information," *PEW Research Center*, November 2019, https://www.pewresearch.org/internet/wp-content/uploads/sites/9/2019/11/Pew-Research-Center_PI_2019.11.15_Privacy_FINAL.pdf, p. 17.

[175] Brooke Auxier, et al., "Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information," *PEW Research Center*, November 2019, https://www.pewresearch.org/internet/wp-content/uploads/sites/9/2019/11/Pew-Research-Center_PI_2019.11.15_Privacy_FINAL.pdf, p. 39.

retention and use practices, which members were uninformed since they tried to review Amazon's Policy Pages and did not understand them, and which members did not try to engage with Amazon's Policy Pages at all.

122.     Second, the surveys cited by Prof. Hoffman and Dr. Egelman in their expert reports support my opinion that members of the Putative Classes are *heterogeneous in their privacy concerns broadly and in their privacy concerns over Amazon's retention and use of Alexa Recordings more specifically*.  For example, Prof. Hoffman cites another study which asked survey respondents about the collection of sensitive data, including by Amazon.[176]  The authors find that "44.4%, 53.3%, 55.1%, and 59.9% of our participants were concerned with the type of data collected by Google, Amazon, Facebook – Information, and Facebook – Signals, respectively."[177]  Put another way, the study found that around 53 percent of participants were concerned with the type of data collected by Amazon, which implies that around 47 percent of participants were *not* concerned.[178]  Setting aside that the type and use of data collected by Amazon described in the study is not the same as the data at-issue in this matter (Alexa Recordings, used for training purposes only) and assuming this study included a sample of respondents who are representative of the Putative Classes, identifying members of the Putative Classes who are concerned with the type of data collected by Amazon and the members of the Putative Classes who are not concerned with the type of data collected by Amazon requires individualized inquiry.  The harm (if any) experienced by members of the Putative Classes who are not concerned with the type of data collected by Amazon is different than the harm (if any) experienced by members of the Putative Classes who are concerned with the type of data collected by Amazon.

123.     The survey of owners of in-home voice assistants (the majority of which were owners of Alexa Devices) conducted by Dr. Egelman and co-authors also provides support that individuals are heterogenous in their *stated* privacy preferences in the context of the way Alexa Devices are used.  The study found that respondents accepted or were indifferent ("neutral") to the notion that their recordings would be retained forever for over half of the recordings reviewed,[179] 74

---

[176] Ibdah, Duha, et al. "'Why Should I Read the Privacy Policy, I Just Need the Service': A Study on Attitudes and Perceptions Toward Privacy Policies," *IEEE Access* 4, 2021, pp. 166465–166487 ("Ibdah, et al., (2021)").
[177] Ibdah, et al. (2021), p. 166477.
[178] Ibdah, et al. (2021), p. 166477.
[179] Malkin, et al. (2019), pp. 255–256.

percent of reviewed recordings were deemed by respondents to be acceptable for use in improving the voice assistant, and for 68.7 percent of reviewed recordings, respondents were accepting or indifferent ("neutral) to human review of the recordings.[180]

124.     Further, individual responses to this survey demonstrate individuals' heterogenous privacy preferences.  For instance, one respondent stated broadly "I am not a person that really ever has privacy concerns. I have nothing to hide and nothing worth stealing."[181]  Others provided more specific preferences toward the recordings captured by the voice assistant, explaining "[i]t contains nothing that is a threat to my privacy or identity so I am not especially worried about how it is used,"[182] another stating "[t]here was nothing that needed to be hid[den] from anyone,"[183] and a third respondent stating "I don't really want any of my recordings stored on Amazon's servers."[184]  Some respondents, as Dr. Egelman and co-authors state in their article, "were more accepting of the data retention because they saw its benefits and found them worthwhile" such as a respondents stating "I think they use the recordings [to] create a voice profile so Alexa gets better at understanding what I say. So [I] will keep all recordings,"[185] and another saying, "I think [having recordings stored] may help with the technology and we all have to do our part to advance it."[186]

125.     These studies and the study participants' individual commentary demonstrate that individualized inquiry is necessary to determine which members of the Putative Classes are concerned by Amazon's retention and use of Alexa Recordings.  The harm (if any) experienced by members of the Putative Classes who are not concerned with Amazon's retention and use of Alexa Recordings is different than that experienced by those who were concerned.

126.     Third, the surveys cited by Prof. Hoffman and Dr. Egelman in their expert reports support my opinion that members of the Putative Classes are *heterogeneous in their revealed privacy preferences and attitude toward the value of their voice recordings*.  For example, the survey of owners of in-home voice assistants conducted by Dr. Egelman and co-authors found that "[o]nly 18.6% of respondents described taking any steps to limit their devices. Among them, most

---

[180] Malkin, et al. (2019), pp. 258–259.
[181] Malkin, et al. (2019), p. 257 (citing participant P31).
[182] Malkin, et al. (2019), p. 256 (citing participant P122).
[183] Malkin, et al. (2019), p. 256 (citing participant P99).
[184] Malkin, et al. (2019), p. 256 (citing participant P88).
[185] Malkin, et al. (2019), p. 256 (citing participant P3).
[186] Malkin, et al. (2019), p. 256 (citing participant P111).

commonly (43% of respondents who took privacy actions, 7.8% of all participants), users described turning off the microphone… or unplugging the device altogether."[187]  Respondents described their behavior changing in different circumstances, such as one respondent stating "[s]ometimes I would turn off the microphone especially if I was having a private, personal conversation with someone,"[188] or another stating "I've unplugged the damn thing when I know I'm going to be [] having sensitive conversations in my home."[189]  One respondent described his behavior with respect to the location of the device, reflecting different privacy preferences in different locations of the residence: "I thought about putting one in my bedroom, but moved it."[190]

127.    The same survey also investigated voice assistant users' reactions to both the knowledge their recordings are retained and to hearing those recordings.  55.2 percent of respondents said they wouldn't delete any of the recordings they reviewed.[191]  One respondent explained this response by stating that "there was nothing I felt the need to delete,"[192] while another expressed a preference to delete "[a]nything regarding my home address, travel destinations, or sensitive personal information."[193]  The study explicitly states "[s]ome participants decided whether they would delete a recording based on its perceived sensitivity. For example, P18 chose to keep a recording because 'it is just a basic request and conveys no personal information or interest (other than my voice pattern I suppose). So I would [not] feel the need to, and the system seems to work better when it has more recordings to help it learn/recognize my vocal patterns.' However, they stated that they would delete another interaction 'since this is info about my interests and preferences,' acknowledging, though, that 'this type of info about me is already available in many different ways.'"[194]  Another respondent noted they wouldn't delete the recordings generally because "our uses of Alexa are extremely mundane,"[195] yet felt differently

---

[187] Malkin, et al. (2019), p. 259.
[188] Malkin, et al. (2019), p. 259 (citing participant P28).
[189] Malkin, et al. (2019), p. 259 (citing participant P90).
[190] Malkin, et al. (2019), p. 259 (citing participant P14).
[191] Malkin, et al. (2019), p. 257.
[192] Malkin, et al. (2019), p. 261 (citing participant P42).
[193] Malkin, et al. (2019), p. 263 (citing participant P83).
[194] Malkin, et al. (2019), pp. 256–257.
[195] Malkin, et al. (2019), p. 261 (citing participant P38).

toward a recording of their child stating that "I guess I feel differently about this one because it's a recording of my child's voice."[196]

128.    One action that might reveal privacy preferences in a specific context is the choice to engage with a privacy policy.  As noted previously, a 2019 Pew report cited by Prof. Hoffman states: "About one-in-five Americans say they always or often read privacy policies before agreeing to them," and, furthermore, "36% say they never read a company's privacy policy before agreeing to it."[197]  Therefore, members of the Putative Classes who are part of the latter described group demonstrate in their actions that they are generally not concerned with privacy issues.

129.    These studies demonstrate that individualized inquiry is necessary to determine which members of the Putative Classes changed their behavior in reaction to knowledge of Amazon's retention and use of Alexa Recordings or which members of the Putative Classes would have changed their behavior in reaction but-for Amazon's alleged failure to disclose this information. The harm (if any) experienced by members of the Putative Classes whose behavior demonstrates they were not concerned with Amazon's retention and use of Alexa Recordings is different than that experienced by those who were concerned.

### D.    Putative Class Members Have Heterogeneous Experiences With False Wakes.

130.    Plaintiffs take issue with the existence of False Wakes and Amazon's retention and use of data collected from False Wakes.[198]  Harm, if any, resulting from False Wakes and Amazon's retention and use of Alexa Recordings from False Wakes is also subject to heterogeneity across members of the Putative Classes.  Plaintiffs and their experts fail to consider the many possible factors which can affect the *likelihood* of a False Wake occurring (as I discuss below), and that members of the Putative Classes are likely heterogeneous in their *tolerance* of False Wakes.[199]

---

[196] Malkin, et al. (2019), p. 257 (citing participant P38).

[197] Brooke Auxier, et al., "Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information," *PEW Research Center*, November 2019, https://www.pewresearch.org/internet/wp-content/uploads/sites/9/2019/11/Pew-Research-Center_PI_2019.11.15_Privacy_FINAL.pdf, pp. 5, 38.

[198] *See*, for example, Plaintiffs Motion for Class Certification, p. 7.

[199] Mr. Hochman testified in his deposition that he is not offering an opinion on the types of utterances that are more (or less) likely to cause a False Wake.  Hochman Deposition, p. 209:3–16 ("Q. And you're also not offering an opinion as to what types of utterances are more or less likely to cause a false wake. Correct? A. In -- in -- in general, I haven't been asked that, and I haven't

As such, some members of the Putative Classes may not suffer any harm at all from False Wakes, and may instead be worse off if False Wakes were reduced at the expense of Alexa's responsiveness and performance.

131.    As an initial matter, academic literature has identified several factors which affect the likelihood of a voice assistant device (such as Alexa Devices) experiencing a false positive activation (False Wake in the case of Alexa Devices).  For example, one study which focused on identifying words that would generate a false positive activation (*e.g.*, saying "Alex" instead of "Alexa") for devices including those using Amazon, Google, and Apple voice assistant technologies found that speech volume, speech speed, noise levels, and speaker gender all impact the "wake-up rate."[200]  This study also generated specific words which were deemed to be likely to activate voice assistants,[201] which implies that the types of words that are spoken are also a factor that affects the likelihood of a false positive activation.  As another example, a study which tracked false positive and false negative activations across different Amazon Echo devices over an eight-week period stated that a device's ability to appropriately detect a wake word depends on its hardware's ability to capture the human voice, which is influenced by factors such as microphone design, the user's proximity to the microphone array, and ambient noise levels.[202] The authors also noted that the diversity of participants (*e.g.*, with respect to dialect, accent, tone, and gender) is a relevant factor (albeit not captured by their study).[203]

132.    Additionally, as Mr. Hochman acknowledges, "it is an engineering decision, based on business objectives, how to balance false wakes with latency (speed of response by Alexa)."[204] Mr. Hochman affirmed in his deposition that "there's a tension between reducing false wakes and reducing latency" and further stated that "[t]here may also be a tension between reducing

---

issued that opinion. I think I've got one quote where I identified a couple phrases that are likely to generate false wakes in which Amazon said these are -- we want to hang on to these. Like, any time says -- someone says these, we definitely want to use these for testing, because they're -- they're good challenges for the system.").

[200] Chen, Yanjiao, et al., "*FakeWake*: Understanding and Mitigating Fake Wake-up Words of Voice Assistants," *Proceedings of the 2021 ACM SIGSAC Conference on Computer and Communications Security,* 2021, pp. 1–22 ("Chen et al. (2021)"), p. 8.

[201] Chen et al. (2021), pp. 4–6.

[202] Combs, Marcia, Casey Hazelwood, and Randall Joyce, "Are You Listening? – An Observational Wake Word Privacy Study," *Organizational Cybersecurity Journal: Practice, Process and People* 2, no. 2, 2022, pp. 113–123 ("Combs, et al. (2022)"), p. 114.  I also note that the study concluded that "false positives decreased over time, suggesting smart speaker artificial intelligence was learning voice patterns."  Thus, even over an eight-week experiment, researchers found evidence that Amazon Alexa's technology improved and reduced the frequency of False Wakes.  Combs, et al. (2022), p. 121.

[203] Combs, et al. (2022), p. 121.

[204] Hochman Report, ¶ 64.

false wakes and rejects."[205]  In other words, reducing the likelihood of False Wakes can lead to lower responsiveness and performance of the Alexa Device.  Members of the Putative Classes who have a low tolerance for device latency or responsiveness more generally yet higher tolerance for False Wakes would be *worse off* if False Wakes are reduced at the expense of latency, responsiveness, and performance.  Further, ascertaining preferences around this tradeoff for members of the Putative Classes—and thus the extent to which members of the Putative Classes were harmed by False Wakes (if at all)—requires individualized inquiry.

### E.    Prof. Hoffman's Proposed "Just-in-Time" Notifications May Have Negative Impact On Putative Class Members.

133.    Prof. Hoffman claims that best practices for technology such as Alexa would be to deploy "just-in-time or short form notice" so individuals specifically understand when they are being recorded.[206]  However, Prof. Hoffman has not evaluated whether these hypothetical "just-in-time" notifications could be disruptive and diminish the user experience of Alexa Devices (*e.g.*, due to latency as discussed in this section).

134.    As an initial matter, Prof. Hoffman acknowledges in his report that Amazon's Policy Pages state that Alexa Devices use visual and audio cues to indicate when Alexa is listening and recording.[207]  Despite this, Prof. Hoffman testified in his deposition that these visual and audio cues do not serve as suitable "just-in-time" notifications for ordinary or reasonable individuals.[208]  However, Prof. Hoffman failed to provide specificity as to how sufficient "just-in-time"

---

[205] Hochman Deposition, pp. 166:8–168:1 ("Q. And going back, would -- would you a- -- agree that it is a benefit to Alexa users for the wake-word detection to be more accurate?  … A. I don't think I've opined about benefits to users. All right? So, obviously, as a user of a technology product, you would hope the product works well, or you're going to dump it and use some another one that might work better. But maybe that's a complicated thing. … Q. You've taught courses on privacy and policy in computer science. Correct? A. Yes. Yes. I -- I've taught a course in privacy that has touched on policy. Q. And would you agree that a more accurate wake-word detection engine that results in fewer false wakes is beneficial for users of Alexa? … THE WITNESS: Yeah. A. I haven't been asked to investigate that. So again, I -- I just want to be careful in forming opinions. So I just will remain silent on that question, 'cause I haven't really investigated it. Because I -- what I do know what I have said is that Amazon knew, from the start, that there would always be false wakes; and that I -- I pointed out that there's a tension between reducing false wakes and reducing latency. There may also be a tension between reducing false wakes and rejects. You know, you can certainly reduce false wakes by rejecting anything that might not be the wake word. But then, you're going to annoy the user, because you're going to not answer them when they expect an answer. So it's -- it's complicated.").
[206] Hoffman Report, ¶ 3.e.
[207] Hoffman Report, ¶¶ 56–61.
[208] Hoffman Deposition, p. 104:10–13 ("Q. Would the lighting up of the blue ring light on an Alexa-enabled device provide a just-in-time notice to the consumer that they are being recorded? A. Not to an ordinary or reasonable individual."), p. 149:12–19 ("Q. … You testified earlier that you don't believe the blue ring light is an effective just-in-time notice; is that right? A. Yes. Q. What about your opinion of the audible tone that could be played every time an Alexa device is recording, is that an effective just-in-time notice? A. No.").

notifications would be designed and implemented. At best, Prof. Hoffman provided one example with the caveat that the example he provided (an audible statement prior to the recording happening) is sufficient only "in a context where it's clear that the individuals who are going to be recorded are going to hear it and understand it."[209] Prof. Hoffman's single example fails to meet his logic if implemented. Suppose all Echo Dot devices were to use an audible statement like "recording in progress" when Alexa is activated (like the notification in Zoom when the recording button is selected).[210] In the context of an adult near the device in a quiet room, the user will likely hear and understand the notification. However, if the same user using the same device were in a room with a lot of background noise, the audible notification may not be heard. In such a case, a visual notification (*e.g.*, a blue light) would be more informative than an audible notification.

135.    In addition, Prof. Hoffman does not evaluate the potential negative impact such additional "just-in-time" notices could have on user experience of Alexa Devices and admitted in his deposition that evaluating whether consumers would want such notices was not part of his assignment.[211] To the extent such notifications would be undesirable to users as it may increase latency and friction when using an Alexa Device, it will decrease the benefits of using the Alexa Devices. Amazon has a developer help page dedicated to reducing latency for Skills developed for Alexa (*e.g.*, for use with other smart home devices), acknowledging that "speed matters" to

---

[209] Hoffman Deposition, pp. 153:4–154:9 ("Q. So I am just trying to ask about what, in your opinion, would be a sufficient just-in-time notice. One previous example you provided was when we started this Zoom recording, we were audibly told that the session is being recorded. I believe you were giving an example of an Alexa alert that could do the same and notify the user audibly that they are being recorded. And I was asking whether that notice on its own would be sufficient just-in-time notice. A. And what I was saying is that the task that I undertook was to look at the specific context and to determine whether it provided adequate information for a reasonable and ordinary person to know whether they are being recorded, and I was able to answer that question and offer the opinions that are in the document. I was not asked to fully describe the specific context that then would actually be following best practices, which, referencing back to the report, says -- states in the definition of what an effective just-in-time notice is that it is very context dependent. Q. So what are some examples of just-in-time notices that Amazon could provide to alert the user that it is -- that the user is being recorded? … A. In all contexts? Q. Any context of examples of just-in-time notices. A. So there -- an example of a just-in-time notice would be a statement prior to the recording happening in a context where it's clear that the individuals who are going to be recorded are going to hear it and understand it that states that the recording is happening."). Further, I note that Prof. Hoffman states in his report "at a minimum Amazon should have provided repeated, just-in-time notice to Registrants to check their online stored recordings to review and/or delete these unintended intrusions into their private lives." Hoffman Report, ¶ 71. However, Prof. Hoffman's statement does not provide any detail regarding how Amazon should "deploy a just-in-time or short form notice … so that individuals would specifically understand when they are being recorded." Hoffman Report, ¶ 3.e.

[210] Hoffman Deposition, p. 153:4–23.

[211] Hoffman Deposition, pp. 153:24–154:15 ("Q. So what are some examples of just-in-time notices that Amazon could provide to alert the user that it is -- that the user is being recorded? … A. In all contexts? Q. Any context of examples of just-in-time notices. A. So there -- an example of a just-in-time notice would be a statement prior to the recording happening in a context where it's clear that the individuals who are going to be recorded are going to hear it and understand it that states that the recording is happening. Q. Do you think that consumers would want such an audio alert statement from Amazon each time it is interacting with the device? … A. I haven't done that research. That was not the question that I was asked to pursue.").

consumers.[212]  Latency is also acknowledged more broadly in the tech industry to be an important factor for the user experience.[213]  Prof. Hoffman has not analyzed how the additional "written or verbal explanations" alerting users they are being recorded—which could directly increase the time it takes for Alexa to complete a request—would impact Alexa users.

136.    Regardless, both the cost and benefits associated with such notifications are likely to differ across Alexa users, necessitating individualized inquiry to ascertain any potential impact.

## VIII.   Conclusion

137.    In conclusion, my opinions in this report are summarized as:

    a.  Plaintiffs have not provided a common class-wide damages model.

    b.  Aggregated Alexa usage and purchases of Alexa Devices did not decline following periods of high intensity in media coverage of Amazon's retention and use of Alexa Recordings.  This is inconsistent with the claim that Alexa users placed substantial value on the information captured by Alexa Devices.

    c.  Establishing harm, if any, to members of the Putative Classes would require individualized inquiry due to heterogeneous privacy preferences and exposure to information about Amazon's retention and use of Alexa Recordings.

---

[212] Michael Williams, "Best Practices to Reduce Latency on your Smart Home Skill," *Amazon Alexa*, November 20, 2020, https://developer.amazon.com/en-US/blogs/alexa/device-makers/2020/11/Best-Practices-to-Reduce-Latency-on-your-Smart-Home-Skill ("When it comes to your Alexa skill, speed matters. When customers use your skill to control their smart home devices, they expect her to respond quickly. If your skill has high latency, this can lead to a loss of customer engagement and low ratings.").

[213] *See*, for example, "Understanding Latency and its Impact on the User Experience," *DataBank*, July 5, 2024, https://www.databank.com/resources/blogs/understanding-latency-and-its-impact-on-the-user-experience/ ("Minimizing latency is crucial for providing a seamless and responsive user experience. When users interact with applications, especially real-time applications like video conferencing, gaming, or financial trading platforms, any delay can result in frustration and reduced satisfaction. Low latency ensures that user inputs are processed quickly, maintaining the fluidity and interactivity expected from modern applications.  In industries where speed is a critical differentiator … low latency can provide a competitive edge."); "Is Low Latency the Holy Grail to Fantastic User Experience?" *Excentis*, https://www.excentis.com/blog/is-low-latency-the-holy-grail-to-fantastic-user-experience/, accessed September 11, 2024 ("Latency has an enormous impact on end-user experience, because *this is the time that a packet needs to travel from sender to receiver*. The lower the latency, the faster the data are received. As a result, for most of today's and tomorrow's internet applications the following basic premise applies: *the faster the data are received, the happier the end user*.").  Further, in his deposition, Mr. Fresko, a Vice President responsible for Alexa Devices at Amazon, acknowledged that Amazon tries to minimize latency.  Deposition of Nedim Fresko, January 31, 2024, pp. 12:19–13:4, 19:4–7 ("Q. And at that same time, you knew latency was something that you wanted to minimize? A. Yes.  Correct. Latency is something that we always tried to minimize.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2nd of October, 2024

_____
Lorin Hitt, Ph.D.

# Appendix A

**Curriculum Vitae**
**Lorin Moultrie Hitt**

Zhang Jindong Professor
Operations, Information and Decisions Department
University of Pennsylvania, Wharton School
571 Jon M. Huntsman Hall
Philadelphia, PA 19104
(215) 898-7730
E-mail: lhitt@wharton.upenn.edu
www: http://www.iecon.net/

**Educational History**

| | |
|---|---|
| Massachusetts Institute of Technology | Ph.D. Management (1996)<br>Concentration in Information Technology and Economics<br>Dissertation Title: "Economic Analysis of Information Technology and Organization"<br>Committee: Erik Brynjolfsson (MIT, chair), Zvi Griliches (Harvard), Thomas W. Malone (MIT) |
| Brown University | M.S. Electrical Engineering (1989) |
| Brown University | Sc.B. Electrical Engineering with Honors, Magna Cum Laude (1988) |

**Employment History**

University of Pennsylvania, Wharton School, Philadelphia, PA. *Zhang Jindong Professor, Operations, Information and Decisions Department (formerly OPIM)* (2015-present).

University of Pennsylvania, Wharton School, Philadelphia, PA. *Dean's Chair Professor, Department of Operations and Information Management* (2014-2015).

University of Pennsylvania, Wharton School, Philadelphia, PA. *Professor of Operations and Information Management, Department of Operations and Information Management* (2013-2014).

University of Pennsylvania, Wharton School, Philadelphia, PA. *Class of 1942 Professor (Term Chair), Department of Operations and Information Management* (2008-2013).

University of Pennsylvania, Wharton School, Philadelphia, PA. *Alberto Vitale Term Associate Professor of Operations and Information Management (2002-2008).*

University of Pennsylvania, Wharton School, Philadelphia, PA. *Alberto Vitale Term Assistant Professor of Operations and Information Management (2000-2002).*

University of Pennsylvania, Wharton School, Philadelphia, PA. *Assistant Professor of Operations and Information Management (1996-2000).*

# Appendix A

Massachusetts Institute of Technology, Industrial Performance Center, Cambridge, MA. *Graduate Fellow (1995-1996).*

Massachusetts Institute of Technology, Center for Coordination Science, Cambridge, MA. *Research Assistant (1992-1996).*

Brown University, Department of Engineering, Providence, RI and IBM T.J. Watson Research Center, Yorktown Heights, NY. *Graduate Research Assistant (1988-89).*

Brown University, Department of Engineering, Providence, RI. *Research Assistant (1987-88).*

Oliver Wyman and Company, New York, NY. *Consultant (1989-1992).*

Harry Diamond Laboratories, Adelphi, MD. *Engineering Technician (1984-87).*

**Articles Published in Refereed Journals**

1. Wu, Lynn, Lou, Bowen and Lorin M. Hitt (forthcoming). "Innovation Strategy after IPO: How AI Analytics Spurs Innovation after IPO," *Management Science* (https://doi.org/10.1287/mnsc.2022.01559).

2. Wong, Xiaoning, Wu, Lynn and Lorin M. Hitt (2024). "Social Media Alleviates Venture Capital Funding Inequality for Women and Less Connected Entrepreneurs," *Management Science* 70(2):1093-1112.

3. Chen, Pei-Yu, Hitt, Lorin M., Wong, Yili and Shin-Yi Wu (2021). "Measuring Product Type and Purchase Uncertainty with Online Product Ratings: A Theoretical Model and Empirical Application," *Information Systems Research* 32(4):1470-1489 (a previous version appeared as Hong, Yili, Chen, Pei-Yu, and Lorin M. Hitt (2012). "Measuring Product Type with Dynamics of Online Review Variance: Implications for Research and Practice," *Proceedings of the 31st Annual International Conference on Information Systems* [runner-up best paper award]).

4. Wu, Lynn, Hitt, Lorin M. and Bowen Lou (2020). "Data Analytics Skills, Innovation and Firm Productivity," *Management Science* 66(5): 1783-2290.

5. Wu, Lynn, Hitt, Lorin M. and Bowen Lou (2019). "Data Analytics Supports Decentralized Innovation Communities," *Management Science* 65(10): 4451-4949.

6. Bavafa, Hessam, Hitt, Lorin M. and Christian Terwiesch (2018), "The Impact of E-Visits on Visit Frequencies and Patient Health: Evidence from Primary Care," *Management Science* 64(12): 5461-5959.

7. Avgar, Ariel, Tambe, Prasanna and Lorin M. Hitt (2018). "Built to Learn: How Work Practices Affect Employee Learning During Healthcare Information Technology Implementation," *MIS Quarterly* 42(2): 645-659 (a previous version appeared as "The Effects of Organizational Factors on Healthcare IT Adoption Costs: Evidence from New York Nursing Homes," *Proceedings of the 2009 Hawaii International Conference on Systems Sciences: HICSS-43*.).

# Appendix A

8. Wu, Lynn, Jin, Fujie and Lorin M. Hitt (2018). "Are All Spillovers Created Equal? A Network Perspective on IT Labor Movement," *Management Science* 64(7): 2973-3468. (A previous version appeared as: Wu, Lynn, Jin, Fujie and Lorin M. Hitt (2014). "Are All Spillovers Created Equal? A Network Perspective on IT Labor Movements," *Proceedings of the 33rd Annual International Conference on Information Systems*.).

9. Tan, Fangyun, Netessine, Sergei and Lorin M. Hitt (2017). "Is Tom Cruise Threatened? An Empirical Study of the Impact of Product Variety on Demand Concentration," *Information Systems Research* 28(3): 643-660.

10. Hitt, Lorin M. and Prasanna Tambe (2016). "Health Care Information Technology, Work Organization and Nursing Home Performance," *ILR Review* (69): 834-859.

11. Tambe, Prasanna and Lorin M. Hitt (2014). "Measuring Information Technology Spillovers," *Information Systems Research* 25(1):53-71. (A previous version appeared as: Hitt, Lorin M. and Sonny Tambe (2006). "Measuring Spillovers from Information Technology Investments," *Proceedings of the 25th Annual International Conference on Information Systems*)

12. Tambe, Prasanna and Lorin M. Hitt (2014). "Job Hopping, Information Technology Spillovers and Productivity Growth," *Management Science* 60(2): 338-355. (A previous version appeared as: Tambe, Sonny and Lorin M. Hitt (2010). "Job Hopping, Knowledge Spillovers, and Regional Returns to Information Technology Investments," *Proceedings of the 29th Annual International Conference on Information Systems*.) (Finalist, Management Science Best Paper Award IS Area, 2015; Winner Management Science Best Paper Award IS Area, 2016).

13. Wu, D.J., Ding, Ming, and Lorin M. Hitt (2013). "IT Implementation Contract Design: Analytical and Experimental Investigation of IT Value, Learning and Contract Structure," *Information Systems Research* 24(3). 787-801 (A previous version appeared as: Wu, D.J., Ding, Min and Lorin M. Hitt (2003). "Learning in ERP Contracting: A Principal-Agent Analysis," *Proceedings of the 37th Annual Hawaii International Conference on System Sciences*, Honolulu, HI.)

14. Gao, Gordon and Lorin M. Hitt (2012) "IT and Trademarks: Implications for Product Variety" *Management Science* 58(6): 1211-1226. [A previous version appeared as: Gao, Gordon and Lorin M. Hitt (2004). "IT and Product Variety: Evidence from Panel Data," *Proceedings of the 25th Annual International Conference on Information Systems*, Washington, D.C. (Runner-up – Best Paper Award)]

15. Tambe, Prasanna and Lorin M. Hitt (2012). "Information Technology and Productivity 1987-2006: Evidence from New Firm-Level Data," *Information Systems Research* 23(9):599-617. (Winner of the ISR 2013 Best Paper Award).

16. Field, Joy, Xue, Mei and Lorin M. Hitt (2012) "Learning by customers as co-producers in financial services: An empirical study of the effects of learning channels and customer characteristics," *Operations Management Research* 4(1-2), June: 43-56.

17. Tambe, Prasanna and Lorin M. Hitt (2012). "Now IT's Personal: Offshoring and the Shifting Skill Composition of the US Information Technology Workforce," *Management Science 58(4): 678-695*. [A previous version appeared as: Tambe, Sonny and Lorin M.

# Appendix A

Hitt (2010). "Now IT's Personal: Offshoring and the Shifting Skill Composition of the US Information Technology Workforce," *Proceedings of the 29th Annual International Conference on Information Systems*] (Finalist, Management Science Best Paper Award IS Area, 2014).

18. Tambe, Prasanna, Hitt, Lorin M. and Erik Brynjolfsson (2012). "The Extroverted Firm: How External Information Practices Affect Productivity," *Management Science 58(5): 843-859*. [A prior version appeared as: Tambe, Sonny, Hitt, Lorin M. and Erik Brynjolfsson (2008). "The Extroverted Firm," *Proceedings of the 27th Annual International Conference on Information Systems*] (Runner-Up, INFORMS Times Best Paper Award, 2017)

19. Li, Xinxin, Hitt, Lorin M. and Z. John Zhang (2011). "Product Reviews and Competition in Markets for Repeat Purchase Products," *Journal of Management Information Systems* 27(4): 9-42.

20. Hitt, Lorin M, Xue, Mei, and Pei-Yu Chen (2011). "The Determinants and Outcomes of Internet Banking Adoption," *Management Science* 57(2): 291-307.

21. Li, Xinxin and Lorin M. Hitt (2010). "Price Effects in Online Product Reviews: An Analytical Model and Empirical Analysis," *MIS Quarterly* 34(4): 809-831.

22. Tambe, Prasanna and Lorin M. Hitt (2010). "How Does Offshoring Affect IT Workers?" *Communications of the ACM* 53(10): 72-82.

23. Li, Xinxin and Lorin M. Hitt (2008). "Self Selection and the Information Role of Product Reviews," *Information Systems Research* 19(4): 456-474.

24. Wu, Shin-Yi, Hitt, Lorin, Chen, Pei-Yu, and G. Anandalingam (2008) "Customized Bundle Pricing for Information Goods: A Nonlinear Mixed Integer Programming Approach," *Management Science* 54(3): 608-622.

25. Hitt, Lorin M. and Sonny Tambe (2007) "Broadband Adoption and Content Consumption," *Information Economics and Policy* 19(3-4): 362-378.

26. Xue, Mei, Hitt, Lorin M. and Patrick T. Harker (2007). "Customer Efficiency, Channel Usage and Firm Performance in Retail Banking," *Manufacturing and Service Operations Management* (9): 535-558.

27. Eric K. Clemons, Gao, Gordon and Lorin M. Hitt (2006). "When Online Reviews Meet Hyperdifferentiation: A Study of the Craft Beer Industry," *Journal of Management Information Systems* 23(2): 149-171 (a previous version appeared in the *Proceedings of the 37th Annual Hawaii International Conference on System Sciences*, Honolulu, HI).

28. Jacobides, Michael G. and Lorin M. Hitt (2005). "Vertical Scope, Revisited: Transaction Costs vs. Capabilities and Profit Opportunities in Mortgage Banking," *Strategic Management Journal* 26(13): 1209-1227.

29. Hitt, Lorin M. and Pei-Yu Chen (2005). "Bundling with Customer Self-Selection: A Simple Approach to Bundling Low Marginal Cost Goods," M*anagement Science* 51(10): 1481-1493.

30. Clemons, Eric K. and Lorin M. Hitt (2004). "Poaching and the Misappropriation of Information: Transaction Risks of Information Exchange," *Journal of Management Information Systems* 21(2): 87-108. [An earlier version appeared as: Clemons, Eric K. and

**Appendix A**

Lorin M. Hitt (2003). "Poaching and the Misappropriation of Information: Transaction Risks of Information Exchange," *Proceedings of the 37th Annual Hawaii International Conference on System Sciences*, Honolulu, HI.]

31. Snir, Eli and Lorin M. Hitt (2004). "Vendor Screening in Information Technology Contracting with a Pilot Project," *Journal of Organizational Computing and Electronic Commerce* 14(1): 61-88. [An earlier version of this paper appeared as Snir, Eli and Lorin M. Hitt (1999), "Vendor Screening in IT Contracting with a Pilot Project (extended abstract)," *Proceedings of the 20th Annual International Conference on Information Systems*, Charlotte, N.C.: 324-327. (Runner-up for Best Paper Award).]

32. Snir, Eli and Lorin M. Hitt (2003). "Costly Bidding in Online Markets for IT Services," *Management Science* 49(11): 1504-1520.

33. Brynjolfsson, Erik and Lorin M. Hitt (2003) "Computing Productivity: Firm-Level Evidence," *Review of Economics and Statistics* 85(4): 793-808.

34. Brynjolfsson, Erik, Hitt, Lorin M. and Shinkyu Yang (2002) "Intangible Assets: Computers and Organizational Capital, " *Brookings Papers on Economic Activity* (1): 137-199. [An earlier version of this paper appeared as Brynjolfsson, Erik, Hitt, Lorin M. and Shinkyu Yang (1998) "Intangible Assets: How the Interaction of Computers and Organizational Structure Affects Stock Market Valuations", *Proceedings of the 19th Annual International Conference on Information Systems,* Helsinki, Finland: 8-29.].

35. Chen, Pei-Yu and Lorin M. Hitt (2002) "Measuring Switching Costs and Their Determinants in Internet Enabled Businesses: A Study of the Online Brokerage Industry," *Information Systems Research* 13(3): 255-276. [An earlier version of this paper appeared as Chen, Pei-Yu and Lorin M. Hitt (2000) "Switching Cost and Brand Loyalty in Electronic Markets: Evidence from On-Line Retail Brokers," *21st Annual International Conference on Information Systems*, Brisbane, Australia: 134-144.]

36. Hitt, Lorin M., Wu, D.J. and Xiaoge Zhou (2002). "Investment in Enterprise Resource Planning: Business Impact and Productivity Measures," *Journal of Management Information Systems* (Special Issue on ERP) 19(1): 71-98.

37. Hitt, Lorin M. and Frances X. Frei (2002). "Do Better Customers Utilize Electronic Distribution Channels? The Case of PC Banking," *Management Science* 48(6, June): 732-749.

38. Clemons, Eric K., Hann, Il-Horn, and Lorin M. Hitt (2002). "Price Dispersion and Differentiation in Online Travel: An Empirical Investigation," *Management Science* 48(4, April): 534-550.

39. Bresnahan, Timothy, Brynjolfsson, Erik and Lorin M. Hitt (2002). "Information Technology, Workplace Organization and the Demand for Skilled Labor: Firm-level Evidence," *Quarterly Journal of Economics,* 117(1): 339-376. [Reprinted as "Technolǵia de la Informatión, Organizatión del Lugar de Trabajo y Demanda de Trabajadores Calificados: Evidencia a Partir de Datos de Empresa," Chapter 8 in Reformas Y Equidad Social En America Latina Y El Caribe (Carlos Eduardo Velez and Pax Castillo-Ruiz, eds.) Banco Interamericano de Desarrollo: 135-168 (2004). An earlier version of this paper appeared as Bresnahan, Timothy, Brynjolfsson, Erik and Lorin M. Hitt (2000) "Technology, Organization and the Demand for Skilled Labor," Chapter 5 in *The New Relationship:*

# Appendix A

*Human Capital in the American Corporation* (Margaret M. Blair and Thomas A. Kochan, eds.), Brookings Institution Press: 145-193.]

40. Clemons, Eric K., Hitt, Lorin M., Gu, Bin, Thatcher, Matt E. and Bruce W. Weber (2002). "Impacts of eCommerce and Enhanced Information Endowments on Financial Services: A Quantitative Analysis of Transparency, Differential Pricing and Disintermediation," *Journal of Financial Services Research* 22(1,2): 73-90.

41. Brynjolfsson, Erik and Lorin M. Hitt (2000). "Beyond Computation: Information Technology, Organizational Transformation and Business Performance." *Journal of Economic Perspectives*, 14(4): 23-48. [Reprinted as Brynjolfsson, Erik and Lorin M. Hitt (2004). "Information Technology, Organizational Transformation and Business Performance," Chapter 2 in *Productivity, Inequality and the Digital Economy* (Nathalie Greenan, Yannick L'Horty and Jacques Mairesse, eds.), MIT Press: 55-91. Also reprinted as Chapter 4 in Inventing Organizations of the 21st Century (Thomas Malone, Robert Laubacher and Michael S. Scott Morton, eds): 70-99.]

42. Hitt, Lorin M. (1999). "Information Technology and Firm Boundaries: Evidence from Panel Data," *Information Systems Research,* 10(2, June): 134-149.

43. Brynjolfsson, Erik and Lorin M. Hitt (1998). "Beyond the Productivity Paradox," *Communications of the ACM*, 41(8): 49-55.

44. Hitt, Lorin M. and Erik Brynjolfsson (1997). "Information Technology and Internal Firm Organization: An Exploratory Analysis," *Journal of Management Information Systems* 14 (2): 81-101.

45. Brynjolfsson, Erik and Lorin M. Hitt (1996). "Paradox Lost? Firm-Level Evidence on the Returns to Information Systems," *Management Science* 42 (4): 541-558. [reprinted as Section 1 Chapter 1 in *Beyond the IT Productivity Paradox*, (Leslie Willcocks and Stephanie Lester, eds.), John Wiley and Sons: 39-68 (1999) and Section 2 Chapter 1 in *Exploring Information Systems Research Approaches*, (Robert D. Galliers, M. Lynne Markus and Sue Newell, eds.), Routledge: 109-127 (2007). An earlier version of this paper appeared as Brynjolfsson, Erik and Lorin M. Hitt (1993) "Is Information Systems Spending Productive? New Evidence and New Results," *Proceedings of the 14th Annual International Conference on Information Systems*, Orlando, FL. December: 47-64.]. Winner of the Best Paper Award in Information Systems Economics in last seven years (1999 Workshop on Information Systems and Economics).

46. Hitt, Lorin M. and Erik Brynjolfsson (1996). "Productivity, Business Profitability, and Consumer Surplus: Three Different Measures of Information Technology Value," *MIS Quarterly* 20(2): 121-142. Winner of 1996 Best Paper award. [An earlier version of this paper appeared as Hitt, Lorin M. and Erik Brynjolfsson (1994) "The Three Faces of IT Value: Theory and Evidence," *Proceedings of the 15th Annual International Conference on Information Systems*, Vancouver, B.C., December. (Winner of Best Paper and Best Paper Addressing Conference Theme Awards): 263-277.]

47. Brynjolfsson, Erik and Lorin M. Hitt (1995) "Information Technology as a Factor of Production: The Role of Differences Among Firms", *Economics of Innovation and New Technology* 3-4: 183-199.

# Appendix A

48. Martin, Suzanne, Hitt, Lorin M., and James Rosenberg  (1989) "p-Channel Germanium MOSFETs with High Channel Mobility," *IEEE Electron Device Letters* 10(7, July): 325-326.

## Refereed Conference Proceedings (Not otherwise published in Journals)

49. Wu, Lynn, Jin, Fujie and Lorin M. Hitt (2015).  "How Do Data Skills Affect Firm Productivity: Evidence from Process-driven vs. Innovation-driven Practices," *Proceedings of the 34th Annual International Conference on Information Systems*.

50. Wu, Lynn, Jin, Fujie and Lorin M. Hitt (2015).  "Data Skills and the Value of Social Media: Evidence from Large-Sample Firm Value Analysis," *Proceedings of the 34th Annual International Conference on Information Systems*. (Updated version: SSRN 2826115)

51. Tambe, Sonny, Hitt, Lorin M. and Erik Brynjolfsson (2011) "The Price and Quantity of IT-Related Intangible Capital," *Proceedings of the 30th Annual International Conference on Information Systems*.

52. Gao, Gordon and Lorin M. Hitt (2003).  "The Economics of Telecommuting:  Theory and Evidence," *Proceedings of the 24th Annual International Conference on Information Systems*, Seattle, WA.

53. Chen, Pei-Yu and Lorin M. Hitt (2001) "Brand Awareness and Price Dispersion in Electronic Markets," *22nd Annual International Conference on Information Systems*, New Orleans, LA.

54. Gu, Bin and Lorin M. Hitt (2001)  "Transactions Costs and Market Efficiency,"  *22nd Annual International Conference on Information Systems*, New Orleans, LA.

## Other Publications

### *Chapters in Books*

55.  Altuglu, Vildan, Hitt, Lorin M., Hussain, Samid and Matteo Li Bergolis (2023).  "Valuation of Personal Data" in *The Cambridge Handbook of Marketing and the Law* (Jacob E. Gersen and Joel H. Steckle, eds.), Cambridge University Press, p. 78-102.

56. Chen, Pei-Yu and Lorin M. Hitt (2007).  "Information Technology and Switching Costs," in T. Hendershott, ed., *Handbook of Information Systems Economics*.

57. Brynjolfsson, Erik and Lorin M. Hitt (2005) "Intangible but not Unmeasurable: Some Thoughts on the Measure and Magnitude of Intangible Assets," in Carol Corrado and Daniel Sichel, eds., *Measuring Capital in the New Economy*, University of Chicago Press (for NBER).

58. Brynjolfsson, Erik and Lorin M. Hitt (2005)  "Intangible Assets and the Economic Impact of Computers," in William Dutton, Brian Kahin, Ramon O'Callaghan, and Andrew Wyckoff, eds., *Transforming Enterprise*, MIT Press.

59. Clemons, Eric K., Hitt, Lorin M. and David C. Croson (2001)  "The Future of Retail Financial Services:  Transparency, Bypass and Differential Pricing," Chapter 4 in *Tracking a*

# Appendix A

*Transformation: E-commerce and the Terms of Competition in Industries* (J. Zysman, ed.), Brookings Institution Press: 92-111.

60. Clemons, Eric K. and Lorin M. Hitt (2001) "Financial Services: Transparency, Differential Pricing and Disintermediation," Chapter 4 in *The Economic Payoff from the Internet Revolution* (R. Litan and A. Rivlin, eds.), Brookings Institution Press: 87-128.

61. Hitt, Lorin M., Frei, Frances X. and Patrick T. Harker. (1999) "How Financial Firms Decide on Technology," Chapter 3 in *Brookings/Wharton Papers on Financial Services:1999,* Litan, Robert E. and Anthony M. Santomero, Eds. Washington, DC: Brookings Institution Press: 93-136.

62. Hitt, Lorin M. (1999). "The Impact of IT Management Practices on the Performance of Life Insurance Companies," Chapter 7 in *Changes in the Life Insurance Industry: Efficiency, Technology and Risk Management* (J. David Cummins and Anthony M. Santomero, eds.), Norwell, MA: Kluwer Academic Publishers: 211-243.

### Trade Journal Publications

63. Brynjolfsson, Erik and Lorin M. Hitt (1997) "Breaking Boundaries", *InformationWeek 500* September 22: 54-61.

64. Brynjolfsson, Erik and Lorin M. Hitt (1996) "The Customer Counts," *InformationWeek,* September 8: 38-43.

65. Brynjolfsson, Erik and Lorin M. Hitt (1995) "The Productive Keep Producing," *InformationWeek,* September 18: 38-43.

### Books

66. Ferguson, Matthew, Hitt, Lorin and Prasanna Tambe. *The Talent Equation*. McGraw Hill, 2013.

### Reports

67. Ahluwalia, Simran, Caulfied, Matthew, Davidson, Leah, Diehl, Mary Margaret, Ipsas, Aline, Windle, Michael and Lorin M. Hitt (2017). *The Business of Voting*. Wharton Public Policy Issue Industry Report. (https://publicpolicy.wharton.upenn.edu/business-of-voting/)

68. Hitt, Lorin M. and Prasanna Tambe (2011). Technical Report: The Business Case for Healthcare Information Technology in Nursing Homes. White Paper (SSRN 1964841)

69. Beard, Nick, Elo, Kinga Z., Hitt, Lorin M. and Michael G. Housman (2007). The Economics of IT and Hospital Performance. Pricewaterhouse Coopers White Paper (http://www.pwc.com/us/en/technology-innovation-center/assets/healthindex_web-x.pdf)

70. Hitt, Lorin, Wu, Lynn, Campbell, Karen, Jeafarqomi, Karim, Ashtiani, Hamid and Leslie Levesque. "Corporate Data Literacy: Scoring Firms and Firm Performance," IHS Markit White Paper, September 2018.

### Working Papers

71. Yapar, Ozge, Lobel, Ruben and Lorin M. Hitt (2017). "Technology Sharing in Two Sided Markets." Working Paper.

72. Jin, Fujie, Wu, Andy and Lorin Hitt (2017). "Social is the New Financial: How Startup Social Media Activity Influences Funding Outcomes," Mack Center Working Paper,

# Appendix A

Wharton School (https://mackinstitute.wharton.upenn.edu/wp-content/uploads/2017/03/FP0331_WP_Feb2017.pdf)

73. Brynjolfsson, Erik, Hitt, Lorin M. and Heekyung Hellen Kim (2011). "Strength in Numbers: how Does Data-Driven Decisionmaking Affect Firm Performance?" Working Paper (SSRN 1919486)

74. Brynjolfsson, Erik, Hitt, Lorin M., Rock, Daniel and Prasanna Tambe (2021). "IT, AI and the Growth of Intangible Capital," Working Paper (SSRN 3416290) (in revision).

75. Erol, Etiye Cansu, Hitt, Lorin M. and Prasanna Tambe (2021). "Does EMR Adoption by Nursing Homes Decrease Hospitalization Costs?" Working Paper (in revision) (SSRN 3725715).

76. Hitt, Lorin M., Jin, Fujie and Lynn Wu (2016). "Data Analytics Skills and the Corporate Value of Social Media," Working Paper (SSRN 2826115) (in revision).

77. Hitt, Lorin M., Jin, Fujie and Bowen Lou (2024). "You Say, Firm says: An Empirical Study on Online Employer Brand and Firm Performance," Working Paper (in revision).


**Academic Honors**

INFORMS Information Systems Society (ISS) Distinguished Fellow (2021)
INFORMS Information Systems Society (ISS) Practical Impacts Award (2021)
Management Science, Information Systems Best Paper Award Finalist (2014, 2015, winner 2016)
Information Systems Research: Best Paper Award (2013)
Wharton Excellence in Teaching Award, Undergraduate Division (1998, 1999, 2000, 2001, 2003, 2007, 2008, 2012, 2013, 2018, 2019, 2020, 2022)
Best Paper in Information Systems and Economics (last 7 years), Workshop on Information Systems and Economics (1999)
Runner-up for Best Paper, International Conference on Information Systems (1999, 2004, 2012)
David Hauck Award for Distinguished Teaching, Wharton School (1999)
Christian R. and Mary F. Lindback Award for Distinguished Teaching, University of Pennsylvania (1998)
National Science Foundation CAREER Program Grant Recipient (1998)
Best Paper Award, Management Information Systems Quarterly (1996)
International Conference on Information Systems Doctoral Consortium (1995)
MIT Industrial Performance Center Doctoral Dissertation Fellowship (1995)
"Best Paper" and "Best Paper Addressing the Conference Theme" Awards at the International Conference on Information Systems (1994)
DuWayne J. Petersen Fellowship (1992-1996)
Honorable Mention, National Science Foundation Fellowship (1989)
Elected to Tau Beta Pi Engineering Society (1988)
Elected to Sigma Xi Scientific Research Society (1988)
Finalist, National Merit Scholarship Program (1985)
National Society of Professional Engineers' Scholarship (1985)
Honorable Mention, Westinghouse Science Talent Search (1985)


**Grants**

Analytics at Wharton. AI's Effect on Innovation and Productivity. ($50K) (12/20 – 12/22).

# Appendix A

Commonwealth Fund. The Business Case for Healthcare IT in Nursing Homes. (~$150K) (1/08 – 12/13).

Co-Principal Investigator (with Mei Xue and Patrick Harker), National Science Foundation. Collaborative Research: Customer Efficience and the Management of Multi-Channel Service Delivery Systems. Award: ~$250K (8/05 – 8/07)

Wharton eBusiness Initiative/Mack Center, University of Pennsylvania, Wharton School. Product Reviews, Pricing and Market Strategy. Award: $10K (5/05-11/05)

Fishman Davidson Center, University of Pennsylvania, Wharton School. Information Technology, Product Variety and Operations (6/2004-6/2005). Award: ~$18K.

University Research Foundation. Information Technology and Product Variety; Data Development and Analysis. Award: $18.5K (9/2004-5/2005)

Co-Principal Investigator (with Paul Kleindorfer and D.J. Wu), SAP America. Valuation of ERP in the Oil and Gas Industry. Award: $40K (10/02-6/03)

Principal Investigator, NSF Grant IRI-9733877 (Computing and Social Systems Program): The Economics of Information Technology, Organization and Productivity: Theory Development and Empirical Investigation. Award: $309K (6/98-10/04)

Principal Investigator. Customer Behavior in On-Line Markets. Wharton Electronic Commerce Forum. Award: $25K (6/00 – 6/01).

Principal Investigator. Switching Cost and Pricing in Electronic Markets. Wharton eBusiness Initiative. Award $25K (6/01-6/02)

## Journal/Conference Reviews

Editorial Board
Information Systems Research (Guest Senior Editor, 2009-2011; Senior Editor, 2007-2008; Associate Editor 2000-2002, 2004 Guest Associate Editor)
Journal of Management Information Systems (2002-present)
Management Science (2002-2008; Departmental Co-Editor – Information Systems, 2008-2015)
SSRN Information Systems and Economics (2004-2008)

Program Committee
Workshop on Information Systems and Economics (2009 Conference Co-Chair; 2004, Conference Co-Chair)
International Conference on Information Systems (2000, 2003 Associate Editor)
ACM Conference on Electronic Commerce (2007)
International Conference on Information Systems Doctoral Consortium (2007)
NYU CeDER Summer Doctoral Workshop (2007)

# Appendix A

<u>Ad-hoc Reviewer</u>
American Economic Review, Canadian Journal of Economics, Canada Social Science Research and Humanties Council, City University of Hong Kong - Grant Review Committee, Communications of the ACM, Economic Inquiry, European Economic Review, European Journal of Operations Research, Hawaii International Conference on System Sciences
Industrial Relations, Industrial and Labor Relations Review, Information Economics and Policy, Information Systems Frontiers, Information Systems Research, Information Technology and Management, Journal of Banking and Finance, Journal of Industrial Economics, Journal of Law, Economics and Organization, Journal of Management Information Systems, Journal of Organizational Computing, Journal of Productivity Analysis, Management Science, Managerial and Decision Economics, Manufacturing & Service Operations Management, Marketing Science, McGraw-Hill Textbook Division, MIS Quarterly (occasional Guest Associate Editor), National Science Foundation, Review of Economics and Statistics, Regional Science, Sloan Management Review, Quarterly Journal of Economics

**Teaching Experience**

Massachusetts Institute of Technology, Sloan School of Management.  Course:  15.567 - Introduction to eBusiness, Fall, 2001 (2 sections, co-taught with Erik Brynjolfsson)

University of Pennsylvania, The Wharton School.  Course:  OPIM101 - Introduction to Operations and Information Management.  Fall, 2007; Fall, 2008; Fall, 2009;  Fall, 2010; Fall, 2011 (Co-instructor);  Fall, 2012;  Fall, 2013 (x2);  Fall, 2014 (x2) ;  Fall, 2015 (x2) (Instructor).

University of Pennsylvania, The Wharton School.  Course: OIDD105/OPIM105 - Data Analysis in VBA and SQL.  Spring, 2011 (Co-instructor);  Spring, 2012; Spring, 2013;  Fall, 2013; Fall 2015;  Fall 2016 (x2); Fall 2017 (x2);  Fall 2018 (x2), Fall 2019 (x2);  Spring 2020;  Spring, 2022;  Spring, 2023, Spring 2024.

University of Pennsylvania, The Wharton School.  Course:  OIDD315 – Databases for Analytics.  Spring, 2022 (x2) Spring, 2023 (x2), Spring 2024.

University of Pennsylvania, The Wharton School.  Course:  OPIM 469 - Advanced Topics in Information Strategy and Economics.  Spring, 2000 (x2);  Spring, 2001 (x2);  Spring, 2002 (x3) (Instructor);  Spring, 2003 (Co-instructor, 2 sections); Spring, 2004;  Spring, 2005; Spring, 2006; Spring, 2007;  Fall, 2008;  Spring, 2010; Spring, 2011; Spring, 2012; Spring, 2013, Fall 2014 (Instructor)

University of Pennsylvania, The Wharton School.  Course:  OIDD613 – Online Business Models 2022 (x2); 2023 (x2) (co-instructor).

University of Pennsylvania, The Wharton School.  Course:  OIDD663 – Databases for Analytics.  Spring, 2022

University of Pennsylvania, The Wharton School. OPIM669 - Advanced Topics in Information Strategy/Financial Information Systems.  Spring, 1998;  Spring, 1999; Spring, 2000;  Spring, 2001;  Spring, 2002 (Guest Lecturer);  Spring, 2003 (Co-instructor); Spring, 2004; Spring, 2005; Spring, 2006; Spring, 2007 (Instructor).

# Appendix A

University of Pennsylvania, The Wharton School.  Tiger Team Field Application Project.  Spring, 1999;  Spring, 2000; Spring, 2001 (Faculty Advisor for Electronic Commerce/IT projects)

University of Pennsylvania, The Wharton School.  Course: EMTM900 – Electronic Commerce Marketing.  Spring, 2000 (Guest Lecturer)

University of Pennsylvania, The Wharton School.  Course:  D-SEM on Electronic Commerce. Fall, 2000

University of Pennsylvania, The Wharton School.  Course:  OPIM 319 - Advanced Topics in Information Strategy/Advanced Decision Support Systems (now OPIM469).  Spring, 1998; Spring, 1999  (Instructor)

University of Pennsylvania, The Wharton School.  Course:  OPIM 210 - Management Information Systems. Fall, 1996; Spring, 1997; Fall, 1997; Spring, 1998;  Spring 1999 (x2);  Fall, 2002 (x2);  Spring, 2004;  Spring, 2006; Fall, 2006; Spring, 2007;  Fall, 2007 (Instructor).

University of Pennsylvania, The Wharton School.  MBA Pre-Term Exercise on Contract Negotiations for Information Technology Outsourcing.  Fall, 1998;  Fall, 1999 (with D. Croson and R. Croson)

University of Pennsylvania, The Wharton School.  Course:  OIDD/OPIM 899/950/955/960/961 - Doctoral Seminar in Information Technology:  Economics and Organization.  Fall, 1997; Fall, 2000 (co-instructor);  Fall, 2001 (Guest Lecturer);  Fall, 2003 (Guest Lecturer); Spring, 2003; Fall, 2004 (Guest Lecturer); Spring, 2005;  Spring, 2008; Spring, 2010;  Spring, 2012; Spring 2013 (co-instructor); Spring, 2015; Spring 2016;  Spring 2017; Spring 2018; Spring 2019, Spring 2024.

University of Pennsylvania, The Wharton School.  Course: WH101 – Business and You.  Spring, 2017, Fall 2017, Fall 2018, Fall 2019. (cotaught OIDD Session).

University of Pennsylvania, The Wharton School.  Course:  OPIM 666 - Information:  Industry Structure and Competitive Strategy.  Winter Quarter, 1997; Spring Quarter, 1997 (Instructor); Guest Lecturer (Fall Quarter, 1999; Fall Quarter, 2000).

Massachusetts Institute of Technology, Sloan School of Management.  Course:  15.566 - Information Technology as an Integrating Force in Manufacturing. Spring, 1995 (Teaching Assistant)

Brown University, Department of Engineering.  Course:  EN 162- Analog Circuit Design. Spring, 1987 (Teaching Assistant)

## Professional Affiliations

Sigma Xi, Tau Beta Pi, Association for Computing Machinery, American Economic Association, INFORMS, Association for Information Systems

# Appendix A

**Students Supervised**

*Dissertation Supervisor*
 Eli Snir (2001):  Lecturer, Washington University
 Pei-Yu (Sharon) Chen (2002):  Professor, Arizona State University
 Guodong (Gordon) Gao (2005):  Associate Professor, University of Maryland
 Xinxin (Mandy) Li (2005):  Associate Professor, University of Connecticut
 Prasanna (Sonny) Tambe (2008):  Associate Professor, Wharton School
 Fujie Jin (2016):  Assistant Professor, Indiana University
 Atiye Cansu Erol (2024):  Johns Hopkins University.

*Thesis Reader*
 Bin Gu (2002):  Professor, Arizona State University
 Il-Horn Hann (2000): Professor, University of Maryland
 Michael Jacobides (2000):  Professor, London Business School
 Jeff McCullough (2005):  Assistant Professor, University of Minnesota
 Ying Liu (2006):  Assistant Professor, University of Hawaii
 Ben Powell (2003):  Unknown
 Michael Row (2001):  Private Industry
 Baba Prasad (2003):  Unknown
 Mei Xue (2001):  Associate Professor, Boston College
 Matt Thatcher (1999):  Assistant Professor, University of Nevada (Las Vegas)
 Shinyi Wu (2003): Assistant Professor, Arizona State University
 Moti Levi (2001):  Private Industry
 Antonio (Toni) Moreno-Garcia (2012):  Assistant Professor, Northwestern University
 Sergeui Roumanitsev (2006):  Private Industry
 Marcelo Olivares (2007):  Associate Professor, Columbia University
 Ben Shiller (2011):  Assistant Professor, Brandeis University
 Adam Saunders (2011):  Assistant Professor, University of British Columbia
 Fangyun (Tom) Tan (2011):  Assistant Professor, Southern Methodist University
 Vihbahshu Abhishek (2011):  Assistant Professor, Carnegie Mellon University
 Hessam Bavafa (2013):  Associate Professor, University of Wisconsin
 Yili (Kevin) Hong (2013):  Professor, University of Houston
 Dokyun Lee (2014):  Assistant Professor, Carnegie Mellon University
 Jing Peng (2015): Assistant Professor, University of Connecticut
 Bowen Lou (2019):  Assistant Professor, University of Connecticut
 Siriu Wang (2022):  Private Industry
 Xiaoning (Gavin) Wang (2022):  Assistant Professor, University of Texas at Dallas

*Other Doctoral Advising*
 Amanda Jensen (2010):  Summer Paper Advisor
 Felipe Csaszar (2005):  Academic Advisor
 Ozge Yapar (2015-6):  Independent study supervisor
 Kayoung Choi (2015): Summer Paper Advisor

*Masters Students*
 Xiaoge Zhou, OPIM Department, Wharton School (1999-2001):  Thesis Supervisor

# Appendix A

Jihae Wee, School of Engineering and Applied Science (2003):  Project Supervisor
Zhu Lu, College of Arts and Sciences (2014):  Thesis Supervisor

*MBA Students*
Anna Blacyzyck, Wharton School (2004):  Independent Study Project Supervisor
Luca Coltro, Wharton School (1997-1998):  Advanced Study Project Supervisor
Andrew Trader, Wharton School (1999):  Advanced Study Project Supervisor

*Undergraduate Students*
Steven Altman, Wharton School (1997):  Independent Study Project Supervisor
Maury Apple, Wharton School (1997):  Independent Study Project Supervisor
Tara Bhandari, Wharton School (2002):  Society Project Supervisor
Thomas Burrell, Engineering School (2001):  Senior Project Supervisor
Todd Bishop, Wharton School (1999):  Independent Study Project Supervisor
Rachel Boim, Wharton School (1999).  Independent Study Project Supervisor
Hope Bromley, Wharton School (2000):  Independent Study Project Supervisor
John Chiang, Wharton School (2001):  Society Project Supervisor
Charlene Chen, Wharton School (2005):  Senior Design Project Supervisor
Robert Dolan, Wharton School (2003-4):  Wharton Research Scholars Supervisor
Ronak Ghandhi, School of Engineering (2013):  Senior Design Project Supervisor
Gabriel Gottleib, School of Engineering (2002):  Senior Design Project Supervisor
Jenny Ham, Wharton School (2024):  Independent Research Project Supervisor
Phuong Ho, Department of Economics (1998):  Honors Advisor
Richard Hooper, Systems Engineering (1999):  Independent Study Project Advisor
Hunter Horsley, Wharton School (2015):  Independent Study Project Advisor
Melinda Hu, Wharton School (2018-2019):  Wharton Researh Scholars Advisor
Pawel Hytry, Wharton School (2011-2012):  Independent Study Project Advisor
Ulhas Jagdale, School of Engineering (2013):  Senior Design Project Supervisor
Johnny Kong, Wharton School (2005):  Senior Design Project Supervisor
Amin Laksmani, Computer Science and Enginering (2010): Senior Design Supervisor
Henrique Laurino, Wharton School (2018):  Senior Thesis Supervisor
Jacob Lefkowitz, Wharton School (1998):  Society Project Supervisor
Steven Levick, Wharton School (2012):  Independent Study Supervisor
Brandon Newberg, Wharton School (2012):  Independent Study Supervisor
David Perez y Perez, Wharton School (1999):  Independent Study Supervisor
Nickhil Ramchandi, Wharton School (1999):  Independent Study Supervisor
Reuben Randolf, School of Engineering (1998):  Project Supervisor
Kevin Reeves, School of Engineering (2001):  Independent Study Project Supervisor
Allison Rosen, Wharton School (1997): Independent Study Project Supervisor
Jennifer Seo, School of Engineering (2000):  Senior Design Project Supervisor
Kyle Smith, Wharton School (2001):  Independent Study Project Supervisor
David Thornton, Wharton School (2005):  Senior Design Project Supervisor
Jon Turow, Wharton School (2005-6):  Independent Study Supervisor
Udack Victor,  School of Engineering (2000):  Senior Design Project Supervisor
Jason Wang, Wharton School (1998):  Society Project Supervisor
Melinda Wang, Wharton School (2018):  Senior Project Supervisor
Christine Wong, Wharton School (1997):  Society Project Supervisor

# Appendix A

**Other Service**

University of Pennsylvania
> Academic Dishonesty Disciplinary Committee Panel (2012)
> Trustees Committee on Academic Policy (2009-2010)
> Lindback Teaching Award Committee (1999)

Wharton School
> Undergraduate Curriculum Evaluation Committee (chair, 2021-2022)
> Curriculum Innovation and Review Committee (CIRC) (chair, 2016-20, 2022-2024)
> Undergraduate Curriculum Evaluation Committee (2014-2016)
> Management Department Q-Review Committee, Chair (2013-2014)
> Wharton Personnel Committee (2009-2011,2024-2025)
> Dean's Advisory Group (2008)
> Panel Moderator, Wharton Asia Business Forum (2006)
> Undergraduate Curriculum Design Committee (2003)
> Ph.D Program Review Committee (2000)
> Dean's Council on Education (2001)
> WebI Curriculum Development Committee (2000)

Wharton School, Undergraduate Division
> Moderator, Wharton Information Technology Career Panel (1997-99)
> Graduation Speaker (1999)
> Parents Weekend Speaker (1999)
> Hauck Teaching Award Committee (2000-01)
> Electronic Commerce Concentration Advisor (2000-present)
> Wharton/Monitor Corporation Undergraduate Case Competition Judge (2001)
> Deans Award for Excellence Committee (2010, 2006)

Wharton School, Department of Operations and Information Management/OIDD
> Recruiting Committee (2005, 2006, 2011, 2014, 2016, 2021)
> Doctoral Admissions Committee (2004, 2005, 2011, 2012-13, 2015-7)
> Department Q-Review Committee (1999-00)
> Undergraduate Coordinator (1998-01, 2002-2008)
> Undergraduate Curriculum Committee (1998-01, 2002-2008)
> Department Computing Coordinator (1997)
> Department Representative to Wharton Computing (1997)
> Department Seminar Coordinator (1996, 2010. 2022)
> Departmental Tenure Committees (2006, 2013, 2014, 2019)

Wharton School, Public Policy Initiative
> Wharton/OSET Foundation Project on the Voting Technology Industry (2016)

Morgan State University
> Advising on Curriculum Design (2019)

MIT Center for Coordination Science
> Seminar Coordinator (1994)

National Science Foundation
> Panelist (1998, 2001, 2003, 2005, 2006, 2015)
> Participant in the NSF CISE/SBE Cyberinfrastructure Workshop (2005)

International Conference on Information Systems
> Doctoral Consortium Faculty (2006)

Other

# Appendix A

MIT Inclusive Innovation Competition Judge (2016)
NYU/CeDER Summer Doctoral Consortium Faculty (2006)

# Appendix B

# Prior Testimony at Trial, Arbitration
# or Deposition in the Last Four Years

*Erica Frasco, et. al. v. Flo Health, Inc. et. al.,* United States District Court Northern District of California, Case No. 3:21-cv-00757-JD. August, 2023 and July, 2024.

*Charlotte Willoughby, et. al. v. Abbott Laboratories*, United States District Court Northern District of Illinois, Eastern Division, Case No. 1:22-cv-01322. July, 2024.

Federal Court of Australia, Victoria Registry, Beach J, No. NSD 1236 of 2020, No. NSD 190 of 2021, No. VID 341 of 2022, No. VID 342 of 2022, *Epic Games, Inc and Others and Apple Inc and Others*. June, 2024.

*Darius Clark, John H. Cottrell, David Lumb, Kyla Rollier, and Jenny Szeto, et. al. v. Yodlee, Inc.,* United States District Court for the Northern District of California, Case No. 3:20-cv-5991-SK. May, 2024.

*Bumbales et. al. vs. Curators of the University of Missouri d/b/a MU Healthcare.* Circuit Court of Boone County, State of Missouri, Case No. 20BA-CV03309 Division IV. December, 2023.

*Tamika Miller and Julianne Chuanroong, et. al. v. Travel Guard Group, Inc. et. al.,* United States District Court for the Northern District of California, C.A. No. 3:21-cv-09751-TLT. August, 2023 and November, 2023.

*International Business Machines, Corp., Claimant v. Kyndryl, Inc., Respondent and Counterclaimant,* American Arbitration Association Case No. 01-22-0002-6955. September, 2023.

*In Re: Blackbaud, Inc. Customer Data Security Breach Litigation*, United States District Court for the District of South Carolina Columbia Division, Case No. 3:20-mn-02972-JFA, MDL No. 2972. August, 2023.

*Tamika Miller and Julianne Chuanroong, et. al. v. Travel Guard Group, Inc. et. al.*, United States District Court for the Northern District of California, C.A. No. 3:21-cv-09751-TLT. August, 2023.

*In Re Apple iPhone Antitrust Litigation* and *Donald Cameron, et al. v. Apple, Inc.*, United States District Court for the Northern District of California Oakland Division, Case Nos: 4:11-cv-06714-YGR and 4:19-cv-03074-YGR. October, 2021 and April, 2023.

*Holly Rydman et al. v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court, Western District of Washington, Seattle Division, Case No. 2:18-CV-01578-RSM. September, 2022.

*In re: Oracle Corporation Derivative Litigation*, Court of Chancery, State of Delaware, Case No. 2017-0337-SG. December, 2021 and August, 2022.

# Appendix B

*Dr. Joseph Ciccio et al., v. SmileDirectClub, Inc., et al.*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:19-cv-00845.  August, 2022.

*Sarah Hogan et al. v. Ulta Salon, Cosmetics and Fragrance, Inc.*, Supreme Court of the State of New York, County of New York, Index No. 651986/2020.  June, 2022.

*Mark Chapman, et al. v. General Motors, LLC.*, United States District Court, Eastern District of Michigan, Case No. 2:19-cv-12333-TGB-DRG.  June, 2022.

*Facebook, Inc. & Subsidiaries v. Commissioner of Internal Revenue*, United States Tax Court, Docket 21959-16.  March, 2022.

*Wesley Won et al. vs. General Motors, LLC.*, United States District Court for the Eastern District of Michigan, Southern Division, Case 2:19-cv-11044.  December, 2021.

*In re: Takata Airbag Product Liability Litigation*, United States District Court for the Southern District of Florida, Miami Division, MDL No. 2599.  December, 2021.

*Stephen Marcinkiewicz and Robin Surcess v. General Motors et al.*, Ontario Superior Court of Justice, Case No. CV-17-576146-00CP.  October, 2021.

*VLSI Technology, LLC v. Intel Corporation*, United States District Court for the District of Delaware, Case No. 1:18-cv-00966-CFC.  July, 2021.

*In Re: Capital One Consumer Data Security Breach Litigation*, United States District Court for the Eastern District of Virginia, Alexandria Division.  MDL No. 1:19md2915 (AJT/JFA).  May, 2021.

*Epic Games, Inc. v. Apple, Inc.*, United States District Court, Northern District of California, Oakland Division, Case No. 4:20-cv-05640-YGR-TSH.  March, 2021 and May, 2021.

*Rachel Colangelo et al. v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court, Northern District of New York, Case No. 6:18-cv-01228 (LEK/DEP).  April, 2021.

*Ramy Shaker et al. v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court, Eastern District of Michigan, Southern Division, Case No. 2:18-cv-13603-LJM-DRG.  April, 2021.

*Afshin Zarinbaf et al. v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court, Northern District of Illinois, Eastern Division, Case No. 1:18-cv-06951.  April, 2021.

*Stuart Mackinnon v. Volkswagen Canada Group, Inc., et al.*, Ontario Superior Court of Justice File No. CV-17-582746-00CP.  February, 2021.

*Andrea M. Williams et al. v. Apple Inc.*, United States District Court for the Northern District of California, Case No. 5:19-cv-4700-LHK.  February, 2021.

# Appendix B

*Damonie Earl et al. v. The Boeing Company, Southwest Co.*, United States District Court for the Eastern District of Texas, Sherman Division, Case No. 4:19-cv-00507-ALM.  January, 2021.

*Jennifer Song and Scott Werkin v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court, District of Minnesota, Case No. 18-cv-03205-PJS-KMM.  December, 2020.

*VLSI Technology, LLC v. Intel Corporation*, United States District Court for the Eastern District of Texas, Case No. 19-cv-00977-ADA.  September, 2020.

# Appendix C

# Documents Considered List

**Academic Articles**

- Acquisti, Alessandro, Laura Brandimarte, and George Loewenstein, "Privacy and Human Behavior in the Age of Information," *Science* 347, no. 6221, 2015, pp. 509–514

- Adjerid, Idris, Eyal Peer, and Alessandro Acquisti, "Beyond the Privacy Paradox: Objective Versus Relative Risk in Privacy Decision Making," *MIS Quarterly* 42, no. 2, 2018, pp. 465–488

- Bian, Bo, Xinchen Ma, and Huan Tang, "The Supply and Demand for Data Privacy: Evidence from Mobile Apps," *Working Paper*, 2021, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3987541

- Cavusoglu, Hasan, Huseyin Cavusoglu, and Jun Zhang, "Patch Management: Share the Burden or Share the Damage?", *Management Science* 54, no. 4, 2008, pp. 657–670

- Chen, Yanjiao, et al., "*FakeWake*: Understanding and Mitigating Fake Wake-up Words of Voice Assistants," *Proceedings of the 2021 ACM SIGSAC Conference on Computer and Communications Security*, 2021, pp. 1–22

- Chow, Gregory C., "Tests of Equality between Sets of Coefficients in Two Linear Regressions," *Econometrica* 28. no. 3, 1960, pp. 591–605

- Combs, Marcia, Casey Hazelwood, and Randall Joyce, "Are You Listening? – An Observational Wake Word Privacy Study," *Organizational Cybersecurity Journal: Practice, Process and People* 2, no. 2, 2022, pp. 113–123

- Fallah, Alireza, et al., "Optimal and Differentially Private Data Acquisition: Central and Local Mechanisms," *Working Paper*, 2023, https://arxiv.org/abs/2201.03968

- Ghosh, Arpita, and Aaron Roth, "Selling Privacy at Auction," *Games and Economic Behavior* 91, 2015, pp. 334–346

- Grady, Christine, "Money for Research Participation: Does it Jeopardize Informed Consent?" *The American Journal of Bioethics* 1, no. 2, 2001, pp. 40–44

- Gross, Ralph, and Alessandro Acquisti, "Information Revelation and Privacy in Online Social Networks," *Workshop on Privacy in the Electronic Society (WPES)*, 2005

- Hitt, Lorin M., and Pei-Yu Sharon Chen, "Bundling with Customer Self-Selection: A Simple Approach to Bundling Low-Marginal-Cost Goods," *Management Science* 51, no. 10, 2005, pp. 1481–1493

# Appendix C

- Ibdah, Duha, et al., "'Why Should I Read the Privacy Policy, I Just Need the Service': A Study on Attitudes and Perceptions Toward Privacy Policies," *IEEE Access* 4, 2021, pp. 1–23

- John, Leslie K., Alessandro Acquisti, and George Loewenstein, "Strangers on a Plane: Context-Dependent Willingness to Divulge Sensitive Information," *Journal of Consumer Research* 37, no. 5, 2011, pp. 858–873

- Jones, Charles I., and Christopher Tonetti, "Nonrivalry and the Economics of Data," *American Economic Review* 110, no. 9, 2020, pp. 2819–2858

- Kokolakis, Spyros, "Privacy Attitudes and Privacy Behaviour: A Review of Current Research on the Privacy Paradox Phenomenon," *Computers & Security* 64, 2017, pp. 122–134

- Malkin, Nathan, et al., "Privacy Attitudes of Smart Speaker Users," *Proceedings on Privacy Enhancing Technologies*, no. 4, 2019, pp. 250–271

- Martin, Kirsten, and Katie Shilton, "Why Experience Matters to Privacy: How Context-Based Experience Moderates Consumer Privacy Expectations for Mobile Applications," *Journal of the Association for Information Science and Technology* 67, no. 8, 2016, pp. 1871–1882

- Nissenbaum, Helen, "Privacy as Contextual Integrity," *Washington Law Review* 79, no. 1, 2004, pp. 119–158

- Norberg, Patricia A., Daniel R. Horne, and David A. Horne, "The Privacy Paradox: Personal Information Disclosure Intentions Versus Behaviors," *The Journal of Consumer Affairs* 41, no. 1, 2007, pp. 100–126

- Preibusch, Sören, "Guide to Measuring Privacy Concern: Review of Survey and Observational Instruments," *International Journal of Human-Computer Studies* 71, no. 12, 2013, pp. 1133–1143

- Shiller, Benjamin, and Joel Waldfogel, "The Challenge of Revenue Sharing with Bundled Pricing: An Application to Music," *Economic Inquiry* 51, no. 2, 2013, pp. 1155–1165

- Smith, H. Jeff, Sandra J. Milberg, and Sandra J. Burke, "Information Privacy: Measuring Individuals' Concerns About Organizational Practices," *MIS Quarterly* 20, no. 2, 1996, pp. 167–196

- Spence, A. Michael, "Multi-Product Quantity-Dependent Prices and Profitability Constraints," *The Review of Economic Studies* 47, no. 5, 1980, pp. 821–841

- Spiekermann, Sarah, Jens Grossklags, and Bettina Berendt, "E-Privacy in 2nd Generation E-Commerce: Privacy Preferences Versus Actual Behavior," *Paper Presented at EC'01: Proceedings of the Third ACM Conference on Electronic Commerce*, 2001, pp. 38–47

# Appendix C

**Bates Stamped Documents**

- Data:
  - AMZ_GARNER_00064610
  - AMZ_GARNER_00066544
  - AMZ_GARNER_00073774
  - AMZ_GARNER_03544339
  - AMZ_GARNER_03544341
  - AMZ_GARNER_03710803
  - AMZ_GARNER_03710804

- Other Documents:
  - AMZ_GARNER_00063159–61
  - AMZ_GARNER_01012801–3

**Books and Book Chapters**

- Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, Third Edition (Washington D.C.: The National Academies Press, 2011), pp. 425–502

- Angrist, Joshua D., and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion* (Princeton, NJ: Princeton University Press, 2009)

- Birchler, Urs, and Monika Bütler, *Information Economics* (Abingdon, England: Routledge, 2007)

- Kaye, David H., and David A. Freedman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, Third Edition (Washington, D.C.: The National Academies Press, 2011), pp. 211–302

- Mankiw, N. Gregory, *Principles of Economics*, Eighth Edition (Boston, MA: Cengage Learning, 2018)

- Varian, Hal R., *Intermediate Microeconomics: A Modern Approach* (New York, NY: W.W. Norton & Company, 2014)

**Depositions**

- Amazon Employees:
  - Deposition of Nedim Fresko, January 31, 2024

**Appendix C**

- o   Deposition of Shiv Naga Prasad Vitaladevuni, August 31, 2023

- o   Deposition of Shiv Naga Prasad Vitaladevuni 30(b)6, April 23, 2024

- Named Plaintiffs:

  - o   Deposition of Caron Watkins, January 25, 2024

  - o   Deposition of Diane McNealy, September 21, 2023

  - o   Deposition of Jeffrey J. Hoyt, August 8, 2023

  - o   Deposition of Jodi Brust, August 1, 2023

  - o   Deposition of Kaeli Garner, September 26, 2023

  - o   Deposition of Lorlie Tesoriero, August 9, 2023, with Exhibits

  - o   Deposition of Michael McNealy, September 20, 2023

  - o   Deposition of Ricky Babani, August 15, 2023

  - o   Deposition of Ronald E. Johnson, II, October 12, 2023

  - o   Deposition of Selena M. Johnson, October 11, 2023

- Plaintiffs' Experts:

  - o   Deposition of David Hoffman, September 4, 2024

  - o   Deposition of Jonathan Hochman, September 5, 2024

  - o   Deposition of Serge Egelman, Ph.D., Volume I, September 6, 2024

## Expert Reports

- Confidential Expert Report of Jonathan Hochman, and Supporting Materials, June 18, 2024

- Expert Report of David Hoffman, and Supporting Materials, June 18, 2024

- Expert Report of Serge Egelman, Ph.D., and Supporting Materials, June 18, 2024

## Legal Documents

- Declaration of Leila Rouhi, September 13, 2024

- Declaration of Nedim Fresko, September 14, 2024

- Defendants' Objections, Responses, and Supplemental Responses to Plaintiffs' First Set of Interrogatories (Nos. 1, 4), *Kaeli Garner, et al. v. Amazon.com, Inc., et al.*, November 17, 2021

# Appendix C

- First Amended Consolidated Complaint-Class Action, *Kaeli Garner, et al. v. Amazon.com, Inc., et al.*, November 17, 2021

- Order Regarding Requests for Production Nos. 70–75, *Kaeli Garner, et al. v. Amazon.com, Inc., et al.*, June 20, 2023

- Plaintiffs' Motion for Class Certification, Kaeli Garner, et al. v. Amazon.com, Inc., and Amazon.com Services LLC, June 18, 2024

## Online Public Press Articles and Other Web Content

- "Alexa and Alexa Device FAQs," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=201602230

- "Alexa and Alexa Device Terms," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=201566380

- "Alexa Built-In Devices," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=15443147011

- "Alexa Devices," *Amazon*, https://www.amazon.com/b/?node=9818047011&ref=MARS_NAV_desktop_shop_dvc

- "Alexa, Echo Devices, and Your Privacy," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=GVP69FUJ48X9DK8V

- "Alexa Features," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=21576558011

- "Alexa Information," *Amazon*, https://www.amazon.com/alexa-information/b?ie=UTF8&node=21588420011&ref=pe_alxhub_aucc_en_us_IC_HP_10_HUB_INFO

- "Alexa News," *Amazon*, https://www.amazon.com/alexa-news-flash-briefing/b?ie=UTF8&node=21362891011&ref=pe_alxhub_aucc_en_us_IC_HP_7_HUB_NEWS

- "Alexa Productivity," *Amazon*, https://www.amazon.com/alexa-productivity-hacks/b?ie=UTF8&node=21588422011&ref=pe_alxhub_aucc_en_us_IC_HP_2_HUB_PRO

- "Amazon Skills Kit Glossary," *Amazon*, https://developer.amazon.com/en-US/docs/alexa/ask-overviews/alexa-skills-kit-glossary.html

- "Alexa Skills Kit Glossary: Interaction," *Amazon Alexa*, https://developer.amazon.com/en-US/docs/alexa/ask-overviews/alexa-skills-kit-glossary.html#i

# Appendix C

- "Alexa Skills Kit Glossary: Utterance," *Amazon Alexa*, https://developer.amazon.com/en-US/docs/alexa/ask-overviews/alexa-skills-kit-glossary.html#u

- "Alexa Utterance Guidelines," *Amazon Alexa*, https://developer.amazon.com/en-US/alexa/branding/alexa-guidelines/brand-guidelines/speech-bubble

- "Alexa Terms of Use," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=201809740

- "Amazon.com Privacy Notice," *Amazon*, March 31, 2024, https://www.amazon.com/gp/help/customer/display.html?nodeId=GX7NJQ4ZB8MHFRNJ

- "Amazon Conditions of Use," *Amazon*, https://www.amazon.com/gp/help/customer/display.html%3FnodeId%3DGLSBYFE9MGKKQXXM

- "Amazon Echo Dot (3rd Gen) Smart Speaker with Alexa - Charcoal (2 Pack)," *Walmart*, https://www.walmart.ca/en/ip/Amazon-Echo-Dot-3rd-Gen-Smart-speaker-with-Alexa-Charcoal-2-Pack/PRD69N7RQYZSU95

- "Amazon Echo Dot (5th Gen, 2022 Release) | With Bigger Vibrant Sound, Helpful Routines and Alexa | Charcoal," *Amazon*, https://www.amazon.com/All-New-release-Smart-speaker-Charcoal/dp/B09B8V1LZ3/ref=s9_acsd_al_ot_c2_x_3_t

- "Community Guidelines," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=GLHXEX85MENUE4XF

- "Cost Pass-Through: Theory, Measurement, and Potential Policy Implications: A Report Prepared for the Office of Fair Trading," *RBB Economics*, February 2014, https://assets.publishing.service.gov.uk/media/5a74a3a940f0b619c86593b8/Cost_Pass-Through_Report.pdf

- "Customer Privacy Notice," *Tesla*, https://www.tesla.com/legal/privacy

- "Dialog Interface Reference," *Amazon Alexa*, https://developer.amazon.com/en-US/docs/alexa/custom-skills/dialog-interface-reference.html

- "Follow the Journey of a Voice Request," *Amazon*, https://www.amazon.com/b/?node=23608618011

- "How Alexa Works: Wake Word," *Amazon*, https://www.amazon.com/b/?node=23608571011

- "How to Describe Alexa: Connected Devices, Services, and Features," *Amazon Alexa*, https://developer.amazon.com/en-US/alexa/branding/alexa-guidelines/communication-guidelines/how-describe-amazon-echo-and-alexa

# Appendix C

- "Is Low Latency the Holy Grail to Fantastic User Experience?" *Excentis*, https://www.excentis.com/blog/is-low-latency-the-holy-grail-to-fantastic-user-experience/

- "Learn More About Alexa on Your Samsung Fridge," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=24783556011

- "Learn to Use Alexa with Fire TV," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=202104940

- "More Than 82 Million People Visited The Washington Post in April," *The Washington Post*, May 15, 2019, https://www.washingtonpost.com/pr/2019/05/15/more-than-million-people-visited-washington-post-site-april/

- "Multi-Room Music and Alexa Home Theater," *Amazon*, https://www.amazon.com/alexa-multi-room-audio/b?ie=UTF8&node=21480962011&ref=pe_alxhub_aucc_en_us_IC_HP_15_HUB_MRM

- "Personalize Your Alexa Privacy Settings," *Amazon*, https://www.amazon.com/b?ie=UTF8&node=23608614011

- "Privacy Policy," *OpenAI*, November 14, 2023, https://openai.com/policies/row-privacy-policy

- "Research Incentives 101: Setting Appropriate Compensation," *Virtual Incentives*, November 15, 2023, https://www.virtualincentives.com/research-incentives-101-setting-appropriate-compensation-2/

- "Request Your Personal Information," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=TP1zlemejtTn6pwYKS

- "Review Your Alexa Voice History," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=GHXNJNLTRWCTBBGW

- "Top Customer Questions," *Amazon*, https://www.amazon.com/b/?node=23608568011&ref=MARS_NAV_desktop_privacy_Learn_more

- "Traffic," *Amazon*, https://www.amazon.com/Amazon-Traffic/dp/B071VM1RMH, accessed September 15, 2024

- "Turn on Do Not Send Voice Recordings," *Amazon*, https://www.amazon.com/gp/help/customer/display.html?ref_=hp_left_v4_sib&nodeId=GQXLLWHBCVL6L5QD

# Appendix C

- "Understanding Latency and its Impact on the User Experience," *DataBank*, July 5, 2024, https://www.databank.com/resources/blogs/understanding-latency-and-its-impact-on-the-user-experience/

- "User-Generated Data," *Garrett Technologies*, September 25, 2023, https://www.garrett-tech.com/gt-blog/user-generated-data

- "What Do the Lights on Your Echo Device Mean?" *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=GKLDRFT7FP4FZE56

- "What is the Alexa Skills Kit?" *Amazon Alexa*, https://developer.amazon.com/en-US/docs/alexa/ask-overviews/what-is-the-alexa-skills-kit.html, September 5, 2024

- "Which Echo Device Do I Have?" *Amazon*, https://www.amazon.com/gp/help/customer/display.html?nodeId=GHRYQ6GHE4A5TUD2

- Achim Zeileis, et al., "Package 'Strucchange,'" *The Comprehensive R Archive Network*, September 2, 2024, https://cran.r-project.org/web/packages/strucchange/strucchange.pdf

- Andrei Hagiu, and Julian Wright, "When Data Creates Competitive Advantage: and When it Doesn't," *Harvard Business Review*, January–February 2020, https://hbr.org/2020/01/when-data-creates-competitive-advantage

- Anthony Cuthbertson, "Amazon Admits Employees Listen to Alexa Conversations," *The Independent*, April 11, 2019, https://www.independent.co.uk/tech/amazon-alexa-echo-listening-spy-security-a8865056.html

- Brian Heater, "Amazon is Helping to Remove False Wake Words from Alexa's Vocabulary," *TechCrunch*, May 15, 2017, https://techcrunch.com/2017/05/15/amazon-is-helping-to-remove-false-wake-words-from-alexas-vocabulary/

- Brooke Auxier, et al., "Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information," *PEW Research Center*, November 2019, https://www.pewresearch.org/internet/wp-content/uploads/sites/9/2019/11/Pew-Research-Center_PI_2019.11.15_Privacy_FINAL.pdf

- Christoph Sax, and Dirk Eddelbuettel, "Season Adjustment by X-13 ARIMA-SEATS in R," *The Comprehensive R Archive Network*, 2018, https://cran.r-project.org/web/packages/seasonal/vignettes/seas.pdf

- Christopher Mele, "Bid for Access to Amazon Echo Audio in Murder Case Raises Privacy Concerns," *The New York Times*, December 28, 2016, https://www.nytimes.com/2016/12/28/business/amazon-echo-murder-case-arkansas.html

# Appendix C

- Danny Hakim, "An Alexa Holdout Wants to Know Who's Listening?" *The New York Times*, December 8, 2017, https://www.nytimes.com/2017/12/08/business/echo-alexa-amazon.html

- George Kuhn, "How Much Should You Pay Participants in Market Research?" *Drive Research*, March 9, 2020, https://www.driveresearch.com/market-research-company-blog/how-much-should-you-pay-participants-in-market-research/

- Hayley Tsukayama, "How Closely is Amazon's Echo Listening?" *The Washington Post*, November 11, 2014, https://www.washingtonpost.com/news/the-switch/wp/2014/11/11/how-closely-is-amazons-echo-listening/

- Jason Cipriani, "How to Set Up the Amazon Dash Wand," *CNET*, June 19, 2017, https://www.cnet.com/tech/mobile/how-to-setup-the-amazon-dash-wand/

- Jay Peters, "Facebook Will Now Pay You for Your Voice Recordings," *The Verge*, February 20, 2020, https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounundciations-app

- Laura Stevens, "Amazon Alexa-Powered Device Recorded and Shared User's Conversation Without Permission," *The Wall Street Journal*, May 24, 2018, https://www.wsj.com/articles/amazon-alexa-powered-device-recorded-and-shared-users-conversation-without-permission-1527203250

- Matt Day, Giles Tuner, and Natalia Drozdiak, "Is Anyone Listening to You on Alexa? A Global Team Reviews Audio," *Bloomberg*, April 10, 2019, https://www.bloomberg.com/news/articles/2019-04-10/is-anyone-listening-to-you-on-alexa-a-global-team-reviews-audio

- Matt Day, Giles Tuner, and Natalia Drozdiak, "Thousands of Amazon Workers Listen to Alexa Users' Conversations," *Time*, April 11, 2019, https://time.com/5568815/amazon-workers-listen-to-alexa/

- Michael Liedtke, "Will the Internet Listen to Your Private Conversations?" *AP News*, July 29, 2015, https://apnews.com/general-news-191e14ac28244bab86ab849aee92407e

- Michael Williams, "Best Practices to Reduce Latency on your Smart Home Skill," *Amazon Alexa*, November 20, 2020, https://developer.amazon.com/en-US/blogs/alexa/device-makers/2020/11/Best-Practices-to-Reduce-Latency-on-your-Smart-Home-Skill

- Niraj Chokshi, "Is Alexa Listening? Amazon Echo Sent Out Recording of Couple's Conversation," *The New York Times*, May 25, 2018, https://www.nytimes.com/2018/05/25/business/amazon-alexa-conversation-shared-echo.html

# Appendix C

- Rohit Prasad, "Alexa at Five: Looking Back, Looking Forward," *Amazon Science*, November 6, 2019, https://www.amazon.science/blog/alexa-at-five-looking-back-looking-forward

- Stephanie Clifford, "Web Start-Ups Offer Bargains for Users' Data," *The New York Times*, May 30, 2019, https://www.nytimes.com/2010/05/31/business/media/31privacy.html/

- Steve Lohr, "You Want My Personal Data? Reward Me for it," *The New York Times*, July 17, 2010, https://www.nytimes.com/2010/07/18/business/18unboxed.html

- Tatum Hunter, "These Companies Will Pay You for Your Data. Is it a Good Deal?" *The Washington Post*, February 6, 2023, https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/

- Tom Knowles and Mark Bridge, "Amazon Listens to Conversations Through Alexa," *The Times*, April 12, 2019, https://www.thetimes.com/uk/politics/article/amazon-listens-to-conversations-through-alexa-qh328jlw0

- USA Today Network, "How to Listen to What Amazon's Alexa has Recorded in your Home," *Chicago Sun Times,* May 29, 2018, https://chicago.suntimes.com/2018/5/29/18377440/how-to-listen-to-what-amazon-s-alexa-has-recorded-in-your-home

## Other

- factiva.xlsx